UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

STEPHEN J. TOPALIAN,                                    Civ. Act. No.: 10-cv-1965 (KAM) (VVP)

                        Plaintiff,

        -against-                                       **DEFENDANT'S COUNTER
                                                        STATEMENT TO PLAINTIFF'S**
HARTFORD LIFE INSURANCE COMPANY,                        **RULE 56.1 STATEMENT**

                        Defendant.                      DOCUMENT
--------------------------------------------------------X        ELECTRONICALLY FILED

        Pursuant to Rule 56.1 of the Local Civil Rules For The Southern And Eastern Districts of New

York, Defendant HARTFORD LIFE INSURANCE COMPANY ("Hartford"), by and through its

attorneys, Sedgwick LLP, submits this Counter Statement to Plaintiff's Rule 56.1 Statement dated

February 29, 2012, as follows:

<u>**PRELIMINARY STATEMENT**</u>

        Hartford states that it has filed its Rule 56.1 Statement of Material Facts dated February 29,

2012, in support of its own motion for summary judgment.  Rather than restating those statements

herein, Hartford respectfully refers this Court to Defendant's Rule 56.1 Statement for supplemental

facts asserted in opposition to Plaintiff's motion.

<u>**PRELIMINARY OBJECTIONS**</u>

        1.      Hartford objects to each and every statement to the extent that Plaintiff has failed to

include citations to record evidence that would be admissible as set forth in Rule 56(e), FED. R. CIV.

PROC.

        2.      Hartford objects to each and every statement that references evidence that was not

identified in Plaintiff's Rule 26(a) Disclosure, or otherwise, produced in discovery.

3.      Hartford objects to each and every statement to the extent that it references hearsay evidence not attached to a sworn declaration or affidavit made on personal knowledge.

4.      Hartford objects to each and every statement to the extent it relies on information or evidence outside the administrative record to prove Plaintiff's alleged entitlement to benefits.

5.      Hartford objects to each and every statement to the extent that it treats issues of law as issues of fact.

6.      Hartford objects to each and every statement to the extent that it references "facts" that are not material to the pending motion for summary judgment.

7.      Hartford objects to each and every statement to the extent it is not a short and concise statement.

## RESPONSES

1.      Admits.  (383).  (The numbers in parentheses refer to the Bates Stamped pages starting with the prefix "TOPALIAN 000__," which are annexed to the Declaration of Genie M. Guthrie, dated February 22, 2012 ("Guthrie Dec."), as Exhibits "A" through "B").

2.      Admits.  (1691).

3.      Admits.  (154).

4.      Admits.  (154).

5.      Denies, except admits that at some point after graduating from SUNY Farmingdale, Topalian attended Vale Tech.  (936).

6.      Admits.  (936).

7.      Admits.  (936).

8.      Admits.  (936).

9.      Objects on the grounds that this statement fails to cite to any admissible evidence. Subject to and without waiving the foregoing, Hartford denies the statement except admits that Topalian worked for Allstate, or its subsidiaries, from 1989 through approximately 2005.  (155, 936).

10.     Admits.  (163).

11.     Admits.  (163).

12.     Admits.  (163).

13.     Admits.  (163).

14.     Admits.  (1802-03).

15.     Admits.  (828).

16.     Denies, except admits that Topalian's position required eight hours of sitting and/or two hours of standing, with one hour of walking and five hours of driving.  The position required frequent bending/stooping and occasional lifting of up to ten pounds.  He would engage in "fine manipulation or computer use" for 34-75% of the day, "Data entry with keyboarding" for 34-75% of the day, "10 key pad" for 1-33% of the day, and "use the mouse" for 34-75% of the day.  (828-829). Further, it was noted that the company purchased a special chair to accommodate Topalian, and that he was a "remote worker" who worked out of his home.  (828-829).

17.     Denies, except admits that Rebecca Abel at Allstate indicated "that Steve's job varies greatly from day to day.  One day he could be at his desk sitting and on his computer, or in the field all day reinspecting autos."  (829).

18.     Denies, except admits that on March 1, 2009, Topalian stated in his Certification that, "Prior to the onset of the first symptoms, I lived a physically active life.  I used to enjoy bowling, trap & skeet shooting, golf, model building, and taking walks on the beach near my old home.  I also believed it was essential to exercise regularly in order to live a long life."  (1803).

19.     Denies, except admits that Topalian correctly quotes from his Certification, dated March 1, 2009.  (1803-05).

20.     Denies, except admits that Topalian correctly quotes from a letter dated July 28, 2004 from Jeanne Green, M.D., Topalian's family physician, to Hartford.  (779-80).

21.     Denies, except admits that Topalian correctly quotes from his March 2, 2009 appeal letter.  (1691).

22.     Admits.  (839-840).

23.     Admits.  (839, 923).

24.     Denies, except admits that on February 9, 2004, Topalian's claim for short-term disability ("STD") benefits was commenced by an intake interview with Rebecca Abel at Allstate, who advised that Topalian's last date of work was January 30, 2004 and that his date of disability was February 4, 2004.  (1966).

25.     Denies, except admits that on February 27, 2004, Topalian's claim for STD benefits was approved until March 12, 2004.  (909).

26.     Admits. (911).

27.     Admits.  (914-15).

28.     Admits.  (915).

29.     Denies, except admits that on May 10, 2004, Hartford noted that Topalian "went in to hx for congestive heart failure and when he went in his [blood pressure] was 230/128 ee is dizzy they think its from his [blood pressure]. asked his [return to work] plan? dr stated ee is at least a month away from that. ee wants to go back to work."  (916).

30.     Admits.  (917).

31.     Admits.  (919).

32.     Denies, except admits that as a result of his employment with Allstate, Topalian was eligible to participate and did enroll in Allstate's long-term disability ("LTD") benefits plan, called the Group Long Term Disability Plan for Employees of Allstate Insurance Company (the "Plan"), No. GLT-673454, effective January 1, 2000 (the "Plan"). (1).

33.     Denies, except admits that Hartford issued a group policy of insurance to fund the Plan benefits and administered claims for Plan benefits. (15-16).

34.     Admits. (28).

35.     Admits. (32).

36.     Admits. (28).

37.     Denies, but admits that by July 7, 2004, Hartford was in contact with Topalian concerning completing paperwork for his claim for LTD benefits and that on that date Topalian contacted Hartford and stated that he "fell over the other day because he got so dizzy & he said that the ENT told him it was not vertigo. He said his blood pressure is still high." (920).

38.     Denies, but admits that on August 11, 2004, Topalian's claim was approved through August 3, 2004. Hartford noted Topalian's medical conditions, including morbid obesity, obstructive sleep apnea, dizziness and overwhelming fatigue. Hartford further noted that. "The dr indicates that ee is unable to work due to dizziness and overwhelming fatigue." (1952). Hartford then emailed human resources and the employer in this regard. (1952).

39.     Denies, but admits that Topalian correctly quotes from Hartford's summary detail report concerning its telephone conference interview with Topalian on September 10, 2004. (923).

40.     Admits. (924).

41.     Admits. (926).

42.     Denies, but admits that on September 24, 2004, John Sherlock from Allstate emailed Hartford Examiner Dan Rose advising that Topalian's annual salary as of October 2003 was $69,312,

and requested that Topalian's LTD payments be updated accordingly because the information that Hartford had originally received from Allstate was incorrect. (765, 926).

43.     Admits. (927).

44.     Admits. (28).

45.     Admits. (932).

46.     Admits. (933).

47.     Admits. (934).

48.     Admits. (936-937).

49.     Denies, but admits that on March 16, 2006 Hartford noted that it received medical records from urologist Dr. Zito. (937). These records included a July 29, 2004 CT scan report of Topalian's abdomen. (659, 937). It was noted that the study was limited due to Topalian's large size. (659, 937). The final impression was: "There is very minimal right hydronephrosis and minimal right mid peri-uteral stranding. There is a 2.0 mm right renal calculus posteriorly and questionable tiny right mid uteral calculi. These findings can be seen in a recently passed stone. Tiny left renal calculus. Cholelithiases." (659, 937). Dr. Zito's records also included a July 29, 2004 CT scan of Topalian's pelvis. (660, 937). The results stated: "As described in CT scan of the abdomen report, there is minimal right mid peri-ureteral stranding with associated tiny calculi with tiny right mid ureteral calculi. There is no evidence of hydroureter. There is no evidence of definite bladder calculus. The visualized bowel is unremarkable with no evidence of obstruction. There is no evidence of free fluid or adenopathy." (661).

50.     Denies, but admits that on March 27, 2006, Hartford noted that Topalian weighed 413 pounds and stated that he wanted to undergo gastric banding surgery. (939). Also on this date Topalian informed Hartford that he had been awarded Social Security Disability and Hartford requested that Topalian forward the Notice of Award once he received it. (939).

51.     Admits. (941).

52.    Admits.  (632).

53.    Denies, except admits that on April 24, 2006, Hartford noted that it would close its handling with respect to Topalian's claim for Social Security Disability Income ("SSDI") since Topalian had now received an award of SSDI with Hartford's help.  (943).  Hartford then proceeded to calculate past due benefits, and subtracted the amount owed to Topalian's Social Security attorney.  (943).

54.    Admits.  (942).

55.    Admits.  (943).

56.    Denies, but admits that on June 23, 2006, Hartford received medical records from Dr. Schiller.  (949).  Dr. Schiller's April 10, 2006 notes reflected that Topalian was seen for an ulcer on his right leg that was present for one month.  His right calf ulcer medial was well circumscribed and superficial, and associated with past drainage.  Topalian's past treatment was noted to include minimal local care and jost stockings.  It was noted that

> [Topalian was] seen for ulcer on [right] leg present 1 mth. [Right] calf ulcer medial well circumscribed and superficial, associated with drainage in the past. Past [treatment] included minimal local care and Jost stockings, States he has an [history of] venous insufficiency and [chronic heart failure]. [Physical Examination:] Denies back pain, bone pain, joint pain. [Range of motions] all normal. Lt LE: darkened area of discoloration on calf ad shin and venous stasis. Gait normal and able to stand [without] difficulty. Assesment: ulcer of calf, venous insufficiency, obesity, systolic heart failure chronic.

(949).  Furthermore, Hartford also received Dr. Schiller's notes from approximately one month later, dated May 4, 2006.  These noted explained that:

> [Topalian] has [a history of] lumbar region pain begining [sic] 2 [months] ago. Pain moderate and radiates into both buttocks. Bending, lifting, prolonged standing, sitting, walking aggrevate. [Change] of position and lying help alleviate. Pain does not wake him from sleep and is better in the morning. No [additional] complaints. Current [Weight] 409. [Range of motion] C spine within normal [limits]. Heart regular rate and rhythym, no edema. Spine: para spinal muscle tenderness L region L4-L5. Rt/LT [lower extremities]: no joint limb tenderness, no edema, joint stability within normal [limits], [Range of Motion] normal. Motor Exam: RLE/LLE strength normal, motor function tone normal, no

> atrophy. Reflexes: 2+ bilaterally, sensation intact. Assesment: Lumbago, muscle spasms, obesity, essential htn benign. Instructions: avoid heavy lifting, local heat, exercise.

(949).

57.    Denies, except admits that effective June 24, 2006, "disability" under the Plan would be defined by the Plan as being "prevented from performing one or more Essential Duties of Any Occupation." (711).

58.    Admits. (951).

59.    Denies, except admits that on August 31, 2006, Hartford Nurse Amanda P. Ferrill reviewed all of Topalian's medical records and concluded that he was still disabled due to symptoms of his pulmonary hypertension, left ventricular hypertrophy, and bilateral venous insufficiency/edema and noted that without weight loss his condition would not improve.  (1910-12).

60.    Denies, except admits that on August 31, 2006, Hartford Nurse Amanda P. Ferrill noted that:

> Mr. Topalian also has bilateral venous insufficiency. He has documented venous stasis and it appears that he does get periodic ulcers on his lower extremities. Mr. Topalian also has peripheral edema. This will impede Mr. Topalian's ability to sit for extended durations. Mr. Topalian would most likely need to elevate his lower extremities throughout the day. Sitting for extended durations would cause Mr. Topalian's edema to worsen. It could also potentially worsen his venous stasis.

(954).

61.    Denies, except admits that, based on Topalian's circumstances at the time, Hartford nurse Ferrill stated on August 31, 2006:

> Although the current R/L(s) are slightly restrictive clarifying them will not impact this claim. MCCM opines that Mr. Topalian is unable to perform sustained work activities in an ordinary work setting on a regular and continuing basis.

> P: Return claim to CE. MCCM would suggest that CE follow up with medical on a yearly basis and note any significant weight changes. It should be noted that without significant weight loss Mr. Topalian's health will not improve.

(954).

62.     Denies, except admits that on September 8, 2006, Hartford Ability Analyst Jamie L. Lindvall recommended that Topalian's claim for LTD benefits be approved under the test change to "any occupation" definition of disability. (955). Ms. Lindvall indicated that she was "[r]ecoding to more than 48 mths," and also stated that Topalian's condition was unlikely to change unless he were to undergo significant weight loss. (955).

63.     Denies, except admits that on September 8, 2006, Ability Analyst Jamie L. Lindvall recommended that Topalian's claim for LTD benefits be approved under the Plan's "any occupation" disability definition (1909-10), and by letter dated September 11, 2006, she advised Topalian that his claim for continuing LTD benefits under the "any occupation" standard, which took effect on June 24, 2006, had been approved. (438).

64.     Denies, except admits that after Hartford had granted Topalian's claim for continuing LTD benefits through the test change and continued to receive and review Topalian's updated medical records, on March 27, 2007, Hartford Examiner Brian t. Mathews indicated that Topalian's "[c]laim proactively reviewed by SIU but was not accepted for investigation at this time." (957).

65.     Denies, except admits that Topalian's file was assigned to LTD Claim Specialist Debbie Staz on August 13, 2007. (959).

66.     Objects on the grounds that this statement is based on evidence outside of the administrative record to prove plaintiff's alleged entitlement to benefits. Subject to and without waiving the foregoing objection, Hartford denies the statement, except admits that Ms. Staz previously scheduled surveillance with vendors while she worked as a Special Investigative Analyst. (Affidavit of Michael Quiat, dated February 29, 2012 ("Quiat Aff."), Ex. "B", 14:19-15:3)

67.     Objects on the grounds that this statement is based on evidence outside of the administrative record to prove plaintiff's alleged entitlement to benefits. Subject to and without waiving the foregoing objection, Hartford denies the statement.

68.     Denies, except admits that on September 6, 2007, Hartford noted that Topalian stated during a telephone call that after his upcoming colonoscopy he was planning to undergo a weight loss surgery, although appointments were already being booked through October and he had to undergo a psychiatric evaluation prior to banding surgery.  (960).

69.     Admits.  (961).

70.     Admits.  (961).

71.     Admits.  (964).

72.     Denies, except admits that on November 1, 2007, Ms. Staz noted that based on the information provided by Allstate, Topalian's claim had been overpaid since August 1, 2004, and that she would submit a recommendation to waive the overpayment and issue the correct amount effective November 1, 2007.  (964).

73.     Denies, except admits that on November 2, 2007, Hartford Examiner Nancy Hyndman noted that comments from Allstate had confirmed Topalian's salary at the higher rate.  (964).

74.     Admits.  (1490).

75.     Denies, except admits that on February 13, 2008, Ms. Staz received Topalian's completed Claimant Questionnaire and Work and Education History form, dated January 30, 2008, and explained that "Mr. Topalian notes that he has moderate to severe swelling of his lower extremities as well as tingling and numbness. The tingling and numbness also affects his fingers but less often than his legs. Shortness of breath can occur when walking, laying down, going up and down stairs, etc. He notes he has back and neck pain due to all of the falling due to dizziness over the past several years. He experiences dizziness whenever he bends down. He notes he had gastric banding surgery on 11/13/2007." (969).  Further, attached to Topalian's Questionnaire was a June 30, 2007 MRI Report of his lumbar spine that found "Multilevel lumbar degenerative disc and facet disease with significant central stenosis at L3-L4 and mild stenosis at L4-L5." (969).  Hartford also received on February 13,

2008, an APS completed by Dr. Schiller and dated January 10, 2008, which indicated an improvement in Topalian's restrictions and limitations and stated that Topalian was capable of participating in vocational rehabilitation services. (389- 90; 1895).

76.     Admits. (970).

77.     Denies, except admits that on March 14, 2008, Hartford received medical records from Dr. Collin Brathwaite regarding Topalian's gastric banding procedure.  These records included the operation report concerning Topalian's November 13, 2007 gastric banding surgery, as well Dr. Brathwaite's post operative office visit notes dated December 21, 2007 and February 19, 2008 and body composition analyses.  (1893; 236-56; 1452-55; 971).  According to Dr. Brathwaite's records, Topalian presented in December 2007 without any complaints and reported walking 30 minutes a day. (244).  He denied abdominal pain or discomfort and denied any signs or symptoms of infection of surgical wounds. (244).  Further, Topalian's pre-gastric banding surgery weight was noted as 404 pounds, while his post gastric banding surgery weight was noted as 378 pounds. (971).

78.     Denies, except admits that on March 16, 2008, Ms. Staz noted that she would continue to follow up with Topalian concerning his HIPAA authorization form for the cardiologist's medical records and that she would call Topalian to determine his current physicians and status.  (972).

79.     Admits. (973).

80.     Denies, except admits that on April 15, 2008, Ms. Staz was following up on the most current medical records from Dr. Schiller and Dr. Muhlard and stated that once the records would be received, she planned to send a letter to all current physicians to ask if Topalian is capable of performing a sedentary/light occupation.  (974-975).

81.     Admits. (975).

82.     Admits. (975).

11

83.     Denies, except admits that on April 28, 2008, Ms. Staz wrote to Dr. Brathwaite asking him if Topalian was capable of performing full-time sedentary or light-duty work, as defined by the U.S. Department of Labor, due to his lap band surgery, and provided him with an opportunity to explain, if appropriate, that Topalian was not fit for this position and to back up this conclusion with medical evidence.   (149-150).

84.     Denies, except admits that on April 28, 2008, Ms. Staz wrote to Dr. Schiller asking him if Topalian was capable of performing full-time sedentary or light-duty work, as defined by the U.S. Department of Labor, "due to his knee pain and low back pain," and provided him with an opportunity to explain, if appropriate, that Topalian was not fit for this position and to back up this conclusion with medical evidence. (147).

85.     Admits.  (975).

86.     Objects on the grounds that this statement fails to cite to any admissible evidence. Subject to and without waiving the foregoing objection, Hartford denies the statement.

87.     Denies, except admits that on May 7, 2008, Ms. Staz referred Topalian's file for an Employability Analysis to be conducted, and on May 27, 2008, Marvin Bryant, MS, CRC completed the analysis. (122-23, 144-5).

88.     Denies, except admits that on May 13, 2008 Topalian called Ms. Staz and stated that he lost thirty-nine pounds since the gastric banding surgery and had no other complaints other than knee and back pain.  (977).

89.     Admits. (978).

90.     Denies, except admits that on May 29, 2008, Ms. Staz reviewed the documentation submitted in support of Topalian's continuing LTD benefit claim, found that "[b]ased on the documentation in the claim file Mr. Topalian has the ability to perform a sedentary occupation," and recommended that benefits be terminated. (1881-85).

91.     Denies, except admits that on June 6, 2008, Team Leader G. Sharmaine McNeil put the termination on hold, stating that Hartford needed to contact Topalian's other providers for his last office visits "to ascertain if there has been recent [treatment] for other conditions which might impact the claimant's functionality." (1884).

92.     Denies, except admits that on June 6, 2008, Hartford requested updated medical records from Dr. Sauter, Dr. Raciti, Dr. Boglia, Dr. Zito, Dr. Capustin, and Dr. Van Essendelft.  Hartford also noted on June 6, 2008 that it had recently received updated clinical data from Dr. Schiller, Dr. Grella, Dr. Franco and Dr. Brathwaite.  (983-984).

93.     Denies, except admits that two weeks after Ms. Staz had recommended termination, and was waiting for further records which would either confirm or deny her recommendation, Ms. Staz stated that she "[w]ill continue to wait until we receive the [medical records] from Dr. Raciti/Dr. Boglia's before referring for termination."  (986).

94.     Denies, except admits that on July 23, 2008, Hartford wrote to Dr. Boglia stating: "After a thorough review of the medical records, it appears Mr. Topalian has the functional capacity to perform at a light to sedentary occupation," and requesting that Dr. Boglia review the definition of light-duty and sedentary work as defined by the U.S. Department of Labor and advise whether Topalian was capable of performing such work in light of hypertension and trace edema.  (2018-19, 53-56).

95.     Denies, except admits that Dr. Boglia responded on July 28, 2008, advising that Topalian was capable of performing full-time light duty work based on the definition provided.  (47-49).

96.     Denies, except admits that, without any specific examples, Topalian claimed that Dr. Boglia signed correspondence from Hartford "because Hartford continued to hound" him.  (1680).

97.     Denies, except admits that by letter dated July 30, 2008, Ms. Staz advised Topalian of Hartford's decision to terminate his LTD benefits based on its finding that he no longer met the policy's definition of disabled.  (42-46).  Ms. Staz provided an in-depth review of the medical documentation,

and advised that: "The weight of the evidence including the medical records and the agreement of the physicians noted above supports that you have, at a minimum, the functional capacity for sedentary work eight hours a day, five days a week." (45).

98.    Admits. (1688-89).

99.    Denies, except admits that Exhibits D and E to Topalian's appeal letter consisted of a list of the medications taken by Topalian, as well as the side-effects he claims to experience as a result and the conditions for which they were prescribed and of printouts from PDRhealth.com providing information on the following medications: (1) Aggrenox; (2) Zyloprim; (3) Ambien CR; (4) Prevpac; (5) Avandamet; (6) Avapro; (7) Zmax; (8) Loratadine/Pseudoephedrine; (9) Effexor; (10) Vaseretic; (11) Flexeril; (12) Lasix; (13) Imdur; (14) Potassium supplement; (15) Lexapro; (16) Topical Anesthetic; (17) Lipitor; (18) Norvasc; (19) OxyContin; and (20) Starlix. (1717–1800).

100.   Admits. (1804-1807).

101.   Denies, except admits that Exhibit "B" to the appeal letter was a letter dated February 17, 2009 from Attorney Quiat to Dr. Brathwaite, on which Dr. Brathwaite checked "yes" next to the following two statements: (1) "The materials set forth in this letter and the accompanying schedule would materially affect my opinion as to Mr. Topalian's disability status," and (2) "In view of the information provided as to Mr. Topalian's multiple medical conditions and medication, I wish to retract my opinion as expressed in my May 2, 2008 correspondence to Hartford." (1706-09).

102.   Denies, except admits that Exhibit A to his appeal letter consisted of a letter dated February 17, 2009 from Attorney Quiat to Dr. Schiller that was identical to his February 17, 2009 letter to Dr. Brathwaite and Dr. Schiller also checked "yes" next to the statements, retracting his opinion in his May 26, 2008 correspondence to Hartford. (1705).

103.   Denies, except admits that by letter dated March 27, 2009, Attorney Quiat's office submitted to Hartford a letter dated March 26, 2009 which had been sent to and then signed by Dr.

Boglia and purported to summarize a conversation that Attorney Quiat had with Dr. Boglia. (1679-81). Topalian correctly quoted from the March 26, 2009 letter. (1680-81).

104.    By letter dated March 27, 2009, Hartford advised Attorney Quiat that it received the March 27, 2009 letter containing Dr. Boglia's responses to his questions and stated that it would make a benefit determination in 45 days. (1028).

105.    Denies, except admits that on April 22, 2009, Ms. Guthrie reviewed the documentation submitted on administrative appeal and noted that: "Based on the appointment calendar provided by claimant, [he] had additional office visits beyond the date of the [last office visit] we have on file, but before or around the time of claim termination on 7/31/08, with Drs. Schiller, Brathwaite, Schirripa, Muhlrad, Franko, Zito & Boglia, as well as [a visit] with a Dr. Connors and a Dr. Hludzinsk not previously referenced in the claim file." (995-96).

106.    Denies, except admits that on July 20, 2009, Dr. Schiller wrote to John C. Walters, Hartford's President & Chief Operating Officer, stating that the purpose of the letter "is to advise you that Mr. Topalian is unable to work because of his chronic medical conditions, and, for this reason, his disability benefits should be reinstated immediately." (1176).

107.    Objects on the grounds that this statement fails to cite to any admissible evidence. Subject to and without waiving the foregoing objection, Hartford denies the statement, except admits that by letter dated May 4, 2009, Ms. Guthrie advised Topalian that Hartford would be taking a 45-day extension to make a decision on his administrative appeal because it had not yet received the medical records necessary to render a determination. (1026).

108.    Objects on the grounds that this statement fails to cite to any admissible evidence. Subject to and without waiving the foregoing objection, Hartford denies the statement.

109.    Denies, except admits that on August 5, 2009, Ms. Guthrie wrote to Attorney Quiat advising that on August 3, 2009 it received Dr. Muhlrad's 2007 medical records and that "[t]his

information completes the appeal to Mr. Topalian's claim for Long Term Disability benefits." (1020).

Ms. Guthrie advised that a decision would be made within 45 days of August 3, 2009, unless an

additional 45-day extension was necessary.  (1020). On August 6, 2009, Ms. Guthrie referred Topalian's

claim for two co-morbid independent medical record peer reviews to be conducted - one by an internist

and one by a specialist in occupational medicine - to assist in Hartford's evaluation of Topalian's medical

records. (1165-66).

110.    Denies, except admits that  on August 13, 2009, Attorney Quiat wrote to Ms. Guthrie,

stating that he disagrees with her "interpretation of the time requirements established under ERISA,"

and arguing that under 29 C.F.R. § 2560.503-1 *et seq.,* Hartford must make its appeal decision 45 days

from the submission of the appeal, with the option of a 45-day extension for cause. (1133-34).

111.    Admits.  (1003).

112.    Denies, except admits that on August 24, 2009, Gary Nudell, M.D., board certified in

internal medicine, submitted his independent medical record peer review to Hartford. (1113-23).  Dr.

Nudell's report provided a detailed list of the documentation reviewed and relied upon in reaching his

medical conclusions. (1113-21).  Based on the medical information before him, Dr. Nudell summarized

Topalian's medical condition by stating:

> The claimant has multiple medical conditions for which he is currently being treated.
> ➤ Diabetes - the claimant is currently on oral medication for diabetes, and there is no
>    documented evidence in the records that the claimant's diabetes is causing any restrictions.
>
> ➤ Hypertension - being treated medically, and no mention of any end organ damage, thus
>    should not pose any work restrictions.
>
> ➤ OSA - reportedly being treated with CPAP. Should not pose any work restrictions, and I see
>    no mention in the records that the claimant is experiencing any severe daytime fatigue or
>    issues with the CPAP itself.
>
> ➤ CAD - the medical records from the treating cardiologists have stated that the claimant has
>    non-obstructive disease. I do not see any mention of CHF (congested heart failure) by the
>    cardiologists, and no mention of any specific limitations from a cardiac standpoint.

➢ Venous stasis - has previously been treated for a cellulitis of the lower extremity in 2007. While the records do indicate that the claimant has lower extremity edema on examination, there has been no mention of any skin breakdown or infection since 2007. The claimant is at risk for possibly recurrent skin breakdown, and this clearly needs to be monitored closely by the treating physicians. While it would be clinically helpful for the claimant to keep his lower extremities elevated when able, I do not see any recent evidence that this condition would prevent the claimant from functioning in a sedentary position.

➢ Lumbar degenerative disc disease - MRI does show evidence of disc disease and spinal stenosis. Dr. Shiller [*sic*] has not indicated any neurological dysfunction, and there has been no documented evidence of any radiculopathy. While this condition, especially when coupled with obesity, can lead to lumbar pain, I do not see compelling medical evidence that this would prevent the claimant from functioning in a full time sedentary position, as long as he was given the opportunity to shift positions as needed for pain control.

➢ Left knee derangement - currently being followed by an orthopedist. The claimant has a documented meniscal tear and OA. This would limit the claimant's ability to ambulate for prolonged periods, but should not affect his ability to perform in a sedentary position.\

(1113-22). Dr. Nudell concluded:

> Based on the review above, I would opine that the claimant should be capable of functioning in a full time sedentary position. The claimant should be afforded the opportunity to shift positions as needed for pain control; when able he should try to raise his lower extremities to avoid further swelling; should limit ambulation to less than 10 minutes at a time. I see no specific indication to restrict the claimant's fine motor activity with the upper extremities. I would recommend limiting his lifting to less than 10 pounds secondary to his chronic degenerative disc disease.

(1123).

113.     Denies, except admits that on August 24, 2009, Russell Green, M.S., M.D., C.I.M.E submitted his independent medical record peer review report and reviewed the medical documentation submitted regarding Topalian's condition. (1123-1128). Dr. Green then stated the following:

➢ Hypertension: There is no anticipated functional impact of hypertension on this claimant. None of the blood pressures recorded in the documents would be impairing or disqualifying.

➢ Obstructive Sleep Apnea: Given that the claimant is appropriately titrated on CPAP, the obstructive sleep apnea should have no functional impact on his ability to be well and do his normal tasks.

➢ Multiple Medications: The physician who seems to know the claimant is Dr. Kevin Schiller. He reports on 04/24/2009, that the claimant is not having any problems with his medications. The reviewer, therefore, must be persuaded by Dr. Schiller's remarks as he has known the claimant for some time and seems to have a comprehensive grasp on the variety of medical problems the claimant is dealing with.

➢ Diabetes Mellitus: Although the claimant's blood sugars could be better than they are, neither taking the Starlix and the Avandamet nor the level of the blood sugars available for review should functionally impact the claimant. These blood sugars and the medicines prescribed to help control them should not have a negative impact on the claimant's ability to perform his daily tasks and to work if he were working.

➢ Knee Pain: It is possible that the fall in 01/2007 and the injury to the claimant's right knee in 2008 could result in difficulty performing activities of daily living and make it somewhat difficult for the claimant to get around if there were no other medical issues. Having said that, the magnetic resonance imaging findings are not so severe that one would expect the claimant to have to significantly change his activities of daily living or contemplate a different type of work than he had been working in.

➢ Back Pain: While there is little doubt that the claimant is experiencing low back pain, it is of a degenerative nature and not peculiar to an individual of his age irrespective of occupational demands or the impact of morbid obesity on the axial spine.

➢ Morbid Obesity: In and of itself, morbid obesity is associated with an obesity related cardiomyopathy which the heart catheterization in 01/2007 demonstrated. In addition, the heart cath shows a degree of pulmonary hypertension which is consistent with the morbid obesity. The peripheral swelling and the venous stasis problems that the claimant struggles with are in no doubt related to the extra weight that he is carrying. It is not surprising that he has evolved venous stasis, cellulitis, and varicose ulcers as a result of his weight.

➢ Social and Marital Disruption: It would not be surprising to see that the claimant would have some personal social issues evolve from not working and dealing with his multiple health concerns.

(1126).   Dr. Green further stated: "Taken individually, no one of these diagnoses should have a significant functional impact on day to day activities experienced by the claimant apart from the morbid obesity and its associated conditions. Taken as a collection of conditions, it is my opinion that his functional capacity is impaired," but that he is still capable of performing a sedentary occupation. (1127). With respect to his recommended occupational restrictions and limitations, he advised that Topalian "should be allowed to be up and about to reduce the risks of lower extremity swelling, and most sedentary positions would allow for this." (1127).  He further noted that "[t]he claimant must be very

strong in order to raise himself up and move himself about. It is therefore my recommendation that he is able to lift, carry, push, or pull 10 lbs. on an occasional (activity or condition exists up to 1/3 of the time) basis." (1127).  He advised that while there were no restrictions on bending, writing, or using a phone, Topalian would be restricted from squatting, kneeling, lifting greater than ten pounds overhead, and walking more than 100 feet without being permitted to rest.  (1127).  Dr. Green noted that these restrictions "would allow working on a computer, performing paperwork tasks, using the telephone, and interacting with others in an office setting."  Given the foregoing, Dr. Green stated:  "It would be my opinion that the claimant would be able to work eight hours per day, 40 hours per week." (1127).  Dr. Green explained that:

> The logic behind this conclusion is that the duties involved with sedentary work and those that the Claimant is currently performing at home are very similar. A sedentary position does not require significant ambulation or mobility. A sedentary position does not require a great deal of lifting or exertion. The activities that the claimant describes at home are very much like those required of a sedentary position in the workplace. There would be significant benefit to the claimant medically to return to the workplace.

(1128).

114.    Objects on the grounds that this statement fails to cite to any admissible evidence. Subject to and without waiving the foregoing objection, Hartford denies the statement, except admits that on September 1, 2009, Ms. Guthrie reviewed Topalian's claim file, including all of the documentation submitted on administrative appeal, and recommended that Hartford's initial determination to deny Topalian's claim for continuing LTD benefits be upheld and noted that, "[t[he preponderance of the evidence available to us establishes that claimant has the residual functional capacity to perform sedentary level work with flexibility of position changes." (1003-06).

115.    Denies, except admits that by letter dated September 1, 2009, Topalian was advised of Hartford's decision to uphold its original decision to deny his claim for continuing LTD benefits. (1008-15).

116.     Objects on the grounds that this statement fails to cite to any admissible evidence. Subject to and without waiving the foregoing objection, Hartford denies the statement.

117.     Denies, except admits that the documents produced by Hartford as part of the administrative record consist of the contract between Allstate and Hartford for group benefits and that the Policy includes the Certificate of Insurance and the Booklet-certificate. All of the foregoing documents are integrated with one another, and collectively form the Plan. (1-39).

118.     Denies, except admits that the documents comprising the Policy constitute the Plan since they explain what benefits are available, how they are funded, and who administers claims for Plan benefits. Thus, the Policy includes the Certificate of Insurance and the Booklet-certificate. (3, 15-39).

119.     Objects on the grounds that this statement fails to cite to any admissible evidence. Subject to and without waiving the foregoing objection, Hartford denies the statement, except admits that it produced the Plan. (12). The documents comprising the Policy includes the Certificate of Insurance and the Booklet-certificate, and constitute the Plan. (1-39).

120.     Objects on the grounds that this statement fails to cite to any admissible evidence. Subject to and without waiving the foregoing objection, Hartford denies the statement.

121.     Objects on the grounds that this statement fails to cite to any admissible evidence. Subject to and without waiving the foregoing objection, Hartford admits the statement. (14, 33).

122.     Objects on the grounds that this statement fails to cite to any admissible evidence. Subject to and without waiving the foregoing objection, Hartford denies the statement, except admits that the documents produced by Hartford as part of the administrative record consist of the contract between Allstate and Hartford for group benefits. (3, 16).

123.     Objects on the grounds that this statement fails to cite to any admissible evidence. Subject to and without waiving the foregoing objection, Hartford denies the statement, except admits

that the documents produced by Hartford as part of the administrative record consist of the contract

between Allstate and Hartford for group benefits.  (3, 16).

Dated:  New York, New York
        March 28, 2012

                                   Respectfully Submitted,

                                   s/ _____

                                 MICHAEL H. BERNSTEIN (MB 0579)
                                 JOHN T. SEYBERT (JS 5014)
                                 DANIEL M. MEIER (DM 2833)
                                 SEDGWICK, LLP
                                 125 Broad Street, 39th Floor
                                 New York, New York 10004-2400
                                 Telephone: (212) 422-0202
                                 Facsimile:  (212) 422-0925
                                 (SDMA File No. 02489-000081)
                                 ***Attorneys for Defendant***
                                 HARTFORD LIFE INSURANCE COMPANY

To:     Michael E. Quiat Esq.
           Uscher, Quiat, Uscher & Russo
           433 Hackensack Avenue, 2d Floor
           Hackensack NJ 07601
           Business Phone:  (201) 342-7100
           Business E-mail:  mquiat@uqur.com
           *Attorneys for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I, DANIEL M. MEIER, hereby certify and affirm that a true and correct copy of the

attached **DEFENDANT'S COUNTER STATEMENT TO PLAINTIFF'S RULE 56.1**

**STATEMENT** was served **via email and Regular Mail** on March 28, 2012, upon the following:

> Michael E. Quiat Esq.
> Uscher, Quiat, Uscher & Russo
> 433 Hackensack Avenue, 2d Floor
> Hackensack NJ 07601
> Business Phone: (201) 342-7100
> Business E-mail: mquiat@uqur.com

Dated: New York, New York
March 28, 2011

> s/ _____
>        DANIEL M. MEIER (DM 2833)