UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------X
STEPHEN J. TOPALIAN,

                Plaintiff,

-against-

HARTFORD LIFE INSURANCE
COMPANY,

                Defendant.
------------------------------X

**MEMORANDUM & ORDER**

10-CV-1965

**MATSUMOTO, United States District Judge:**

On April 30, 2010, plaintiff Stephen J. Topalian
("plaintiff" or "Topalian"), a former employee of Allstate
Insurance Company ("Allstate"), commenced this action against
Hartford Life Insurance Company ("defendant" or "Hartford"),
pursuant to § 502 of the Employee Retirement Income Security Act
of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), challenging
Hartford's termination of his long term disability ("LTD")
benefits under the Group Long Term Disability Income Plan for
Allstate Employees (the "Plan"). (*See* ECF No. 1, Complaint dated
4/27/10 ("Compl.").)  Plaintiff seeks reversal of Hartford's
decision to terminate his LTD benefits, unpaid LTD benefits
retroactive to July 30, 2008, interest on those unpaid benefits,
attorneys' fees, costs, a declaration that he is totally
disabled within the meaning of the Plan, and future payment of
LTD benefits under the Plan. (*See* Compl. at 6.)

Presently before the court are the parties' fully-briefed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. (ECF No. 55, Hartford's Motion for Summary Judgment dated 4/20/12 ("Hart. Mot."); ECF No. 56, Hartford's Memorandum in Support of Summary Judgment Motion ("Hart. Mem."); ECF No. 66, Plaintiff's Memorandum in Opposition to Hart. Mot. ("Pl. Opp."); ECF No., 63, Hartford's Reply Memorandum ("Hart. Reply"); ECF No. 60, Hartford's Rule 56.1 Statement ("Hart. 56.1 Stmt."); ECF No. 66, Exh. 1, Plaintiff's 56.1 Counter-Statement ("Pl. 56.1 Resp."); ECF No. 64,[1] Exh. 1, Plaintiff's Redacted Motion for Summary Judgment dated 2/29/12 ("Pl. Mot."); ECF No. 64, Exh. 2, Plaintiff's Memorandum in Support of Summary Judgment Motion ("Pl. Mem."); ECF No. 61, Hartford's Memorandum in Opposition to Pl. Mot. ("Hart. Opp."); ECF No. 65, Plaintiff's Reply Memorandum ("Pl. Reply"); ECF No. 64, Exh. 17, Plaintiff's Rule 56.1 Statement ("Pl. 56.1 Stmt."); ECF No. 62, Hartford's 56.1 Counter-Statement ("Hart. 56.1 Resp.").)

For the reasons set forth below, Hartford's motion for summary judgment is granted, and plaintiff's cross-motion for summary judgment is denied.

---

[1] On April 24, 2012, plaintiff filed an unopposed motion to file redacted versions of his summary judgment submissions. (ECF No. 64, Plaintiff's Motion to Amend Redactions.)  Upon consent of the parties, plaintiff's motion was granted.  Additionally, by Order dated April 25, 2012, the court restricted access to the non-redacted versions of these documents. (*See* Order dated 4/25/12.)

## BACKGROUND

The following facts, taken from the parties' Rule 56.1

statements[2] and relevant portions of the expansive Administrative

Record,[3] are undisputed unless otherwise noted.  The court has

---

[2] Pursuant to Local Civil Rule 56.1(d), "[e]ach statement by the movant or opponent [of a summary judgment motion], including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  To the extent that the parties have failed to cite to admissible evidence in support of factual assertions in their respective Rule 56.1 Statements and Responses, the court has disregarded such unsupported factual assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003).

[3] The citations to the administrative record ("AR ___"), which omit any leading zeroes, correspond to the bates-stamped documents submitted by both parties in support of their respective summary judgment motions. (*See* ECF No. 58, Affidavit of Genie Guthrie ("Guthrie Aff."), Exh. A, Allstate Long Term Disability Income Plan, AR 000001-000039; Guthrie Aff., Exh. B, Hartford Claim File, AR 000040-002075; ECF No. 64, Exh. A, Topalian Administrative Record, AR 000001-002075.)  The court notes that the parties' have redacted portions of their submissions pursuant to a Stipulated Protective Order filed on March 14, 2011 and a Supplemental Protective Order dated April 16, 2012. (ECF No. 19, Stipulated Protective Order dated 3/14/11; Judge Viktor Pohorelsky's Order dated 4/5/11; ECF No. 51, Supplemental Protective Order dated 4/16/12.)  On April 14, 2013, the court, in an excess of caution, issued an unredacted Memorandum and Order under seal and instructed the parties to confer and agree upon proposed redactions of sensitive factual material from that Memorandum and Order in accordance with the terms of the Stipulated Protective Order and Supplemental Protective Order. (ECF No. 71, Sealed Memorandum and Order dated 4/14/13.)  On April 18, 2013, the parties jointly submitted proposed redactions of the court's references to Hartford's BMS Claims Manual. (ECF No. 73, Exh. 1, Proposed Redactions dated 4/18/13.)  On April 22, 2013, the court offered the parties an opportunity to submit supplemental briefing to establish the demonstrable harm that would be suffered or would likely be suffered absent the proposed redactions and to provide legal authority supporting the redaction of the court's minimal references to Hartford's claims manual. (*See* Minute Order dated 4/22/13.)  By letter brief dated April 29, 2013, Hartford argued that the court should redact all references to Hartford's claims manual because the claims manual contains confidential proprietary information, the disclosure of which would have a deleterious effect on Hartford's ability to compete in the insurance marketplace. (ECF No. 74, Hartford Letter Brief dated 4/29/13 ("Hart. Ltr. Br.") at 2.)  In its letter brief, Hartford further argued that the court should redact the quoted portions of Hartford's claims manual because the manual is subject to a stipulated confidentiality agreement between the parties. (*Id.* at 2-3.)

Upon review of the parties' proposed redactions and the relevant case law and having balanced the competing interests for and against redaction of the court's references to Hartford's claims manual, the court finds that the minimal references to and quotations of the language in

considered whether the parties have proffered admissible

evidence in support of their positions and, in evaluating each

party's respective summary judgment motion, has viewed the facts

in the light most favorable to the non-moving party. *See Spiegel*

*v. Schulmann*, 604 F.3d 72, 77, 81 (2d Cir. 2010).

Plaintiff, a morbidly obese man in his fifties during

the period relevant to this action, is a former Allstate

---

Hartford's claims manual should not be redacted from the court's Memorandum and Order. *See Pall Corp. v. 3M Purification Inc.*, 764 F. Supp. 2d 478, 479 (E.D.N.Y. 2011) ("There is a strong presumption of public access to judicial records that is based on the need for federal courts [. . .] to have a measure of accountability and for the public to have confidence in the administration of justice." (alteration in original) (internal quotation marks omitted)); *Lytle v. JPMorgan Chase*, 810 F. Supp. 2d 616, 620-21 (S.D.N.Y. 2011) ("There is a long-established common law right of public access to judicial documents . . . ." (internal quotation marks omitted)). Although the court acknowledges that Hartford's claims manual is subject to a court-ordered Stipulated Protective Order between the parties to facilitate discovery, the court is not convinced that Hartford will suffer any harm absent redaction of the minimal references to its claims manual.  Indeed, apart from speculative and generalized assertions, Hartford has failed to proffer any evidence in support of its claim that the few references to the claims manual, which are integral to the court's reasoning, will harm Hartford's proprietary interests.  Nor has Hartford demonstrated that its purported proprietary interests outweigh the public's presumptive right of access to this court's unredacted Memorandum and Order.  Finally, the court notes that at least one district court within the Second Circuit has recently quoted from Hartford's claims manual without any redaction. *See Carroll v. Hartford Life & Accident Ins. Co.*, No. 3:11-CV-1009, 2013 WL 1296487, at *23 (D. Conn. Mar. 28, 2013) (quoting language from Hartford's claims manual). In *Carroll*, as in this case, the parties jointly entered into a court-ordered confidentiality agreement, stipulating that Hartford's "Claim Product Manual" was confidential. (*See* Joint Motion for Protective Order, *Carroll v. Hartford Life & Accident Ins. Co.*, No. 3:11-CV-1009 (D. Conn. Mar. 14, 2012); Order Granting Joint Motion for Protective Order, *Carroll v. Hartford Life & Accident Ins. Co.*, No. 3:11-CV-1009 (D. Conn. Mar. 16, 2012).)  Despite this court-ordered stipulation, the court in *Carroll* quoted directly from Hartford's Claim Product Manual to explain its reasoning in its Memorandum and Order without any redaction. *Carroll*, 2013 WL 1296487, at *23.  Like the district court in *Carroll*, this court quotes from and references Hartford's claims manual in order to address plaintiff's arguments and to explain the reasons for the court's findings.  Because the countervailing proprietary interests asserted by Hartford do not outweigh the public's right to view the complete and unredacted reasoning of the court, the court finds that redaction is not warranted and therefore publishes this Memorandum and Order without the parties' proposed redactions.

employee who began receiving LTD benefits through the Plan in 2004.  In 2008, Hartford terminated those LTD benefits, upon a finding that plaintiff was no longer disabled under the meaning of the Plan.  After filing an unsuccessful administrative appeal of Hartford's termination decision, plaintiff now argues that Hartford's termination of his LTD benefits was improper, unfair, and unsupported by substantial evidence.

Set forth below is a detailed summary of the Plan documents, plaintiff's personal background and employment history, and the extensive medical evidence and proceedings relevant to Hartford's termination of plaintiff's LTD benefits.

## I.   **The Plan Documents**

Beginning in January 1, 2000, Hartford, a claims administrator, insured and administered the Plan through an insurance policy designated "GLT-673454."[4] (Hart. 56.1 Stmt. ¶ 3; Pl. 56.1 Resp. ¶ 3; AR 1, 15-16.)  The parties do not dispute that plaintiff enrolled and participated in the Plan and received disability benefits under that Plan.  (Hart 56.1 Stmt. ¶ 3; Pl. 56.1 Resp. ¶ 3.)  The parties disagree, however, regarding whether the documents included in the Administrative Record constitute "the Plan" that lies at the heart of this

---

[4] Plaintiff notes that Hartford did not insure and administer the Plan for claims initiated after January 1, 2005. (Pl.'s 56.1 Resp. ¶ 4.) Rather, plaintiff maintains that the Plan was insured by Liberty Mutual, as established in Allstate's submissions in a Middle District of Florida ERISA case. (*Id.* (*Cooprider v. Liberty Life Assurance Co.*, No. 10-CV-559 (M.D. Fl. Oct. 22, 2010), ECF No. 1).)

action. (*Compare* Pl. 56.1 Stmt. ¶¶ 117-20, Pl. 56.1 Resp. ¶¶ 3-6, and Pl. Mem. at 28, *with* Hart. 56.1 Stmt. ¶¶ 3-8, Hart. Resp. ¶¶ 117-20, and Hart. Opp. at 8-9.)  These documents include: (A) the "Group Benefit Plan: Allstate Insurance Company" (the "Group Benefit Plan Document"), (AR 12-39), and (B) the "Amendment to Group Policy 673454 on July 30, 2004" (the "2004 Policy Amendment" or the "Amendment"), (AR 1-11).

**A.    The Group Benefit Plan Document/Booklet-Certificate**

The Group Benefit Plan Document contains a Certificate of Insurance, which explains that

> [t]he terms of the Group Insurance Policy which affect an employee's insurance are contained in the following pages [of the Group Benefit Plan].  This Certificate of Insurance and the following pages will become your Booklet-certificate.  The Booklet-certificate is part of the Group Insurance Policy.

> This Booklet-certificate replaces any other which Hartford Life may have issued to the Policyholder to give you under the Group Insurance Policy specified herein.

(AR 15.)  Additionally, the Group Benefit Plan Document includes a "Schedule of Insurance" document, which provides a "Plan Effective Date" of January 1, 2000, identifies the Group Insurance Policy as "GLT-673454," and clarifies that the benefits described within the Group Benefit Plan are "those in effect as of January 1, 2003." (AR 16.)  The Schedule of Insurance also specifies that "[t]his plan of Disability

6

Insurance provides you with loss of income protection if you become disabled from a covered accidental bodily injury, sickness or pregnancy." (*Id.*)

Moreover, in response to the question "Who interprets policy terms and conditions?", the Group Benefit Plan Document clarifies that Hartford retains "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." (AR 27.)

The Group Benefit Plan Document then provides the following definitions of relevant terms:

> **Any Occupation** means an occupation for which you are qualified by education, training or experience, and that has an earnings potential greater than an amount equal to the lesser of the product of your Indexed Pre-disability Earnings and the Benefits Percentage and the Maximum Monthly Benefit shown in the Schedule of Insurance.
>
> . . .
>
> **Disability** or **Disabled** means that during the Elimination Period and for the next 24 months you are prevented by: 1. accidental bodily injury; 2. sickness; 3. Mental Illness; 4. Substance Abuse; or 5. pregnancy, from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-disability Earnings.  After that, you must be so prevented from performing one or more of the Essential Duties of Any Occupation.
>
> . . .

**Monthly Benefit** means a monthly sum payable to you while you are Disabled, subject to the terms of the Group Insurance Policy.

**Physician** means a person who is: 1. a doctor of medicine, osteopathy, psychology or other healing art recognized by us; 2. licensed to practice in the state or jurisdiction where care is being given; and 3. practicing within the scope of that license.

**Regular Care of a Physician** means you are attended by a Physician, who is not related to you: 1. with medical training and clinical experience suitable to treat your disabling condition; and 2. whose treatment is: a) consistent with the diagnosis of the disabling condition; b) according to guidelines established by medical, research and rehabilitative organizations; and c) administrated as often as needed, to achieve the maximum medical improvement.

(AR 28-31.)

The Group Benefit Plan Document further provides that Hartford may terminate a claimant's LTD benefits on any the following dates, among others:

1. the date you are no longer Disabled as defined;
2. the date you fail to furnish Proof of Loss, when requested by [Hartford];
3. the date you are no longer under the Regular Care of a Physician, or refuse [Hartford's] request that you submit to an examination by a Physician;

   . . .

7. the date no further benefits are payable under any provision in this plan that limits benefit duration.

8

(AR 20.)

Further, the Group Benefit Plan Document contains an

"ERISA Information" section, which states as follows:

> This employee welfare benefit (Plan) is
> subject to certain requirements of the
> Employee Retirement Income Security Act of
> 1974 (ERISA), as amended.   ERISA requires
> that you receive a Statement of ERISA
> Rights, a description of Claim Procedures,
> and other specific information about the
> Plan.   This document  .  .  . provides
> important information about the Plan.
>
> The benefits described in your booklet-
> certificate (Booklet) are provided under a
> group insurance policy (Policy) issued by .
> .  . Hartford  .  .  . and are subject to the
> Policy's terms and conditions.   The Policy
> is incorporated into, and forms a part of,
> the Plan.   The Plan has designated and named
> the Insurance Company as the claims
> fiduciary for benefits provided under the
> Policy.   The Plan has granted the Insurance
> Company full discretion and authority to
> determine eligibility for benefits and to
> construe and interpret all terms and
> provisions of the Policy.
>
> A copy of the Plan is available for your
> review during normal working hours in the
> office of the Plan Administrator.

(AR 33.)   The Group Benefit Plan Document thereafter describes

the procedures for filing claims for benefits and appealing

denials of such claims. (AR 36-38.)

### B.   The 2004 Policy Amendment

Like the Group Benefit Plan Document, the 2004 Policy

Amendment sets forth an effective date of January 1, 2003,

identifies the Group Insurance Policy as "GLT-673454," and clarifies that the Group Insurance Policy has an effective date of January 1, 2000. (AR 1.)

The Amendment contains an "Incorporation Provision" which states that "[t]he Booklet-certificate(s), and the endorsement form(s) enclosed therein, attached to this Policy are hereby incorporated in, and made a part of, this policy" and thereafter references Booklet Form 673454 (GLT)1 Rev.6. (AR 3.) In addition, the Incorporation Provision notes that "[t]he terms found in . . . Booklet-certificate [673454] will control: the benefit plan provisions; the eligibility and effective date of insurance rules; the termination of insurance rules; exclusions; and other general policy provisions pertaining to state insurance law requirements." (AR 3.)

Furthermore, the Amendment incorporates by reference the "Schedule of Insurance" set forth in Booklet-certificate 673454 (GLT)1 Rev.6, which is included in the Group Benefit Plan explained above. (AR 4.)  According to the Amendment, this Schedule of Insurance "will control the: benefit amounts and maximum limits; eligibility and effective date rules; and other schedule amounts and limits," all of "which apply to the employees of the Policyholder." (AR 4.)

Finally, the Amendment sets forth certain "Policy Provisions" that control the Plan. (AR 8-9.)  Among those Policy

Provisions is the statement that "the [entire] contract between the parties consists of: the policy; the application of the Policyholder, a copy of which is attached to and made a part of the policy when issued; and the applications, if any, of each insured person." (AR 8.)  The Amendment then explains that "Hartford . . . will give the Policyholder an individual Booklet-certificate for each insured employee.  The Booklet-certificate is part of the policy, and will explain the important features of the policy." (AR 9.)

## II.  <u>Plaintiff's Personal Background and Employment History</u>

Plaintiff was born on December 22, 1957, graduated from high school in 1975, and earned his Associates Degree from SUNY Farmingdale in 1977. (AR 154.)  After his graduation from SUNY Farmingdale, plaintiff attended Vale Technical Institute for two years. (AR 936.)

Thereafter, plaintiff worked as an insurance appraiser for various companies and as an account representative for a stock brokerage between 1979 and 1989. (AR 936.)  On September 25, 1989, plaintiff began working as a Senior Auto Appraiser for CNA Personal Insurance, which was later acquired by Allstate. (Hart. 56.1 Stmt. ¶ 1; Pl. 56.1 Resp. ¶ 1.)  As a Senior Auto Appraiser, plaintiff negotiated and estimated vehicle insurance claims and "[s]et appointments, document[ed] files, [wrote]

11

drafts, [and] arrive[d] at [an] agreed price [with a repair] shop when possible." (AR 163.)

In 2000, Plaintiff was promoted to the position of Reinspector for Encompass Insurance Company ("Encompass"), a division of Allstate. (Hart. 56.1 Stmt. ¶ 2; Pl. 56.1 Resp. ¶ 2; AR 163.)  In his capacity as Reinspector, plaintiff reviewed the work of staff appraisers and independent appraisers. (AR 163.) Two years later in 2002, plaintiff was promoted to Front Line Performance Leader Auto Field Manager ("Auto Field Manager"). (Hart. 56.1 Stmt. ¶ 2; Pl. 56.1 Resp. ¶ 2; AR 163.)  As Auto Field Manager, plaintiff supervised eight employees, oversaw "all claims referred to independent appraisers," conducted performance reviews, tracked statistics, and developed goals for his staff members. (AR 163.)  Plaintiff regularly worked between ten to twelve hours each day during his tenure as Auto Field Manager and drove an average of five hundred miles per week. (AR 1802-03.)

III. **Plaintiff's 2004 Claim for STD Benefits**

Plaintiff stopped working as an Auto Field Manager on January 30, 2004. (*See* AR 1965-66.)  On February 9, 2004, Allstate employee Rebecca Abel and Hartford employee Sharon Ryan conducted an intake interview regarding plaintiff's claim for STD benefits. (*See* AR 1965.)  Ms. Abel advised Hartford that plaintiff's date of disability was February 4, 2004. (AR 1966.)

On February 13, 2004, Dr. Jeanne Green, plaintiff's family physician, sent Hartford an Attending Physician's Statement ("APS"), along with plaintiff's medical records. (*See* AR 838-57.)  The APS indicated that plaintiff's "primary diagnosis" was hypoxia, congestive heart failure, hypertension, and obstructive sleep apnea. (AR 839.)  The APS further identified plaintiff's "secondary diagnosis" as "super morbid obesity" and noted subjective symptoms of shortness of breath and dyspnea on exertion. (*Id.*)  Moreover, according to the APS, plaintiff was hospitalized for these conditions between February 5, 2004 and February 9, 2004. (*Id.*)  During his hospitalization, he was diagnosed with congestive heart failure. (AR 923.)

Among the additional medical records sent to Hartford by Dr. Green were a dual isotope adenosine study dated June 9, 2003 and an echocardiogram report dated February 5, 2004.  (AR 844, 852-55.)  The June 9, 2003 dual isotope adenosine study stated that "[t]here is no evidence of ischemia nor infarct but the patient appears to have a dilated left ventricle with a reduced ejection fraction of 43% but there are technical limitations due to his body size." (AR 855.)  Moreover, the February 5, 2004 echocardiogram report returned negative, with no thrombi or pericardial effusions noted or ventricular irregularities noted. (*See* AR 844.)

Dr. Green contacted Hartford on numerous occasions
throughout March and April 2004 to provide additional
information regarding plaintiff's medical conditions.  For
example, on March 17, 2004, Dr. Green informed a Hartford claims
examiner that plaintiff's "blood sugar, weight, [and]
hypertension" were disabling and prevented plaintiff from
working. (AR 1962.)  On April 5, 2004, Dr. Green sent Hartford a
fax explaining that plaintiff "should remain out of work . . .
at least another month." (AR 831, 1962.)

On May 6, 2004, Ms. Abel provided Hartford with a
description of the physical requirements of plaintiff's Auto
Field Manager position. (AR 156-57.)  In particular, Ms. Abel
described the Auto Field Manager position as requiring eight
hours of sitting and/or two hours of standing, one hour of
walking, five hours of driving, frequent bending, and occasional
lifting of up to ten pounds. (AR 156.)

On or around June 29, 2004, Dr. Green faxed Hartford
additional medical records dated March 29, 2004 through June 25,
2004. (Hart. 56.1 Stmt. ¶ 30; Pl. 56.1 Resp. ¶ 30; AR 816-27.)
One of those records, a sleep study dated March 29, 2004,
confirmed plaintiff's diagnosis with obstructive sleep apnea
"associated with a moderate degree of oxygen desaturation during
sleep," which improved with use of a continuous positive airway
pressure ("CPAP") machine. (AR 826.)  Based on the foregoing

14

medical conditions, Hartford extended plaintiff's STD benefits until August 3, 2004. (AR 1951.)

## IV.  Plaintiff's 2004 Claim for LTD Benefits

### A.  Initial Submission of LTD Benefits Claim

On May 11, 2004, Hartford provided plaintiff with the necessary forms to submit a claim for LTD benefits. (Hart. 56.1 Stmt. ¶ 33; Pl. 56.1 Resp. ¶ 33.)  On July 9, 2004, plaintiff faxed Hartford his LTD benefits application, which included an Employee's Statement, a Claimant Questionnaire, a list of treating physicians, and an APS. (AR 782-97.)  In his Employee's Statement, plaintiff confirmed that he completed two years of college at Vale Technical Institute, where he studied auto damage estimating. (AR 783.)  Moreover, in his Claimant Questionnaire, plaintiff described his medical conditions as "[s]piking blood pressure, dizzy, lightheaded, problem[s] w[ith] . . . shortness of breath simply from walking," retaining fluids in his lower extremities, and waking up in the middle of the night to catch his breath. (AR 787.)  Despite these conditions, plaintiff indicated in his Claimant Questionnaire that he was able to continue some of his physical activities, such as fishing on one occasion as well as supervising his sons' yard work. (AR 787.)

In his list of treating physicians, plaintiff named the following medical doctors: Dr. Green, Dr. Rocca D. Grella,

Dr. Yanpino Yu, Dr. Richard S. Litman, Dr. Scott R. Capustin, Dr. Gerald J. Furst, Dr. Lisa Schirripa, Dr. Vithiananthan, Dr. Chawla, and Dr. Gary Zito. (*See* AR 788-89.)

Finally, in her APS, Dr. Green reported primary diagnoses of congestive heart failure, hypertension, and obstructive sleep apnea and secondary diagnoses of morbid obesity. (AR 796.)  Dr. Green then reviewed plaintiff's functional capabilities and indicated that, despite his medical conditions, plaintiff's ability to stand was minimally affected; his walking abilities progressed to approximately one hundred yards without stopping; he could sit for approximately thirty minutes "without changing positions or getting up"; he could lift up to ten pounds "occasionally"; but was unable to push, pull, reach[]/work[] overhead." (AR 797.)  Dr. Green additionally stated that plaintiff could drive for approximately ten miles without stopping and taking a break and that his ability to use his keyboard was "minimally affected." (AR 797.) In light of these findings, Dr. Green concluded that "at the current rate of improvement," she "anticipate[d] an additional [three] months of incapacity." (AR 797.)

On July 28, 2004, Dr. Green sent a letter to Hartford in further support of plaintiff's LTD benefits claim. (AR 779-80.)  In that letter, Dr. Green explained that "[a]t this time [plaintiff] remains unable to return to work due to dizziness

16

and overwhelming fatigue secondary to which he falls asleep
constantly." (AR 779.)  Dr. Green informed Hartford that
plaintiff was considering bariatric surgery, was being treated
by a pulmonologist for his sleep apnea, consulted a nephrologist
regarding his labile hypertension, and pursued treatment from a
neurologist for episodic vertigo. (AR 779-80.)  Dr. Green
advised that, based on her diagnoses, plaintiff "remains fully
disabled and unable to return to work in any capacity at this
time" and stated that she "anticipate[d] at least another two
months before [plaintiff] could consider returning" to work. (AR
780.)

**B.  Hartford's Initial Approval of LTD Benefits Claim**

On September 10, 2004, Hartford informed plaintiff by
telephone that his LTD benefits claim was approved. (AR 1940.)
During that telephone call, plaintiff informed Hartford that he
would promptly contact the Social Security Administration
("SSA") to file an application for benefits. (*Id.*)  By letter
dated September 14, 2004, Hartford informed plaintiff that his
LTD benefits were approved effective June 24, 2004 and that he
was awarded a "net monthly benefit" of $2,850. (AR 767.)

Two weeks later, on September 24, 2004, Allstate
notified Hartford that plaintiff was entitled to a higher net
monthly benefit based on an annual salary of $69,312. (AR 765.)

In response, Hartford adjusted plaintiff's net monthly benefit to $2,900. (AR 1937.)

## V.   Hartford's Extension of Plaintiff's LTD Benefits

On April 21, 2005, Noelle C. Anderson, a Hartford claims examiner, contacted plaintiff by phone for a "milestone call." (AR 1936.)  During that call, plaintiff reported kidney stones, swelling in his legs, memory problems, depression, and periodic dizziness. (*Id.*)  That same day, Hartford advised plaintiff that it required updated information regarding his LTD benefits claim and requested a Claimant Questionnaire and APS by May 31, 2005. (AR 759.)

Approximately one month later, on May 24, 2005, Dr. Green submitted an updated APS, in which she reported a primary diagnosis of "super morbid obesity" and secondary diagnoses of hypertension, diabetes, high cholesterol, obstructive sleep apnea, a history of congestive heart failure, and transient ischemic attacks. (AR 714.)  Dr. Green enclosed imaging studies and lab reports in support of these diagnoses. (*Id.*)  Dr. Green also listed plaintiff's subjective symptoms of "dyspnea, fatigue, min[imal] endurance, episodic vertigo, and amnesia." (*Id.*)  Moreover, Dr. Green advised that plaintiff recovered from his congestive heart failure (with "no recurrent episodes"), noted slight improvement in his hypertension, diabetes, and high cholesterol, and stated that plaintiff's ischemic attacks

18

occurred more frequently. (*Id.*)  As to plaintiff's functional limitations, Dr. Green indicated that plaintiff suffered pain in his hips, knees, and ankles after standing for more than fifteen minutes. (AR 715.)  Dr. Green further observed that plaintiff's walking ability was limited by dyspnea and pain and that plaintiff "must change position" every thirty minutes. (*Id.*) Dr. Green's APS further stated that plaintiff had a limited ability to work or reach overhead, to drive for longer than ten minutes, and to lift, carry, push, or pull objects. (*Id.*)  Dr. Green observed that plaintiff's typing ability was limited only by his ability to sit. (*Id.*)  Finally, Dr. Green expressed her opinion that she expected plaintiff's "period of incapacity to be indefinite," but that plaintiff was pursuing "bariatric surgery options." (*Id.*)

On or around May 25, 2005, plaintiff submitted his updated Claimant Questionnaire describing his disabling medical conditions. (AR 719-25.)  Specifically, plaintiff listed the following medical conditions:

> When blood pressure spikes, I get dizzy/lightheaded. Occasionally, my blood pressure gets so high that I can hear it usually in my right ear. When this occurs, I have a problem with my equilibrium. Shortness of breath from walking or climbing stairs. Still waking up at night needing to sit up to catchy my breath. Moderate to severe swelling below knees.

(AR 719.)  Plaintiff additionally listed his height, 6 feet, and weight, 395 pounds.  (AR 719.)  Plaintiff further reported that he frequently "visits [the] bathroom due to [his] medications" and must lie down two to five times a day to reduce swelling in his legs. (*Id.*)  Plaintiff explained that he was able to bathe, dress himself, go to the toilet, transfer from his bed to a chair, control his bladder, feed himself, and maintain his personal hygiene independently. (*Id.*)  Plaintiff noted, however, that he takes "much longer to bathe, use [the] toilet and dress . . . than [he] did in the past" and that bending and transferring from his bed to a chair makes him "dizzy." (*Id.*) Plaintiff again listed Dr. Green as his primary care physician, and also named his two neurologists, Dr. Michael O. Sauter and Dr. Yu, his urologist, Dr. Zito, and his podiatrist, Dr. Schirripa. (AR 720.)  Plaintiff also stated that, within eighteen months of completing his Claimant Questionnaire, he visited Dr. Grella, Dr. Litman, Dr. Capustin, ophthalmologist Dr. Vincent Basilice, and bariatric specialist Dr. Arif Ahmad. (AR 721.)

Upon evaluation of his medical records, Hartford approved plaintiff's continuing claim for LTD benefits on June 10, 2005. (AR 1933-34.)

## VI.  Hartford's 2006 Approval of Plaintiff's LTD Claim under "Any Occupation" Standard

By letter dated January 20, 2006, Hartford notified plaintiff that it had commenced an investigation to determine whether he was eligible under the Plan's new "Any Occupation" standard, which was scheduled to take effect on June 24, 2006. (AR 711-12.)  Hartford therefore requested a "Work and Education History Form," an updated APS, and a Physical Capacities Evaluation Form ("PCE"). (AR 712.)  On March 9, 2006, Hartford received the requested forms from plaintiff.

### A.  Dr. Kevin Schiller's 2006 APS and PCE

In the updated APS, Dr. Kevin Schiller, plaintiff's new primary care physician, reported primary diagnoses of coronary artery disease and hypertension and secondary diagnoses of congestive heart failure and sleep apnea. (AR 702.)  Next to the line for plaintiff's "Subjective symptoms," Dr. Schiller wrote "[shortness of breath] and chronic pain." (*Id.*)  Dr. Schiller recorded plaintiff's weight, 395 pounds, and height, 6 feet. (*Id.*)  Dr. Schiller further noted that plaintiff experienced difficulty standing, walking, reaching/working overhead, pushing, and pulling. (AR 703.)  Dr. Schiller described plaintiff's ability to sit, drive, and use the keyboard as "fair." (*Id.*)  Finally, the APS states that

plaintiff received treatment from neurologist Dr. Sauter, nephrologist Dr. Boglia, and urologist Dr. Zito. (AR 702.)

In the PCE, Dr. Schiller set forth plaintiff's general workplace capabilities as follows: (1) plaintiff could sit for one hour at a time for a total of two hours per day; (2) plaintiff could stand for half an hour at a time for a total of one hour per day; and (3) plaintiff could walk for fifteen minutes at a time for a total of one hour per day. (AR 704.) Dr. Schiller advised that plaintiff could occasionally climb, stoop, kneel, and crouch, as well as lift, carry, push, or pull up to ten pounds. (*Id.*)  Dr. Schiller further indicated that plaintiff could frequently drive, reach at or below waist level, and handle/finger/feel objects with both hands. (AR 704-05.) Finally, Dr. Schiller observed that plaintiff could never balance. (AR 704.)

**B.    Hartford's March 2006 Request for Additional Medical Records**

Upon receipt of Dr. Schiller's APS and PCE, Hartford continued its investigation of plaintiff's LTD benefits claim. To that end, on March 9, 2006, Hartford requested, and ultimately received,[5] updated medical records from plaintiff's

---

[5] Hartford also requested records from Dr. Capustin, plaintiff's pulmonologist; however, Dr. Capustin advised Hartford that plaintiff had not been treated since March 29, 2004. (AR 670, 1062, 1927.)  Similarly, Hartford requested records from Dr. Litman, plaintiff's ear, nose, and throat doctor, (AR 695); however, Dr. Litman's office informed Hartford that plaintiff's last office visit was July 6, 2004. (AR 1927.)

treating physicians: Dr. Zito, Dr. Sauter, Dr. Ahmad, Dr. Yu, Dr. Schirripa, Dr. Grella, and Dr. Schiller. (AR 520-46, 563-67, 614-15, 637-48, 657-65, 1913, 1917, 1922, 1926, 1928.)

In response to Hartford's March 2006 request for medical records, Dr. Zito, plaintiff's urologist, submitted July 2004 CT scan reports of plaintiff's abdomen and pelvis. (AR 659-60.)  The CT scan report of plaintiff's abdomen stated that plaintiff had "very minimal right hydronephrosis," "minimal right mid peri-uteral stranding," and a "questionable tiny right mid ureteral calculi." (AR 659.)  The CT scan report of plaintiff's pelvis indicated "minimal right mid peri-ureteral stranding with associated tiny calculi with tiny right mid ureteral calculi" with no evidence of hydroureter, definite bladder calculus, bowel obstruction, free fluid, or adenopathy. (AR 660.)

On March 10, 2006, Dr. Sauter, plaintiff's neurologist, promptly responded to Hartford's request for medical records. (AR 599-613.)  Dr. Sauter submitted office notes dated August 10, 2005 through March 2, 2006. (AR 600-02.)  In those office notes, Dr. Sauter explained that plaintiff had a history of epilepsy as a child. (AR 601.)  Dr. Sauter also provided the results of plaintiff's Doppler neck carotid procedure on March 21, 2006. (AR 603.)  The procedure revealed "no evidence of hemodynamically significant stenosis,"

particularly "in the proximal left internal carotid artery."
(*Id.*)  Furthermore, Dr. Sauter submitted an August 11, 2005 MRI
report of plaintiff's brain. (AR 604.)  The 2005 MRI report
indicated plaintiff's history of right-sided weakness and memory
loss but noted that plaintiff was "stable." (*Id.*)  Finally, Dr.
Sauter submitted an August 11, 2005 EEG report, which reported
an abnormal EEG "due to occasional sharp wave activity" and
explained that "[h]yperventilation and photostimulation are
unremarkable." (AR 606.)

    Dr. Ahmad, a physician at the Long Island Bariatric
Center, similarly responded to Hartford's records request. (AR
637-648, 1925.)  In a September 21, 2005 office note, Dr. Ahmad
stated that plaintiff steadily gained weight since 1992, when he
was diagnosed with Lyme disease and was unable to exercise as a
result. (AR 639.)  Dr. Ahmad's office note specified that
plaintiff suffered from hypertension, diabetes, sleep apnea,
depression, joint problems, and osteoarthritis, among other
medical infirmities. (*Id.*)  In addition, Dr. Ahmad also
submitted an "Initial Nutrition Consultation," dated October 5,
2004, indicating that plaintiff sought weight reduction surgery.
(AR 638.)  Dr. Ahmad's Initial Nutrition Consultation further
noted that plaintiff's exercise regime consisted of walking five
times a week for approximately twenty minutes. (*Id.*)

In response to Hartford's request, Dr. Yu, plaintiff's nephrologist, mailed the handwritten progress of another treating nephrologist, Dr. Boglia. (AR 623-626, 1923.) Dr. Boglia's progress notes, dated August 2005 through March 2006, discuss certain urinary and bladder issues which plaintiff did not claim were disabling conditions at that time. (*Id.*) Dr. Schirripa, plaintiff's podiatrist, also answered Hartford's request for records and submitted office visit notes dated January 12, 2005 through April 3, 2006. (AR 1922; *see also* AR 563-67.) In those office visit notes, Dr. Schirripa described the painful nails and calluses on plaintiff's feet. (AR 563-67, 1922.)

On June 1, 2006, Hartford also received medical records from the offices of Dr. Grella, plaintiff's cardiologist. (AR 520-46, 1916.) Among those records is a June 9, 2003 letter from Dr. Mitchell Saunders, Dr. Grella's medical partner, to Dr. Green. (AR 527.) In that letter, Dr. Saunders described the results of plaintiff's echocardiogram and stated that "[he] advised [plaintiff] that most likely his chest and arm pains are related to cervical disk disease and not ischemia [because] he does not get them with exertion." (*Id.*) Additionally, Dr. Grella's office submitted a June 22, 2004 adenosine study which found "[n]o clear evidence of ischemia or infarction," anterior thinning, "[m]ildly delayed inferoapical

systolic motion," increased "left ventricular end diastolic and end systolic volumes," and a "[l]eft ventricular ejection fraction of 46%."(AR 534.)  Notably, the June 2004 adenosine study reported that plaintiff experienced "no significant change in left ventricular function, left ventricular volumes, or myocardial perfusion" since his last test in June 2003. (*Id.*)

Dr. Grella's office submitted two letters from Dr. Grella to plaintiff's primary care physicians.  In his May 25, 2005 letter to Dr. Green, Dr. Grella opined that "[s]ince his hospitalization in February, the patient has been out of work just due to 'not feeling well' but overall a fairly nondescript situation." (AR 525.)  Dr. Grella noted, however, that

> [r]eview of [plaintiff's] systems is notable for sweats, fatigue, nosebleed on higher dose aspirin . . ., shortness of breath, snoring, . . . abdominal pains, history of urinary tract infections and kidney stones with blood in his urine, headaches, loss of balance, history of diabetes, depression and easy bruising.

(*Id.*)  Dr. Grella noted that plaintiff's "[p]hysical examination reveals a well-developed, morbidly obese man in no acute distress." (AR 526.)

The second letter, dated December 2, 2005, from Dr. Grella to Dr. Schiller, sets forth Dr. Grella's "[f]inal impression" of plaintiff as a "hypertensive, diabetic with multiple medical problems, who has continued complaints of . . .

26

atypical chest pain, exertional dyspnea which were of unclear origin." (AR 524.)  In the December 2, 2005 letter, Dr. Grella expressed his impression that much of plaintiff's "exertional dyspnea including the pulmonary hypertension . . . [is] likely related to his . . . morbid obesity." (*Id.*)  Dr. Grella therefore recommended additional cardiac testing. (*Id.*)  Dr. Grella reported that plaintiff's "blood pressure appears to be adequately controlled at the current time" and recommended "no change of [plaintiff's] medications." (*Id.*)

Finally, Hartford received documents from Dr. Schiller on June 23, 2006. (AR 614-15, 618, 1913.)  Dr. Schiller submitted a March 7, 2006 letter addressed to him from nephrologist Dr. Boglia. (AR 614-15.)  In that March 7th letter, Dr. Boglia informed Dr. Schiller that plaintiff complained of "occasional urinary frequency and incomplete bladder emptying." (AR 614.)  With respect to plaintiff's hypertension, Dr. Boglia reported that plaintiff's

> blood pressure was significantly improved from our last visit. He will also undergo a 24-hour blood pressure monitor. The patient's blood pressure will not become normalized at his current weight. If he is able to lose significant amount of weight, his blood pressure will dramatically improve.

(*Id.*)  With respect to plaintiff's diabetes, Dr. Boglia reported that plaintiff's "Hemoglobin A1C was well controlled back in

27

December of 2005." (AR 615.) Finally, regarding plaintiff's obesity, Dr. Boglia indicated that plaintiff "states []he is attempting diet and exercise" and "is still considering going for bariatric surgery." (*Id.*)

### C. 2006 Social Security Administration ("SSA") Disability Finding

On March 28, 2006, Ted S. Shapiro, Esq., plaintiff's counsel during his SSA proceedings, transmitted to Hartford SSA's fully favorable Notice of Decision dated March 22, 2006. (*See* AR 627-35.) In his proceedings before the SSA, the administrative law judge ("ALJ") found that plaintiff lacked the residual functional capacity ("RFC") to perform sedentary work and that plaintiff was unable to engage in any substantial gainful activity. (*Id.*) Specifically, the ALJ held that

> [t]he medical evidence reveals [that plaintiff] . . . is severely impaired by morbid obesity, hypertension, diabetes mellitus, nephrolithiasis, obstructive sleep apnea, and congestive heart failure associated with left ventricular dysfunction.
>
> At my request Dr. Osvaldo Fulco . . . reviewed the medical evidence and answered interrogatories I posed. Writing on February 28, 2006, Dr. Fulco estimated the claimant – an individual with severe shortness of breath and edema and brawny discoloration of both lower extremities with evidence, by a nuclear scan performed on June 9, 2003, of a reduced left ventricular ejection fraction of forty-three percent – could sit only two hours, stand/walk less than two hours, and lift/carry no more than

> ten pounds during an eight-hour workday.
> Unable to climb, push and pull, the
> [plaintiff], in the opinion of the medical
> expert, must avoid hazardous situations such
> as unprotected heights and dangerous moving
> machinery.

(AR 631-32.)  The ALJ therefore concluded that plaintiff lacked

the RFC "to perform even sedentary work because of persistent

and severe shortness of breath compounded by swelling of both

lower extremities." (AR 632.)  According to the ALJ, these

conditions resulted in "an ability to lift/carry no more than

ten pounds, to sit only two hours, and to stand/walk less than

two hours during an eight-hour workday." (*Id.*)  Finally, the ALJ

explained that plaintiff's "exertional and nonexertional

limitations preclude him from performing his past relevant work

and significantly erode his remaining occupational base for

sedentary work to the extent that he is unable to engage in any

alternative substantial gainful activity existing in significant

numbers in the national economy." (AR 633.)

By fax dated April 20, 2006, plaintiff transmitted a

copy of the SSA's Notice of Award to Hartford. (AR 585.)  The

SSA's Notice of Award stated that the SSA found plaintiff

"disabled under [SSA] rules on February 5, 2004." (AR 586.)

Upon notification of plaintiff's SSA Award, Hartford

calculated past due benefits, subtracted the amount owed to

plaintiff's Social Security attorney, and offset the amount of

LTD benefits owed by the amount awarded by the SSA. (*See* AR 943.)

### D.    Plaintiff's July 2006 Claimant Questionnaire

By letter dated June 29, 2006, Hartford informed plaintiff that it was continuing its investigation to determine whether plaintiff was disabled under the "Any Occupation" standard set forth in the Plan. (AR 446-47.)  Hartford further clarified that "[a]dditional benefits paid beyond June 24, 2006 should not be construed as an admission of continued liability." (AR 447.)

Accordingly, on July 19, 2006, Hartford requested an updated Claimant Questionnaire from plaintiff. (AR 445.) Hartford received plaintiff's updated Claimant Questionnaire on August 10, 2006. (AR 440-43, 1912.)  In that July 2006 Claimant Questionnaire, plaintiff described his medical conditions as follows: "Blood pressure has been more stable overall, but is still spiking daily.  When [blood pressure] spikes, I get light headed/dizzy.  Sometimes my [blood pressure] gets so high that I can hear it in my right ear which in turn gives me problems [with] equ[i]librium.  Shortness of breath from walking or using stairs." (AR 440.)  Plaintiff further reported moderate to severe swelling of his lower extremities and shortness of breath when laying down. (*Id.*)  Nevertheless, the July 2006 Claimant Questionnaire indicates that plaintiff's daily activities

included going for a walk, using the treadmill, and spending time with his family in the evenings. (*Id.*)  Plaintiff further noted that he does light chores around the house, brings in empty trash pails, and went fishing once a year between 2004 and 2006. (*Id.*)

### E.  Hartford's Approval of Plaintiff's Continuing LTD Benefits Claim

Upon review of plaintiff's July 2006 Claimant Questionnaire, Hartford Nurse Amanda P. Ferrill concluded that plaintiff was still disabled based on his pulmonary hypertension, left ventricular hypertrophy, and bilateral venous insufficiency/edema. (AR 1910-12.)  Nurse Ferrill further opined that "without significant weight loss [plaintiff's] health will not improve" and therefore recommended a "follow up with medical on a yearly basis [to] note any significant weight changes." (AR 1912.)

Thereafter, on September 8, 2006, Hartford analyst Jamie L. Lindvall recommended that plaintiff's claim for continued LTD benefits be approved based on his medical conditions. (AR 1909.)  In particular, Ms. Lindvall took note of plaintiff's left ventricular hypertrophy, bouts with chronic leg edema, and hypertension. (*Id.*)  Although Ms. Lindvall acknowledged that plaintiff could occasionally climb, stoop, kneel, crouch, crawl, and reach above and lift, carry, push, and

pull up to tend pounds, she concluded that plaintiff's "[c]ondition [was] unlikely to improve" absent "significant weight loss." (AR 1909.)

By letter dated September 11, 2006, Hartford advised plaintiff that his claim for continuing LTD was approved under the "Any Occupation" standard. (AR 438, 1909-10.)  Hartford's September 11, 2006 letter clarified that payment of LTD benefits would continue "subject to terms and limitations of the Policy, as long as [plaintiff] meet[s] the policy definition and requirements." (AR 438.)

## VII. **Hartford's 2007 Reevaluation of Plaintiff's Disability**

On February 14, 2007, Hartford again requested plaintiff to complete an updated Claimant Questionnaire and APS in support of his continuing LTD benefits claim. (AR 425, 1908.) On March 27, 2007, Hartford's Special Investigations Unit reviewed plaintiff's continuing LTD benefits claims but determined not to accept the claim for investigation. (AR 1907.) Hartford subsequently received plaintiff's 2007 Claimant Questionnaire on April 11, 2007. (AR 426-30.)  In his 2007 Claimant Questionnaire, plaintiff described his medical conditions as tingling and numbness in his lower extremities and fingers; moderate to severe swelling of lower extremities; shortness of breath; back and neck pain; spiking blood pressure; and unstable equilibrium. (AR 426.)  Plaintiff advised that he

32

could do the following activities independently: bathe, dress, use the toilet, transfer from bed to chair, maintain his personal hygiene, and feed himself. (*Id.*)  Plaintiff further advised that he occasionally performed light chores around the house and yard such as watering the plants and garden and bringing in empty garbage pails. (*Id.*)  Finally, plaintiff stated that he was 425 pounds in October 2006 but had lost 29 pounds as of April 2007. (*Id.*)

In April 2007, Hartford also received a portion of plaintiff's updated APS and Dr. Schiller's office visit note, both of which were dated March 10, 2007. (AR 431-34.)  The first page of the 2007 APS reported primary diagnoses of right leg pain, chest pain, and shortness of breath, and subjective symptoms of shortness of breath. (AR 431.)

On April 11, 2007, Hartford analyst Molly Grossman approved plaintiff's continuing claim for LTD benefits, stating that "[u]nless [plaintiff] loses weight he will not be able to [return to work] at any occ[upation]." (AR 1906-07.)  Ms. Grossman further noted plaintiff's tingling and numbness, shortness of breath, swelling, spiking in blood pressure, and back and neck pain. (AR 1906.)  Ms. Grossman acknowledged that plaintiff reported a loss of 29 pounds since October 2006. (AR 1907.)  Finally, Ms. Grossman summarized plaintiff's history of

medical conditions, including but not limited to hypertension, diabetes, obesity, and high cholesterol. (*Id.*)

On August 13, 2007, plaintiff's file was assigned to Hartford Claim Specialist Debbie Staz. (AR 959.)  On September 13, 2007, Ms. Staz and plaintiff spoke on the phone, during which plaintiff indicated that his "last hope" was gastric banding, or "stomach band," surgery. (AR 961.)  On October 17, 2007, Ms. Staz noted that plaintiff was scheduled to undergo gastric banding surgery on November 13, 2007. (AR 964.)  On November 13, 2007, plaintiff underwent gastric banding surgery. (AR 1490.)

## VIII. Hartford's 2008 Reevaluation of Plaintiff's Disability

### A. January 2008 Work and Education History Form, Claimant Questionnaire, and APS

On January 2008, Ms. Staz requested plaintiff to complete an updated Work Education History Form, Claimant Questionnaire, and APS in support of his continuing LTD benefits claim. (AR 407, 1899.)

Plaintiff's Work and Education History Form set forth plaintiff's employment history, educational background, work skills, and noted that he resigned from Allstate in "2005 after STD [and] LTD were exhausted." (AR 155.)  Moreover, in his 2008 Claimant Questionnaire, plaintiff explained his disabling conditions as follows:

> Moderate to severe swelling of lower extremities, as well as tingling [and] numbness. Tingling [and] numbness also affects my fingers but less often than my legs. Shortness of breath can occur when walking, laying down, going up or down stairs, etc. Blood pressure is normal more of the time, but still spikes (from once every couple of days to multiple times daily)[.] Sometimes I can hear a pulsing/beating in my right each which throws off my equilibrium. . . . Back [and] neck pain due to all of the falling due to dizziness over the past several years.

(AR 378.) Plaintiff indicated that his daily activities included "[s]ome household chores at a slow pace," walking as tolerated, going to doctor's appointments, using the bathroom, measuring blood pressure and blood sugar, sorting through mail, and paying bills. (*Id.*) Moreover, plaintiff indicated that he could do the following activities independently: bathe, dress, use the toilet, transfer from his bed to a chair, control his bladder, maintain his personal hygiene, and feed himself; however, plaintiff noted that activities such as bathing, dressing, and using the toilet take much longer and that actions that require bending can make him dizzy. (*Id.*) Plaintiff indicated that, despite his medical conditions, he could carry out "[v]ery light yard maintenance [and] household chores intermittently." (*Id.*) Plaintiff recorded his height as 6 feet and weight as 388 pounds. (*Id.*)

In addition, Dr. Schiller's 2008 APS reported plaintiff's primary diagnoses as morbid obesity, back pain, and status post-gastric band surgery, along with a secondary diagnosis of hypertension. (AR 389.)  With respect to plaintiff's work environment capabilities, Dr. Schiller advised that plaintiff could sit for two hours at a time for a total of ten hours per day, stand for half an hour at a time for a total of one hour per day, and walk for one hour at a time for a total of one hour per day. (AR 390.)  Dr. Schiller indicated that plaintiff could "occasionally" kneel, crouch, drive, reach overhead, and lift/carry up to 20 pounds with both hands. (*Id.*) In his APS, Dr. Schiller further opined that the expected duration of plaintiff's restrictions was "6 months." (*Id.*)  Dr. Schiller indicated that plaintiff could "participate in vocational rehabilitation services," which included "worksite accommodations, identifying alternative work, and/or retaining assistance." (*Id.*)

Appended to Dr. Schiller's 2008 APS was a January 10, 2008 office visit note. (AR 391-92.)  In his January 2008 office visit note, Dr. Schiller observed that plaintiff's knee pain was "moderate" with "an aching quality" but noted plaintiff's comment that his "[r]ight knee pain [was] improving." (AR 391.) Dr. Schiller further clarified that plaintiff was treated with

"physical therapy and NSAIDS" and has responded well to that treatment. (*Id.*)

## B. Hartford's February 2008 Request for Additional Medical Records

In February 2008, Hartford requested updated medical records from plaintiff's treating physicians, including Dr. Schiller, Dr. Collin Brathwaite, and Dr. Grella.[6]

In response to this request, Dr. Schiller submitted numerous medical records including letters, radiology reports, and office visit notes. (*See* AR 261-365, 970, 1902.)  For example, Dr. Schiller included a letter from Dr. Balchandani describing plaintiff's December 7, 2006 nuclear stress test, "which revealed normal perfusion with no fixed reversible defects identified." (AR 348.)  Additionally, Dr. Schiller provided a cardiac catherization report regarding a June 5, 2007 procedure to evaluate plaintiff's heart pressure, arteries, and ventricular function. (AR 343-45.)  The cardiac catherization report demonstrated non-obstructive coronary artery disease with normal left ventricular function, moderate left ventricular diastolic dysfunction, mild to moderate pulmonary hypertension, normal renal arteries, and successful placement of vascular closure device. (AR 435.)

---

[6] Hartford also requested records from Dr. Jeffrey Muhlrad; however, Dr. Mulhrad's office advised that there were no medical records for plaintiff as of January 1, 2008. (AR 179, 1889.)

Dr. Schiller also included a January 21, 2007 letter
to him from Dr. Thomas P. Ribaudo, in which Dr. Ribaudo noted
that plaintiff expressed no complaints of chest discomfort and
an improvement in shortness of breath. (AR 340.)  In his January
21st letter, Dr. Ribaudo noted plaintiff's admission to "some
episodes of anxiety" and opined that such anxiety "could
definitely be one of the contributing factors" to his shortness
of breath. (AR 341.)

In a January 24, 2007 office note, Dr. Schiller
reported that plaintiff fell through basement stairs and cut his
right lower leg but suffered no fracture. (AR 313.)  According
to a follow-up X-ray, plaintiff showed "no evidence of fracture,
dislocation or destructive bone lesion" with no abnormalities in
his joint spaces and soft tissue. (AR 322.)  On February 10,
2007, plaintiff again visited Dr. Schiller for a follow-up
examination of plaintiff's leg ulcer related to the basement
fall, and Dr. Schiller noted that plaintiff's cellulitis was
improving. (AR 307.)  Moreover, an X-ray and MRI conducted on
March 13, 2007 indicated "[n]o obvious fracture-dislocation"
with "[i]njury to the posterior medial meniscal root ligament
with partial tear and reactive bone marrow edema of the tibia."
(AR 320-21.)  A March 19, 2007 office visit note indicates that
plaintiff presented with complaints of knee pain, again related
to plaintiff's basement fall. (AR 302.)  On May 2, 2007,

38

plaintiff again visited Dr. Schiller, seeking treatment for neck and lower back pain. (AR 297.)  During that office visit, plaintiff noted that he had been receiving physical therapy for three weeks. (*Id.*)

Dr. Schiller also provided Hartford with a May 23, 2007 letter from Dr. Grella, in which Dr. Grella advised that plaintiff denied chest pain and was "clinically stable" and "asymptomatic from a cardiac perspective," despite plaintiff's chronic dyspnea on exertion, some diastolic dysfunction, and non-obstructive coronary artery disease. (AR 338-39.)

Finally, Dr. Schiller submitted various notes recording plaintiff's office visits between June 2007 and November 2007, during which plaintiff presented with leg, knee, and back pain. (*See* AR 264-66, 287-91.)  Dr. Schiller's November 28, 2007 office visit note indicates that plaintiff stated that his "[r]ight knee was improving," despite moderate pain and "an aching quality." (AR 264.)

In addition, Dr. Brathwaite, plaintiff's gastric banding surgeon, provided Hartford with medical records related to plaintiff's November 13, 2007 gastric banding surgery and his post-surgical follow-up examinations. (AR 239-56, 1453-55.) During his December 2007 follow-up visit, plaintiff did not complain about his surgery, denied any signs or symptoms of infection in his surgical wounds, and reported walking thirty

minutes a day. (AR 244.)  In his medical progress notes, Dr.
Brathwaite noted that plaintiff had a decrease in his appetite
due to his divorce and death of his father. (AR 239, 971.)  Dr.
Brathwaite's medical records also demonstrated a pre-surgery
weight of 404 pounds and a post-surgery weight of 378 pounds as
of February 2008. (AR 971.)

Finally, Dr. Grella provided Hartford with updated
medical records regarding plaintiff's cardiac health. (AR 180-
95, 1890.)  Included in those records is the first page of a
November 7, 2007 letter from Dr. Grella to Dr. Brathwaite,
wherein Dr. Grella explained his pre-surgery evaluation of
plaintiff on November 5, 2007. (AR 181.)  Dr. Grella found that
plaintiff

> was found to have nonobstructive coronary
> artery disease with only luminal
> irregularities and a preserved ejection
> fraction of 55%.  The patient additionally
> does not have any significant valvular heart
> disease by echocardiography.  The only
> finding was diastolic dysfunction secondary
> to hypertension, for which he is on medical
> therapy.  He continues to be asymptomatic in
> terms of any cardiac issues in terms of
> chest discomfort.  He does have dyspnea on
> exertion likely secondary to his morbid
> obesity, but otherwise has had no
> lightheadedness, dizziness, palpitations, or
> syncopal events.  He does have chronic leg
> edema, which is known to be related to
> chronic venous insufficiency.

(*Id.*) Dr. Grella also provided a letter dated May 23, 2007, in
which he approved plaintiff for surgery and expressed his

opinion that "from a cardiac perspective [plaintiff] is clinically stable, and overall, would pose an acceptable and low cardiac risk for surgery." (AR 184-85.)

### C.   Ms. Staz's March 2008 Telephone Conversation with Plaintiff

On March 24, 2008, Ms. Staz called plaintiff to discuss his medical condition. (AR 973.)  During that phone conversation, plaintiff expressed that his "back and knee pain [was] really causing him a lot of pain." (AR 972-73.)  Plaintiff reported that he was prescribed Percocet and was taking Vicodin. (AR 972.)  Plaintiff further indicated that his orthopedist, Dr. Muhlrad, diagnosed him with torn cartilage in his right knee but postponed surgery pending plaintiff's gastric banding surgery. (AR 973.)  Plaintiff also confirmed that "since he has been losing . . . weight his back has been hurting a lot more" but that "his diabetes is under control." (*Id.*)

### IX.  2008 Termination of Plaintiff's LTD Benefits

### A.   Ms. Staz's Preliminary Recommendation to Terminate Benefits

On April 28, 2008, Ms. Staz wrote letters to Dr. Schiller and Dr. Brathwaite inquiring whether plaintiff was capable of performing full-time sedentary or light-duty work, as defined by the United States Department of Labor ("DOL").[7] (AR

---

[7] Plaintiff denies that the letters transmitted to Dr. Schiller and Dr. Brathwaite provided the definitions of "light and sedentary work" as defined by the DOL. (Pl. 56.1 Resp. ¶ 209.)

147-50, 1889.)  In both letters, Hartford provided the following

definition of "light work":

> The U.S. Department of Labor defines light
> work as exerting up to 20 pounds of force
> occasionally, and/or up to 10 pounds of
> force frequently, and/or a negligible amount
> of force constantly (constantly: activity or
> condition exists 2/3 or more of the time) to
> move objects.  Physical demand requirements
> are in excess of those for Sedentary Work.
> Even though the weight lifted may be only a
> negligible amount, a job should be rated
> Light Work: (1) when it requires walking or
> standing to a significant degree; or (2)
> when it requires sitting most of the time
> but entails pushing and/or pulling of arm or
> leg controls; and/or (3) when the job
> requires working at a production rate pace
> entailing the constant pushing and/or
> pulling of materials even though the weight
> of those materials is negligible.

(AR 147, 149.)  Additionally, both letters provided the

definition of "sedentary work" as follows:

> The U.S. Department of Labor defines
> sedentary work as follows: exerting up to 10
> pounds of force occasionally (occasionally:
> activity or condition exists up to 1/3 of
> the time) and/or a negligible amount of
> force frequently (frequently: activity or
> condition exists from 1/3 to 2/3 of the
> time) to lift, carry, push, pull, or
> otherwise move objects, including the human
> body.  Sedentary work involves sitting most
> of the time, but may involve walking or
> standing for brief periods of time.  Jobs
> are sedentary if walking and standing are
> required only occasionally and all other
> sedentary criteria are met.

(AR 148, 150.)

Hartford then posed the following question to Dr.
Schiller: "In your opinion, is Stephen Topalian capable of full-
time (8 hours a day, 5 days a week) light work due to his knee
pain?" (AR 147.)  In response, Dr. Schiller placed a checkmark
next to "No." (*Id.*)  Hartford also asked Dr. Schiller: "In your
opinion, is Mr. Topalian capable of full-time (8 hours a day, 5
days a week) sedentary work due to his knee pain and low back
pain?" (AR 148.)  Dr. Schiller placed a checkmark next to "Yes."
(*Id.*)  Hartford then instructed Dr. Schiller to "provide [his]
rationale" and supporting medical evidence should he determine
that plaintiff "is unable to return to" either light or
sedentary work as a result of his knee and back pain. (*Id.*)
Despite this invitation, Dr. Schiller provided no such
rationale. (*Id.*)

Hartford posed similar questions to Dr. Brathwaite.
(AR 149.)  Specifically, Hartford asked Dr. Brathwaite whether
plaintiff was capable of full time light work and whether
plaintiff was capable of full time sedentary work due to his lap
band surgery. (AR 149-50.)  In response to both questions, Dr.
Brathwaite placed a checkmark next to "Yes."  (*Id.*)

On May 13, 2008, plaintiff contacted Ms. Staz and
informed her that he lost 39 pounds since his gastric banding
surgery and that "[t]he only complications he is having is
[that] he hit his knee . . . and hopes to see the Orthopaedist

43

soon.  He also continues to have back pain.  Other than that he
has no other issues." (AR 1887-88.)

On May 27, 2008, Hartford completed an Employability
Analysis Report. (AR 122-23, 144-45.)  Hartford explained that
its Employability Analysis Report was conducted based on
plaintiff's education, training, work history, and functional
capacity. (AR 122.)  With respect to plaintiff's functional
capacity, Hartford noted that it relied on the answers provided
by Dr. Schiller and Dr. Brathwaite in response to Hartford's
questions regarding plaintiff's ability to perform light and
sedentary work. (*Id.*)  Upon review of plaintiff's functional
capacity, education, skills, and employment history, Hartford
determined that plaintiff had the requisite skill, knowledge,
and functional capacity to perform at least three sedentary
occupations prevalent in the national economy: (1) "Supervisor,
Claims"; (2) "Supervisor, Correspondence Section"; and (3)
"Automobile Club Safety Program Coordinator." (AR 123.)

On May 29, 2008, Ms. Staz reviewed plaintiff's
extensive medical history and supporting medical documentation,
determined that plaintiff "has the ability to perform a
sedentary occupation," and recommended termination of
plaintiff's LTD benefits. (AR 1881-85.)

44

**B.    Hartford's Confirmation of Ms. Staz's Recommendation**

Hartford did not terminate plaintiff's benefits immediately after Ms. Staz's recommendation.  Rather, Hartford conducted further investigation "to ascertain if there has been recent [medical treatment] for other conditions which might impact the claimant's functionality." (AR 1885.)  To that end, Ms. Staz contacted the offices of Dr. Sauter, Dr. Boglia, Dr. Zito, Dr. Capustin, and therapist Kathleen Van Essendelft on June 6, 2008, seeking information regarding plaintiff's recent treatment and updated medical records. (AR 1880-81.)

Dr. Sauter's office informed Hartford that plaintiff's last office visit was on March 2, 2006, (AR 112, 1880), and Dr. Boglia's office advised Hartford that plaintiff's last office visit was on March 5, 2008, (AR 1881.)

Dr. Zito's office notified Hartford that plaintiff's next scheduled appointment was for June 17, 2008 and provided treatment records for plaintiff's most recent office visit on June 1, 2007. (AR 1880-81.)  Those treatment records related to plaintiff's annual urological examination. (AR 1880.)

On June 16, 2008, Dr. Capustin promptly replied to Ms. Staz's inquiry and provided updated medical records dating back to May 2007. (AR 108-11, 1879.)  In particular, Dr. Capustin produced a letter dated May 30, 2007 to Dr. Brathwaite, in which Dr. Capustin advised that plaintiff was on a CPAP machine for

45

obstructive sleep apnea and that "[r]epeat CPAP titration is not required." (AR 109.)  In that May 30th letter, Dr. Capustin noted that "as weight loss progresses, CPAP pressures will be titrated down." (*Id.*)

On July 8, 2008, Hartford received a letter from Dr. Van Essendelft, who advised that plaintiff was receiving psychotherapeutic treatment on a weekly to bi-weekly basis beginning in June 4, 2007 related to his obesity. (AR 105.)  In that letter, Dr. Van Essendelft provided a diagnosis of adjustment disorder with mixed disturbance of emotions, listing the psychological stressors of disability and relationship issues at home. (*Id.*)

Ten days later, on July 18, 2008, Hartford received Dr. Boglia's medical records dated January 2, 2007 through June 19, 2008. (AR 59-66, 69-74, 1879.)  In a June 19, 2008 office visit note, Dr. Boglia noted that plaintiff "may need a [left] knee replacement" and observed that plaintiff appeared stressed because of a divorce. (AR 59.)  Dr. Boglia noted, however, that plaintiff was "feeling better" and trying to lose weight and "take control of [his] health." (*Id.*)  Similarly, in a March 17, 2008 office visit note, Dr. Boglia discussed plaintiff's November 2007 gastric banding surgery and plaintiff's subsequent weight loss, noting that plaintiff weighed 378 pounds despite his lack of exercise. (AR 63.)  Dr. Boglia further observed

46

that, at the time of his March 2008 office visit, plaintiff's
father had died, plaintiff was going through a divorce, and that
plaintiff discovered gravel in his urine. (*Id.*)  Finally, in a
July 2, 2007 letter addressed to Dr. Schiller, Dr. Boglia
informed Dr. Schiller that plaintiff suffered from pain in his
right leg, was "following with orthopedics[,] and was diagnosed
with a torn meniscus in the right knee and possible sciatica."
(AR 67.)  Dr. Boglia noted that, although plaintiff experienced
gravel in his urine in April 2007, that condition had not since
recurred. (*Id.*)  Dr. Boglia also noted the presence of
plaintiff's "Grade 1 edema," large head and neck, obesity, and
limp. (*Id.*)  In addition to the aforementioned office notes, Dr.
Boglia also provided Hartford with plaintiff's May 2008 lab
results, confirming plaintiff's diagnosis of kidney stones. (*See*
AR 75-98.)

      By letter dated July 23, 2008, Hartford informed Dr.
Boglia of its finding that "[a]fter a thorough review of the
medical records, it appears [plaintiff] has the functional
capacity to perform at a light to sedentary occupation." (AR 53-
56, 2018-19.)  In that letter, Hartford provided the same
definitions of "light work" and "sedentary work" included in
Hartford's April 28, 2008 letters to Drs. Brathwaite and
Schiller. (AR 55-56.)  Hartford then asked Dr. Boglia whether
plaintiff was "capable of full-time (8 hours a day, 5 days a

week)" light work and sedentary work "due to his hypertension and trace edema." (*Id.*)  On July 28, 2008, Dr. Boglia responded to Hartford's form letter and checked "Yes" next to the question regarding plaintiff's capacity to perform light work despite his hypertension and trace edema, and did not answer the question regarding plaintiff's ability to perform sedentary work. (AR 48-49.)  As with Hartford's letters to Dr. Brathwaite and Dr. Schiller, Dr. Boglia was invited to provide his rationale and supporting medical results to support any finding that plaintiff was unable to perform either light or sedentary work. (AR 49.) Dr. Boglia, however, provided no such rationale or supporting medical records. (*See id.*)

### C.    Hartford's July 2008 Termination Decision

On July 28, 2008, Ms. Staz reassessed the updated medical evidence and again recommended termination of plaintiff's LTD benefits on the ground that plaintiff "no longer meets the definition of total disability from performing any occupation." (AR 987-91.)  Ms. Staz specifically found that plaintiff "has the ability to perform a sedentary and/or light occupation." (AR 991.)

Two days later, on July 30, 2008, Hartford Team Leader G. Sharmaine McNeil approved Ms. Staz's recommendation with the following entry on Hartford's system:

It is important to note that the claimant's [last office visit] with Cardiologist AP Grella was 11/7/07 per the med recs from AP Grella.   As of 11/7/07 the claimant continued to be asymptomatic in terms of any cardiac issues in terms of chest discomfort. A 1/07 [ejection fraction] indicated the claimant did have coronary artery disease and a preserved ejection fraction of 55% (which is within normal limits).   The [plaintiff] has diastolic dysfunction 2nd to [hypertension] for which he is treated. 11/7/07 EKG indicated a normal sinus rhythm with poor R-wave progression in V1-V3; otherwise no [acute] ST-T wave changes were noted.   AP Grella further noted that from a cardiac perspective the claimant was [clinically] stable (for the gastric banding surgery).   As of 11/7/07 the claimant's BP was 120/60 and AP Grella noted that his BP was well controlled (on medications).   In light of the review of all clinical data and multiple physician releases (AP Schiller, AP Brathwaite, and AP Boglia) to perform either a sedentary or light duty [occupation], the weight of the clinic evidence does not support the claimant remains [totally disabled from] any [occupation].

(AR 991-92.)

By letter dated July 30, 2008, Hartford advised plaintiff of its determination to terminate his LTD benefits. (*See* AR 42-46.)   In the determination letter, Hartford specifically informed plaintiff that he did "not meet the policy definition of Disability beyond 7/30/2008." (AR 42.)   Hartford noted that "[a]ll of the papers contained in [plaintiff's] file were reviewed as a whole," which included the following:

- The Employee section of the Application for Long Term Disability Income Benefits received on 7/09/2004;

- The Attending Physician's Statement of Continued Disability signed by Dr. Kevin Schiller on 1/10/2008;

- Office notes and medical records from Dr. Kevin Schiller from 12/28/2006 through 1/10/2008;

- Office notes and medical records from Dr. Collin E. Brathwaite from 2/24/2007 through 2/19/2008;

- Office notes and medical records from Dr. Rocco D. Grella from 1/05/2007 through 11/07/2007;

- Your Claimant Questionnaire you completed 1/30/2008;

- Letter to Dr. Collin Brathwaite dated 4/28/2008 and his reply dated 5/02/2008;

- Letter to Dr. Kevin Schiller dated 4/28/2008 and his reply dated 5/02/200[8];

- Medical record from Dr. Gary J. Zito dated 6/11/2007;

- Reply to our request for medical records from Dr. Sauter on 6/06/2008;

- Medical record dated 5/30/2007 from Dr. Scott Capustin;

- Letter received from Dr. Van Essendelft dated 7/08/2008;

- Medical records from Long Island Nephrology Consultants from 1/05/2007 through 6/19/2008;

- Letter to Dr. Joseph Boglia dated 7/23/2008 and his reply dated 7/28/2008;

- Employability Analysis information completed by a Vocational Rehabilitation Clinical Case Manager on 5/27/2007.

(AR 44.) Hartford further indicated that it considered "all of

the medical information in [plaintiff's] file to decide if [he]

50

continue[d] to meet the definition of Disability." (*Id.*) Thereafter, Hartford provided a detailed review of the medical records compiled by Hartford. (*See* AR 44-46.)

After summarizing Dr. Schiller's 2008 APS, Hartford explained that plaintiff's right knee and lumbar pain were treated with physical therapy and medication and that plaintiff underwent gastric banding surgery in November 2007. (AR 44.) Hartford credited Dr. Brathwaite's post-surgery report that plaintiff reported walking thirty minutes a day and lost twelve pounds. (*Id.*)  Hartford also acknowledged Dr. Brathwaite's finding that, in February 2008, plaintiff had no complaints and had lost approximately 26 pounds. (*Id.*)

With respect to plaintiff's cardiac health, Hartford cited to Dr. Grella's November 2007 letter, which reported a "normal sinus rhythm with poor R-wave progression in V1-V3." (AR 45.)  According to Hartford, medical records established that plaintiff did not have obstructive coronary disease or significant valvular heart disease and had an ejection fraction of 55%. (*Id.*)  Hartford specifically noted that "Dr. Grella felt from a cardiac perspective [that plaintiff was] clinically stable and overall acceptable and a low cardiac risk for surgery." (*Id.*)

Hartford then proceeded to cite to Dr. Schiller, Dr. Brathwaite, and Dr. Boglia's response letters in which: (1) Dr.

Schiller indicated that plaintiff could perform sedentary work but not light work, despite plaintiff's knee and back pain; (2) Dr. Brathwaite stated that plaintiff could perform both sedentary and light work in light of plaintiff's lap band surgery; and (3) Dr. Boglia stated that plaintiff had the functional capacity to perform light work, despite his hypertension and trace edema. (*Id.*)  After reviewing the remainder of the medical findings, Hartford concluded that plaintiff had the functional capacity for full-time sedentary work. (*Id.*)  Hartford also reviewed the Employability Analysis Report and listed three occupations within plaintiff's qualifications and physical capabilities. (*Id.*)

Finally, Hartford reminded plaintiff that it considered his "claim file as a whole for the purposes of determining [his] entitlement to Long Term Disability benefits." (*Id.*)  Hartford then advised plaintiff of his right to an administrative appeal of Hartford's termination decision. (AR 46.)

## X.  <u>Plaintiff's Administrative Appeal</u>

### A.  **Plaintiff's Appeal**

On August 18, 2008, plaintiff requested Hartford to forward "any/all information that was used in [the] decision making process to cancel[] [plaintiff's] disability as of [July 31, 2008]." (AR 2017.)  In response, Hartford transmitted to

plaintiff a complete copy of his claims file. (AR 1031, 1871.)
By correspondence dated November 7, 2008, Michael E. Quiat,
Esq., plaintiff's counsel of record in the instant action,
informed Hartford that he was retained to represent plaintiff to
pursue an administrative appeal of Hartford's decision to
terminate his LTD benefits. (AR 1868-70.)  In that November 7th
letter, Mr. Quiat requested several documents from Hartford,
including a copy of the plan document, the "summary plan
description," the Third-Party Administrator Agreement, and a
copy of the Administrative Record. (AR 1868-69.)

On November 17, 2008, Hartford's Appeal Unit
acknowledged receipt of plaintiff's administrative appeal,
notified Mr. Quiat that Hartford would "make an appeal decision
as soon as possible and should make the decision within 45 days
of the receipt of the request," and further noted that "[i]f
there are special circumstances that prevent us from making the
decision in that time, the evaluation period can be extended to
90 days." (AR 1030.)  On December 3, 2008, Hartford produced a
copy of plaintiff's claim file and advised Mr. Quiat of the 180
day deadline to submit information and documents in support of
plaintiff's appeal. (AR 1029.)

On March 2, 2009, Mr. Quiat submitted the following
documents in support of plaintiff's administrative appeal, each
of which will be discussed in further detail below:

- Exhibit A: Dr. Kevin Schiller['s] Multiple Diagnoses Full Assessment Letter dated February 17, 2009;

- Exhibit B: Dr. Collin E.M. Brathwaite['s] Multiple Diagnoses Full Assessment Letter dated February 17, 2009;

- Exhibit C: Dr. Joseph Boglia['s] Multiple Diagnoses Full Assessment Letter dated February 17, 2009;

- Exhibit D: Schedule of Medication Side Effects for Stephen Topalian;

- Exhibit E: Individual Medication Side Effects/Fact Sheets, provided by Physician Desk Reference (PDR) online service;

- Exhibit F: Certification of Stephen Topalian executed March 1, 2009; and

- Exhibit G: Medical Appointment Monthly Calendars, January 2007 through February 2009.

(AR 1688-89.)

Exhibits A through C consist of letters from Mr. Quiat to Drs. Schiller, Brathwaite, and Boglia.  Each of those letters included the following language:

> [R]ather than provide you with a complete picture of Mr. Topalian's entire medical condition, treatment and medications, Hartford . . . elicited from you a narrow response to a question relating only to your area of treatment, then used that answer to justify a termination of benefits.
>
> In order to correct the record in regard to Mr. Topalian's claim, we have set forth below a *complete* list of all of Mr. Toplian's current diagnoses as well as the attached chart of medications which Mr. Topalian must take daily in order to function in the most minimal capacity.

> Mr. Topalian has current diagnoses for the following diseases and/or conditions: (1) Morbid obesity . . .; (2) Diabetes Mellitus (Type-2); (3) Lumbago . . .; (4) Hypertension; (5) Sleep Apnea, Obstructive; (6) Venous Insufficiency; (7) Hypothyroidism, Acquired; (8) Edema; (9) Gout.

(AR 1703-04, 1707-08, 1711-12.)  In each letter, Mr. Quiat then solicited "Yes/No" responses to the following statements: (1) "The materials set forth in this letter and the accompanying schedule would materially affect my opinion as to Mr. Toplian's disability status."; and (2) "In view of the information provided as to Mr. Topalian's multiple medical conditions and medication, I wish to retract my opinion as expressed in my . . . 2008 correspondence to Hartford." (AR 1705, 1709, 1713.)  In response to these letters, Dr. Schiller checked "Yes" next to statements (1) and (2), (AR 1705), Dr. Brathwaite checked "Yes" next to statements (1) and (2), (AR 1709), and Dr. Boglia did not respond to Mr. Quiat's letter, (AR 1713).

Exhibit D lists plaintiff's medications, which included prescription drugs to treat his hypertension, kidney stones, diabetes, depression, cholesterol, pain, and to supplement key nutrients like potassium. (AR 1715-16.)  In addition Exhibit E provides information regarding many of the prescription drugs listed in Exhibit F. (*See* AR 1717-1800.)

Exhibit F, plaintiff's Certification, sets forth plaintiff's records of plaintiff's personal, employment, and medical history, dating back to 2003. (AR 1801-07.)  Plaintiff further sets forth his allegations regarding his medical condition, particularly his belief that "Medically, [he] continue[s] to deteriorate" in light of his kidney stones. (AR 1805.)  In his Certification, plaintiff also references his "numerous medical conditions," which require him to "be examined and evaluated frequently by [his] treating physicians." (*Id*.)  Plaintiff then chronicles his medical conditions and daily activities including his fatigue, leg swelling, his inability to perform household chores such as vacuuming or dusting because of dizzy spells, and use of an adjustable bed, diabetic shoes, and a CPAP machine. (AR 1804-06.)

Finally, Exhibit G consists of plaintiff's appointment calendar between January 2007 through February 2009, during which period he visited numerous treating physicians and gastric band support groups. (*See* 1808-34.)

In further support of his administrative appeal, plaintiff also submitted a letter addressed to Dr. Boglia, in which Dr. Boglia responds to Mr. Quiat's inquiries about plaintiff's functional capacity. (*See* AR 1679-81.)  In that letter, Mr. Quiat states:

56

> As we discussed in our recent telephone
> call, it is generally not your practice to
> sign correspondence such as the one signed
> in this case because it is generally not in
> the medical purview of nephrologists to
> address the overall impact of other medical
> conditions on the workability of a patient.

(AR 1680.)  Mr. Quiat then posed the following two questions to

Dr. Boglia, to which Dr. Boglia responded "No":

> (1) Given all of the medical conditions from
> which Mr. Topalian currently suffers, are
> you able to give a professional opinion, to
> a reasonable degree of medical certainty, as
> to Mr. Topalian's ability to work on a
> fulltime basis in a light and/or sedentary
> position?

> (2) Do you believe to a reasonable degree of
> medical certainty, that the position which
> you took in the July 23, 2008 correspondence
> with respect *only* to Hypertension and Trace
> Edema, can fairly be relied upon by Hartford
> to determine whether Mr. Topalian is
> disabled from working on a fulltime basis in
> a light and/or sedentary position, given the
> other conditions from which he suffers and
> for which he is currently being treated?

(AR 1681.)

By letter dated March 27, 2009, Hartford advised Mr.

Quiat that it received the letter including Dr. Boglia's

responses to his questions and thereafter advised plaintiff that

Hartford would make a benefit determination in forty-five days.

(AR 1028.)

57

**B.    Hartford's Request for Updated Medical Evidence**

On April 22, 2009, Hartford reviewed the documentation submitted in support of plaintiff's administrative appeal and noted that plaintiff's appointment calendar included office visits with several physicians not accounted for in Hartford's claim file. (AR 995-96.)  Consequently, on April 27, 2009, Hartford informed Mr. Quiat that Hartford had requested updated medical records from the physicians named in plaintiff's appointment calendar and encouraged Mr. Quiat to contact the doctors' offices to ensure prompt transmittal of the requested information. (AR 1025, 1027.)

By letter dated May 4, 2009, Hartford informed plaintiff that it would be taking a forty-five day extension to decide the administrative appeal because Hartford had not yet received the updated medical records from his treating physicians. (AR 1026.)

On May 14, 2009, Mr. Quiat notified Hartford that he contacted the additional physicians and claimed that only podiatrist Dr. Schirripa acknowledged receipt of Hartford's record request. (AR 1553-54.)  On May 14, 2009, Hartford responded to Mr. Quiat's letter by enclosing copies of fax confirmations for each of the physicians and by informing Mr. Quiat that second requests would be sent that day. (AR 1024, 1573, 1575-88.)

1. **Updated Medical Records of Dr. David Franko, Dr. Capustin, Dr. Zito, and Dr. Boglia**

On May 14, 2009, Hartford also received updated medical records from Dr. Franko, Dr. Schirripa, Dr. Capustin, and Dr. Zito. (AR 996.)  Dr. Franko's updated medical records include a July 22, 2008 letter, in which Dr. Franko observed that plaintiff complained of lower back pain and numbness in his extremities but "denie[d] any chest pain, palpitations, or dizziness." (AR 1612.)  In that July 22nd letter, Dr. Franko expressed his opinion that plaintiff's "lap band procedure took well, and there were no complications."  (AR 1613.) Additionally, in an April 14, 2009 letter, Dr. Franko explained that plaintiff lost approximately eighty pounds since his November 2007 gastric banding surgery and denied "dizziness, lightheadedness, naseousness [sic], vomiting, or chest pain" during an office visit. (AR 1609.)  In his April 14th letter, Dr. Franko reported plaintiff's weight as 347 pounds and further noted that plaintiff "ha[d] some mild lower extremity edema" and "mildly elevated" blood pressure.[8] (AR 1609-10.)

Dr. Capustin's updated medical records consist of office visit notes dated May 16, 2008 through January 29, 2009, in which Dr. Capustin indicates that, as of January 29, 2009,

---

[8] Dr. Franko's updated medical records also include a May 6, 2008 EKG report finding "[s]inus rhythm. Possible old anterior infarct.  Inferior T wave changes are nonspecific," (AR 1615), and February 4, 2009 "borderline" EKG report that noted "[s]inus rhythm. Possible left atrial abnormality," (AR 1614).

plaintiff's weight was 347 pounds. (AR 1631-33.)  Furthermore,
Dr. Zito's updated medical records include a June 17, 2008
office visit note describing plaintiff's complaints of frequent
urination. (AR 1636.)

On May 15, 2009, Hartford also received Dr. Boglia's
updated medical records regarding plaintiff's urological
conditions. (*See* AR 1560-72.)  One of those updated records, a
March 30, 2009 office visit note, indicates that plaintiff is
"still lightheaded at times," walks with a limp, and has
occasional high blood pressure. (AR 1563.)  In this March 30th
note, Dr. Boglia further stated that plaintiff's "gastric band
[had] not recently [been] tightened." (*Id.*)  Moreover, in an
April 10, 2009 office visit note, Dr. Boglia recorded
plaintiff's weight as 341 pounds. (AR 1562.)

By letter dated June 1, 2009, Hartford informed Mr.
Quiat's office that Hartford had still not received any
additional records from Dr. Muhlrad. (AR 1023.)  Hartford
advised that under ERISA, Hartford was obligated to provide
plaintiff with forty-five days to respond, and further noted
that "[i]f the information is received prior to the final appeal
decision, we will consider it, whether or not we proceed with
our appeal review on 6/10/09 using the information contained in
the claim file." (*Id.*)

2.   **Updated Medical Records of Dr. Brathwaite and Dr. Schiller**

On June 3, 2009, Hartford received Dr. Brathwaite's updated medical records regarding plaintiff's bariatric health, which included follow-up forms that plaintiff completed. (AR 1422-37.)  In an August 22, 2008 gastric banding follow-up form, plaintiff wrote that he suffered from occasional nausea and indicated that he did not exercise often due to pain in his knees. (AR 1431.)  Dr. Brathwaite's notes from this follow-up visit indicate that plaintiff's "Chief Complaint" was "not losing weight." (AR 1432.)  In a September 30, 2008 gastric banding follow-up form, plaintiff indicated that he walked two to three times a week for as much as fifteen minutes. (AR 1429.)

Two weeks later, on June 17, 2009, Hartford received Dr. Schiller's updated medical records, which included medical reports and office notes dated February 14, 2008 through April 24, 2009. (AR 1000, 1285-1401.)  Among those records were echocardiogram and sonography reports, both dated February 24, 2009. (AR 1379-80.)  The echocardiogram report indicated a "dilated left ventricle with no wall motion abnormalities noted," an "enlarged left atrium," and "a trace mitral regurgitation." (AR 1379.)  The sonography report found "[n]o hemodynamically significant stenosis in the Bilateral Carotid arteries studied at this time." (AR 1380.)  Moreover, three of

Dr. Schiller's updated records concerned plaintiff's lower extremities. (*See* AR 1381-84.)  For example, a February 5, 2009 report diagnosed plaintiff with mild or moderate peripheral vascular disease in both of his calves. (AR 1381.)

### 3.   Updated Medical Records of Dr. Muhlrad

On June 24, 2009, Hartford received Dr. Muhlrad's 2008-2009 medical records, comprised of office visit notes and medical records related to four hyalgan injection shots to treat plaintiff's knee arthritis. (AR 1228-51.)  In one of Dr. Muhlrad's office visit notes, Dr. Muhlrad recommended physical therapy for plaintiff, who had suffered a whiplash injury to his neck during an automobile accident on May 18, 2009. (AR 1265.)

On June 26, 2009, Kathleen Meneses, Mr. Quiat's paralegal, acknowledged that Hartford had not yet received Dr. Muhlrad's 2007 medical records but informed Hartford that "[t]he records from 2007 contain the diagnosis of spinal [s]tenosis and that [plaintiff's] left knee is significantly impaired." (AR 1257.)  In response, Hartford informed Ms. Meneses that it would not commence its review of plaintiff's claim until it received Dr. Muhlrad's 2007 medical records. (AR 1021.)  Hartford further advised Ms. Meneses that "[i]f you want us to evaluate [plaintiff's] appeal without [Dr. Muhlrad's] information, please notify us and we will begin the evaluation." (*Id.*)  Neither

plaintiff nor his attorney requested that Hartford evaluate the appeal without Dr. Muhlrad's 2007 records.

On that same day, Hartford faxed Dr. Muhlrad a request for plaintiff's 2007 medical records. (AR 1001-02.) On August 3, 2009, Hartford received the requested medical records from Dr. Muhlrad. (*See* AR 1002.) Among such records were two MRI reports: a June 30, 2007 MRI report of plaintiff's lower spine and a March 21, 2007 MRI report of plaintiff's right knee. (AR 1199-1200.) The June 30, 2007 MRI report noted "[m]ultilevel lumbar degenerative disc and facet disease with significant central stenosis at L3-L4 and mild stenosis at L4-L5." (AR 1199.) The March 21, 2007 report of plaintiff's right knee documented an "[i]njury to the posterior medial meniscal root ligament with partial tear and reactive bone marrow edema of the tibia. Probable small peripheral tear, posteromedial aspect of the medial meniscus. Soft tissue swelling, greater at the lateral aspect." (AR 1200.) Dr. Muhlrad's updated records also include a September 14, 2007 physical therapy progress report, which noted plaintiff's normal strength and decreased complaints of knee pain. (AR 1201.)

### 4. Dr. Schiller's July 2009 Letter

On July 20, 2009, Dr. Schiller informed Hartford of his opinion that plaintiff "is unable to work because of his chronic medical conditions, and, for this reason, his disability

benefits should be reinstated immediately." (AR 1176.)  In support of this opinion, Dr. Schiller cited to plaintiff's long history of "cardiomegaly and diastolic heart failure," "morbid obesity causing obstructive sleep apnea," "severe left knee pain and low back pain." (*Id.*)  Dr. Schiller acknowledged that plaintiff's "morbid obesity has been partially treated by gastric banding performed in November 2007" but notes that plaintiff has also suffered from a meniscus tear and "severe chronic bilateral lower extremity venous insufficiency, which makes it difficult for him to ambulate." (*Id.*)  In Dr. Schiller's view, plaintiff's venous insufficiency "prevents him from working at a sedentary job." (*Id.*)  Dr. Schiller concluded that he has observed "no substantive improvement in [plaintiff's] condition since [Dr. Schiller] first saw him as a patient in 2006." (*Id.*)

By letter dated August 24, 2009, Hartford assured Dr. Schiller that his letter would be considered as part of its review of plaintiff's administrative appeal. (AR 1017.)

**C.   Hartford's Extended Decision Making Timeframe**

On August 5, 2009, Hartford advised Mr. Quiat that it received Dr. Muhlrad's 2007 medical records and that such records "complete[] the appeal to [plaintiff's] claim for Long Term Disability benefits." (AR 1020.)  Hartford therefore noted

that it would render a decision within forty-five days of August 3, 2009, unless an extension was necessary. (*Id.*)

On August 13, 2009, Mr. Quiat responded to Hartford, expressing his disagreement with Hartford's "interpretation of the time requirements established under ERISA." (AR 1133-34.) Instead, Mr. Quiat argued that Hartford was required to render its decision within forty-five days of plaintiff's submission of the appeal, with only one forty-five day extension for cause. (*Id.*)  Mr. Quiat noted his position that the forty-five day period within which Hartford was required to make a decision on the appeal began to run no later than March 27, 2009. (AR 1134.)

In a response, dated August 24, 2009, Hartford explained that the delay resulted from the need for additional documents from plaintiff's physicians. (AR 1018-19.)  Hartford maintained that "after reviewing the claim file and the documents submitted with the March 2, 2009 and March 27, 2009 appeal letters, . . . Hartford determined that updated medical records for 2008 were necessary in order to provide a full and fair review." (AR 1018.)  Hartford thereafter reminded Mr. Quiat that it already "advised [him] that [it] would not begin the evaluation of [plaintiff's] appeal until the additional information [from Dr. Muhlrad] was received" and further noted that it "gave [plaintiff] the option of notifying [Hartford] if

[he] wanted [Hartford] to evaluate his appeal without the information." (AR 1019.)

Hartford then noted that on July 31, 2009, Hartford received a letter from Dr. Schiller in support of plaintiff's appeal and subsequently received Dr. Muhlrad's 2007 medical records on August 3, 2009. (*Id.*) Hartford then provided its understanding of the appropriate decision making time period for plaintiff's administrative appeal as follows:

> Hartford considers the August 3, 2009 receipt of [plaintiff's] 2007 medical records with Dr. Muhlrad to constitute receipt of new information submitted to complete [plaintiff's] appeal submission. Accordingly, . . . Hartford reserves the right to a 45 days appeal review period under ERISA, commencing on August 3, 2009, with allowance of a second 45 days decision period if there are special circumstances that prevent us from making the decision within that time. At this time, we have requested a medical review by an independent physician consultant and anticipate making a final claim determination on or before September 17, 2009.

(*Id.*)

## D.   **Medical Peer Reviews of Dr. Gary Nudell and Dr. Russell Green**

On August 6, 2009, Hartford referred plaintiff's LTD benefits claim to Reliable Review Services ("RRS") for two co-morbid medical peer reviews: one to be conducted by an internist and another by a specialist in occupational medicine. (AR 1165-66.)   Hartford thereafter notified RRS that it "would really

66

like to have separate reviews to ensure that all conditions in combination are fully considered" in light of "the multiple conditions and specialties involved." (AR 1003.)  Plaintiff's LTD benefits claim was reviewed by Dr. Nudell and Dr. Green, both of whom determined that plaintiff was capable of performing full-time sedentary work and attested that "completion of [plaintiff's] review [did] not constitute a conflict of interest." (*See* AR 1122, 1128.)

### 1. Dr. Nudell's Peer Review

On August 24, 2009, Dr. Nudell, a board certified physician in internal medicine, submitted his peer review to Hartford. (AR 1113-22.)  After describing the numerous documents reviewed in conjunction with his peer review, Dr. Nudell provided his professional opinion regarding claimant's capacity for work as of July 31, 2008 and beyond. (AR 1121-22.)

In particular, Dr. Nudell considered plaintiff's numerous medical conditions, including his diabetes, hypertension, sleep apnea, coronary artery disease, venous stasis, lumbar degenerative disease, and left knee derangement. (*Id.*)  Dr. Nudell provided a brief description of the treatment of each medical condition and his opinion of its effects on plaintiff's work capacity. (*Id.*)

With respect to diabetes, Dr. Nudell noted that "there is no documented evidence in the records that the claimant's

67

diabetes is causing any restrictions." (AR 1121.)  Dr. Nudell
then noted that plaintiff's hypertension was being treated
medically and noted that given the absence of any "end organ
damage," plaintiff's hypertension "should not pose any work
restrictions." (*Id.*)  With respect to plaintiff's sleep apnea,
Dr. Nudell noted that plaintiff was being treated with CPAP and
that his sleep apnea would not pose any work restrictions,
especially because the medical records provide no evidence that
plaintiff experiences severe daytime fatigue or issues with
CPAP. (AR 1122.)  Dr. Nudell advised that plaintiff has non-
obstructive coronary artery disease and noted the absence of any
mention of congestive heart failure or any specific limitations
from a cardiac standpoint. (*Id.*)  Regarding plaintiff's venous
stasis, Dr. Nudell acknowledged plaintiff's history of
cellulitis and leg edema as well as plaintiff's risk for
recurrent skin breakdown. (*Id.*)  Although Dr. Nudell recognized
that it would be "clinically helpful for the [plaintiff] to keep
his lower extremities elevated when able," Dr. Nudell saw no
"recent evidence that this condition would prevent the claimant
from functioning in a sedentary position." (*Id.*)  Dr. Nudell
stated that plaintiff's MRI shows evidence of lumbar
degenerative disc disease and spinal stenosis; however, Dr.
Nudell indicated that he observed no compelling medical evidence
that plaintiff's degenerative disc disease would preclude

68

plaintiff from functioning in a full time sedentary position,
"as long as [plaintiff] was given the opportunity to shift
positions as needed for pain control." (*Id.*)  Finally, with
respect to plaintiff's left knee derangement, Dr. Nudell
observed that plaintiff suffered from a "meniscal tear and OA,"
which would "limit the claimant's ability to ambulate for
prolonged periods, but should not affect his ability to perform
in a sedentary position." (*Id.*)

> In light of the foregoing, Dr. Nudell concluded that

> [plaintiff] should be capable of functioning
> in a full time sedentary position . . .
> [and] should be afforded the opportunity to
> shift positions as needed for pain control;
> when able he should try to raise his lower
> extremities to avoid further swelling;
> should limit ambulation to less than 10
> minutes at a time. I see no specific
> indication to restrict the claimant's fine
> motor activity with the upper extremities.
> I would recommend limiting his lifting to
> less than 10 pounds secondary to his chronic
> degenerative disc disease.

(*Id.*)

## 2. Dr. Green's Peer Review

On August 24, 2009, Dr. Green also submitted his
medical record peer review report. (AR 1123-28.)  Like Dr.
Nudell, Dr. Green reviewed plaintiff's medical records and
treatment history, described plaintiff's medical conditions, and
summarized his opinion regarding the effect of each condition on
plaintiff's functional capacity. (AR 1123-27.)

Dr. Green first noted that "[t]here is no anticipated functional impact of hypertension on [plaintiff]" and that "[n]one of the blood pressures recorded in the documents would be impairing or disqualifying." (AR 1126.)  Second, Dr. Green noted that plaintiff's sleep apnea would have no functional impact on plaintiff's ability to be well and do normal tasks in light of plaintiff's CPAP treatment. (*Id.*)  With respect to plaintiff's multiple medications, Dr. Green concluded based on Dr. Schiller's observation, that plaintiff had no problems with his medications. (*Id.*)  Dr. Green thereafter noted that plaintiff's diabetes medicine should not functionally impact the plaintiff. (*Id.*)  Regarding plaintiff's knee pain, Dr. Green advised that plaintiff's knee injury "could result in difficulty performing activities of daily living and make it somewhat difficult for the claimant to get around if there were no other medical issues." (*Id.*)  Dr. Green concluded, however, that the MRI findings on plaintiff's knee "are not so severe that one would expect [plaintiff] to have to significantly change his activities of daily living or contemplate a different type of work than he had been working in." (*Id.*)  Dr. Green then advised that plaintiff's back pain was "not peculiar to an individual of [plaintiff's] age irrespective of occupational demands or the impact of morbid obesity on the axial spine." (*Id.*)  With respect to plaintiff's morbid obesity, Dr. Green indicated that

morbid obesity "is associated with an obesity related to
cardiomyopathy which the heart catheterization in 01/2007
demonstrated." (*Id.*)  Dr. Green further acknowledged that
plaintiff's pulmonary hypertension, peripheral swelling, and
venous stasis were consistent with plaintiff's morbid obesity.
(*Id.*)

After describing plaintiff's medical conditions, Dr.
Green stated that "[t]aken individually, no one of [plaintiff's]
diagnoses should have a significant functional impact on day to
day activities experienced by [plaintiff] apart from the morbid
obesity and its associated conditions." (AR 1127.)  Dr. Green,
however, noted that "[t]aken as a collection of conditions, it
is my opinion that his functional capacity is impaired." (*Id.*)

Dr. Green thereafter offered his opinion with a
reasonable degree of medical certainty "that given the
information from [plaintiff] questionnaires and the information
from Dr. Schiller's medical records, the [plaintiff] is probably
more functional than he claims" and that "[plaintiff] is capable
of performing a sedentary position." (*Id.*)  Although Dr. Green
stated that plaintiff "should be allowed to be up and about to
reduce the risks of lower extremity swelling," Dr. Green advised
that "most sedentary positions would allow for this." (*Id.*)  Dr.
Green further observed that plaintiff "must be very strong in

order to raise himself up and move himself about" and provided

the following detailed work limitations and restrictions:

> It is therefore my recommendation that he is
> able to lift, carry, push, or pull 10 lbs.
> on an occasional (activity or condition
> exists up to 1/3 of the time) basis.   There
> would be no restriction on bending.   The
> claimant would be restricted from squatting
> or kneeling.   The claimant should walk no
> further than 100 feet without being allowed
> to rest and catch his breath.   Overhead
> lifting should be no greater than 10 pounds.
> There would be no limitations on activities
> involving a minimal weight at waist level or
> while sitting.   This would allow working on
> a computer, performing paperwork tasks,
> using the telephone, and interacting with
> others in an office setting. Hand activities
> such as writing or using a phone would not
> be limited.   It would be my opinion that the
> claimant would be able to work eight hours
> per day, 40 hours per week.

(*Id.*)   Dr. Green concluded by offering the logic of his

recommendation: namely, "that the duties involved with sedentary

work and those that the claimant is currently performing at home

are very similar.   A sedentary position does not require

significant ambulation or mobility.   A sedentary position does

not require a great deal of lifting or exertion." (AR 1128.)

Dr. Green therefore opined that "[t]here would be significant

benefit to the claimant medically to return to the workplace."

(*Id.*)

72

### 3. Consensus Opinion

Dr. Nudell and Dr. Green conferred and co-wrote the following consensus opinion: "The case was discussed with Dr. Green on 08/17/2009 for approximately 15 minutes.  After this discussion, we both agreed that while the claimant has multiple medical issues, that he should be capable of functioning in a full time sedentary position with the restrictions discussed above." (*Id.*)

### E. Hartford's Decision to Uphold Initial Termination on Appeal

On September 1, 2009, after review of the two medical peer review reports and plaintiff's entire LTD benefits claim file, Hartford Examiner Genie Guthrie recommended upholding Hartford's initial termination of plaintiff's LTD benefits claim. (AR 1003-06.)  Ms. Guthrie concluded that "[t]he preponderance of the evidence available to [Hartford] establishes that [plaintiff] has the residual functional capacity to perform sedentary level work with flexibility of position changes." (AR 1006.)  Ms. Guthrie further noted that Hartford's Employability Analysis Report identified three sedentary occupations within plaintiff's functional capacity, qualifications, and skills. (*Id.*)

By letter dated September 1, 2009, Ms. Guthrie informed plaintiff of Hartford's decision to uphold its prior

determination to terminate plaintiff's LTD benefits. (*See* AR 1009-16.)  Ms. Guthrie set forth a list of over thirty documents reviewed by Hartford during the course of plaintiff's administrative appeal. (AR 1009-11.)  Ms. Guthrie then advised that Hartford "also considered the fact that [plaintiff] was approved for Social Security Disability (SSD) benefits." (AR 1011.)  Ms. Guthrie noted, however, that the "SSD decision is based on specific established rulings" and that Hartford "must administer claims based on the medical documentation available to [Hartford], and is required to make its determination based on applicable Policy language and provisions, independent of all other Agencies." (*Id.*)  Ms. Guthrie thereafter provided an analysis of plaintiff's medical records and the documented improvement in plaintiff's condition subsequent to the gastric banding surgery in November 2007. (AR 1011-13.)

Ms. Guthrie proceeded to provide the following critical clarification:

> We would like to point out that . . . Hartford did not rely solely upon the opinion expressed by Dr. Boglia on 7/23/08 with respect to [plaintiff's] conditions of Hypertension and Trace Edema in making a disability determination.  The Hartford considered all of the documentation in Mr. [plaintiff's] claim file, viewed as a whole, including [his] written and oral statements; the medical records available from all of his known treating physicians; the APS completed by Dr. Schiller on 1/30/08; the opinions expressed by Dr. Schiller with

74

> respect to [plaintiff's] knee and low back
> pain, and by Dr. Brathwaite with respect to
> his lapband postoperative status; and the
> 11/7/07 report by Dr. Grella indicating that
> [plaintiff] was clinically stable from a
> cardiac perspective.

(AR 1013.)  Ms. Guthrie further assured plaintiff that Hartford "specifically requested the opinions of [plaintiff's] most current treating physicians, and relied upon those opinions in conjunction with the totality of the claim documentation." (*Id.*) Indeed, Ms. Guthrie noted that despite the retracted opinions of Dr. Boglia, Dr. Schiller, and Dr. Brathwaite, "none of [plaintiff's] physicians has provided any new statement regarding his functionality or specifying any medically indicated limitations or restrictions." (*Id.*)

Thereafter, Ms. Guthrie acknowledged but ultimately rejected Dr. Schiller's July 20, 2009 letter in support of plaintiff's administrative appeal on the grounds that Dr. Schiller provided no "clinical documentation in support of his opinion, and did not specify any functional impairments except difficulty with ambulation." (AR 1014.)  Ms. Guthrie reminded plaintiff that "to provide a full and fair review, [Hartford] sent copies of all of the medical documentation in [plaintiff's] claim file to [RRS] for an independent review by physician consultants . . . to assist [Hartford] in evaluating the functional impact of [plaintiff's] various medical conditions in

aggregate." (*Id.*)   After summarizing the peer review reports of

Dr. Nudell and Dr. Green, Ms. Guthrie again noted that

Hartford's Employability Analysis Report specified at least

three occupations available to plaintiff. (*See* AR 1014-16.)

**F.   Plaintiff's Request for Administrative Record**

On January 4, 2010, Mr. Quiat again requested various

documents from Hartford, including the Administrative Record,

the Summary Plan Description, and Hartford's Third Party

Agreement with Allstate. (AR 1074-76.)   On January 27, 2010,

Hartford responded that "[t]o the extent [plaintiff] requested

information which does not exist, or which is not relevant to

[plaintiff's] claim according to the pertinent regulations, it

is not enclosed." (AR 1073.)   Hartford then reminded plaintiff

that "to protect material such as private third-party

information or privileged communications, certain documents may

have been withheld or appropriately redacted." (*Id.*)

**XI.   Hartford's Claims Administration Procedures and Policies**

In support of its summary judgment motion, Hartford

has provided the affidavit of Ms. Guthrie and the declaration of

Hartford Director of Litigation and Appeals Bruce Luddy. (*See*

ECF No. 57, Declaration of Bruce Luddy ("Luddy Decl."); Guthrie

Aff.)   Their relevant testimony is set forth below:

- Hartford reviews benefits claims fairly without regard to
  the manner in which the plan is funded. (Luddy Decl.
  ¶ 6.; Guthrie Aff. ¶ 8.)

76

- Hartford consistently awards benefits on claims that are entitled to payment pursuant to the provisions of the applicable benefits plan while consistently denying claims that are not entitled to such payments. (Luddy Decl. ¶ 6.)

- Hartford recognizes that awarding benefits on claims that are not entitled to such payments pursuant to the terms of the applicable plan does not benefit all of the persons insured under that plan as a group. (Luddy Decl. ¶ 7.) Instead, such payments could result in increased premiums and/or a reduction or elimination of benefits by the employer, which will ultimately work to the detriment of all participants and beneficiaries of a given plan. (*Id.*)

- Hartford does not provide its Claims Specialists, Team Leaders or Appeals Specialists with any incentives, remuneration, bonuses, awards, achievements, or other recognition based in whole or in part upon the denial or termination of claims. (Luddy Decl. ¶ 8; Guthrie Aff. ¶ 9.)

- Hartford's claims decision-makers are paid fixed salaries and performance bonuses that are wholly unrelated to the number of claims paid or claims denied. (Luddy Decl. ¶ 8; Guthrie Aff. ¶ 9.)

- Hartford's Claim Specialists, Team Leaders and Appeals Specialists are evaluated on the quality and accuracy of their claims decisions in accordance with the applicable plan documents. (Luddy Decl. ¶ 9; Guthrie Aff. ¶ 9.)

- Hartford does not discourage its claim decision-makers from paying legitimate claims. (Luddy Decl. ¶ 10.)

- Hartford maintains a separate Appeals Unit for the consideration of claims that have been denied by the claims department on its initial review. (Luddy Decl. ¶ 3.)

- During the Appeals Specialist's review of a denied claim on administrative appeal, the individual responsible for the appeal does not discuss the merits of the claim with the Claim Specialist who made the initial benefits

determination, or her supervisors. (Luddy Decl. ¶ 5; Guthrie Aff. ¶ 7.)

- Hartford's claims department and Appeals Unit are completely separate business units from the financial and underwriting departments. (Luddy Decl. ¶¶ 12, 14.) Neither the claims department nor the Appeals Unit seeks approval from Hartford's financial underwriters in connection with their decision-making on claims for disability benefits. (Luddy Dec. ¶ 13.) Hartford's financial and underwriting departments do not advise or influence the claims department or Appeals Unit with respect to whether or not to pay a claim. (Luddy Decl. ¶ 14.)

## DISCUSSION

## I.  Standard of Review

### A.  Summary Judgment Standard

"Summary judgment is appropriate where there is no genuine issue as to any material fact and . . . the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004) (internal quotation marks omitted).  "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted).  "A fact is material when it might affect the outcome of the suit under

78

governing law." *Id.* (internal quotation marks omitted).

Moreover, an issue of fact is genuine only if "the evidence is

such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986).

"In order to defeat a motion for summary judgment

supported by proof of facts that would entitle the movant to

judgment as a matter of law, the nonmoving party is required

under Rule 56[] to set forth specific facts showing that there

is a genuine issue of material fact to be tried." *Ying Jing Gan*

*v. City of New York,* 996 F.2d 522, 532 (2d Cir. 1993).  The

nonmoving party may not, however, "rely simply on conclusory

statements or on contentions that the affidavits supporting the

motion are not credible, or upon the mere allegations or denials

of the nonmoving party's pleading." *Id.* at 532-33 (internal

quotation marks and citations omitted).

"Courts reviewing a challenge of denial of benefits

under ERISA may do so on a motion for summary judgment, which

'provides an appropriate vehicle whereby the Court can apply

substantive ERISA law to the administrative record.'"

*Zarringhalam v. United Food & Commercial Workers Int'l Union*

*Local 1500 Welfare Fund*, No. 11-CV-2913, 2012 WL 5989896, at *11

(E.D.N.Y. Nov. 30, 2012) (quoting *Gannon v. Aetna Life Ins.,*

*Co.*, No. 05-CV-2160, 2007 WL 2844869, at *6 (S.D.N.Y. Sept. 28,

2007)); *see also Fortune v. Grp. Long Term Disability Plan for Emps. of Keyspan Corp.*, 637 F. Supp. 2d 132, 141 (E.D.N.Y. 2009), *aff'd*, 391 F. App'x 74 (2d Cir. 2010).  "In such an action the contours guiding the court's disposition of the summary judgment motion are necessarily shaped through the application of the substantive law of ERISA." *Alfano v. CIGNA Life Ins. Co.*, No. 07-CV-9661, 2009 WL 222351, at *12 (S.D.N.Y. Jan. 30, 2009) (internal quotation marks omitted).

## B.   ERISA Standard of Review

As a threshold matter, the court must determine the standard of review applicable to Hartford's termination of plaintiff's LTD benefits.  The Supreme Court has long held that "a denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008); *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 82-83 (2d Cir. 2009).  "When the claims administrator is granted express authority to determine eligibility issues, however, the [c]ourt 'will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious.'" *Salute v. Aetna Life Ins. Co.*, No. 04-CV-2035, 2005 WL 1962254, at *4 (E.D.N.Y. Aug. 9, 2005)

(quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir.
1995)). "The plan administrator bears the burden of proving
that the deferential standard of review applies." *Fay v. Oxford
Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002) (citing *Kinstler v.
First Reliance Standard Life Ins., Co.*, 181 F.3d 243, 249 (2d
Cir. 1999)).

 Here, the parties dispute whether Hartford's
termination decision should be reviewed *de novo* or under an
arbitrary and capricious standard. Plaintiff urges the court to
apply a *de novo* standard of review on two independent grounds.
First, plaintiff argues that Hartford has failed to establish
that Allstate conveyed or intended to convey discretion to
Hartford. (Pl. Mem. at 25; Pl. Opp. at 11.) Second, plaintiff
contends that Hartford failed to comply with the regulatory time
requirements in deciding plaintiff's administrative appeal,
thereby forfeiting any discretion. (Pl. Mem. at 22; Pl. Opp. at
9-11.) As set forth below, both of plaintiff's arguments are
meritless.

### 1. Relevant Plan Documents and Hartford's Discretion under the Plan

 Plaintiff first contends that the Administrative
Record lacks evidence that Allstate conveyed or intended to
convey discretion to Hartford. (Pl. Mem. at 25.) Although
plaintiff concedes that Hartford has identified "adequate plan

language describing discretion," plaintiff maintains that Hartford must also present "evidence that said discretionary authority was *actually transmitted*." (Pl. Opp. at 12 (emphasis in original); *see also* Pl. Mem. at 25.)  To that end, plaintiff argues that the Administrative Record does not contain the Plan itself but instead contains only "plan documents" and a "Summary Plan Description," both of which were drafted and issued by Hartford and thus fail to prove that discretion was explicitly conferred to Hartford. (Pl. Mem. at 26; Pl. Opp. at 12-13.) Plaintiff's contention misconstrues the evidence in the Administrative Record and ignores controlling Plan Documents, which establish that Hartford retains discretionary authority.[9]

As previously noted, the Administrative Record before the court contains a Group Benefit Plan Document and a 2004 Policy Amendment, both of which include provisions that set forth the controlling terms and provisions of the Plan. (AR 1-39.)  The Group Benefit Plan Document contains a Certificate of Insurance, which explains that the pages within the Group Benefit Plan Document, including the Certificate of Insurance, become an employee's "Booklet-certificate." (AR 15.)  The Certificate of Insurance further states that the "Booklet-certificate is part of the Group Insurance Policy." (*Id.*)  The

---

[9] Because the court finds that the Plan Documents conferred discretionary authority on Hartford, the court need not reach Hartford's threshold contention that plaintiff has waived this argument.

Booklet-certificate thereafter explains that Harford retains
"full discretion and authority to determine eligibility for
benefits and to construe and interpret all terms and provisions
of the Group Insurance Policy." (AR 27.)  Moreover, the Booklet-
certificate further explains that "[t]he benefits described in
[the Booklet-certificate] . . . are provided under a group
insurance policy (Policy) issued by . . . Hartford . . . and are
subject to the Policy's terms and conditions." (AR 33.)
Notably, the Booklet-certificate further indicates that the
Policy "is incorporated into, and forms a part of, the Plan" and
that "[t]he Plan has granted [Hartford] full discretion and
authority to determine eligibility for benefits and to construe
and interpret all terms and provisions of the Policy." (AR 33;
see also AR 36.)  As such, plaintiff's Booklet-certificate — a
part of the Policy, which in turn forms a part of the Plan —
features explicit and uncontroverted evidence that Hartford
possesses discretion to determine a claimant's eligibility for
LTD benefits under the Plan and to interpret the provisions of
plaintiff's insurance policy.  No further evidence of Allstate's
"transmittal" of such discretion is needed to demonstrate what
the plain language of the Plan Documents unequivocally
establish.

     In addition, the 2004 Policy Amendment includes an
Incorporation Provision which indicates that the Booklet-

certificate and the forms enclosed therein "are . . . incorporated in, and made a part of, this policy." (AR 3.)   The 2004 Amendment's Incorporation Provision thereafter states that the terms of the Booklet-certificate, comprised of the Certificate of Insurance and all pages in the Group Benefit Plan Document, "will control: the benefit plan provisions; the eligibility and effective date of insurance rules; the termination of insurance rules; exclusions; and other general policy provisions pertaining to state insurance law requirements." (*Id.*)   The Amendment further states that "the [entire] contract between [Hartford and Allstate] consists of: the policy; the application of the Policyholder, a copy of which is attached to and made a part of the policy when issued; and the applications, if any, of each insured person." (AR 8.)   As such, the 2004 Policy Amendment clarifies that the Booklet-certificate is a controlling Plan Document, the terms of which "control . . . the benefit plan provisions." (AR 3.)   Taken together, the Booklet-certificate and 2004 Policy Amendment establish that the Plan unambiguously confers on Hartford the discretionary authority to determine disability eligibility and to enforce and interpret the terms of the Plan.

The district court's analysis in *Joyner v. Continental Cas. Co.*, 837 F. Supp. 2d 233 (S.D.N.Y. 2011) proves instructive in this case.   In *Joyner*, the district court held that a Group

84

Long Term Disability Certificate, which was not designated a
Summary Plan Description, established that the Plan vested
discretionary authority in the Claims Administrator. *Id.* at 237.
Specifically, the district court reasoned that the "integration
clause in the Group Policy states 'The policy, the Employer's
application, *Your* certificate of coverage, and *Your* application,
if any, and any other attached papers, form the entire contract
between the parties.'" *Id.*  The court in *Joyner* therefore
concluded that the Certificate, "according to the plain language
of the Policy, is part of the plan's terms and is 'legally
binding,' and thus gives [the Claims Administrator]
discretionary authority to interpret the plan." *Id.* at 237-38.

Similar to the legally binding Certificate in *Joyner*,
the Booklet-certificate here is incorporated into and is a part
of the plan and controls the benefit plan provisions.  As such,
the discretionary authority set forth in the Booklet-certificate
provides ample proof that Hartford enjoys discretionary
authority under the Plan. *See Thurber v. Aetna Life Co.*, Nos.
12-CV-370, 12-CV-521, 2013 WL 950704, at *3 (2d Cir. Mar. 13,
2013) (acknowledging that the plaintiff's "Booklet" constituted
a plan document that could have, but did not, reserve discretion
to plan administrator); *Palmiotti v. Metro. Life Ins. Co.*, 423
F. Supp. 2d 288, 297-98 (S.D.N.Y. 2006) (finding a "LTD Booklet"
containing reservation of discretionary authority to be a

controlling Plan Document where, as here, the LTD Booklet was
incorporated into the insurance policy).

In arguing to the contrary, plaintiff cursorily
asserts that the Administrative Record includes only a "plan
amendment," a "Summary Plan Description," and/or "Policy
documents," but not the Plan.[10] (Pl. Mem. at 26; Pl. Opp. at 12-
13.)  In support of this claim, plaintiff cites to the following
language in the Booklet-certificate: "[t]he Policy is
incorporated into, and forms a part of, the Plan. . . . A copy
of the Plan is available for your review during normal working
hours in the office of the Plan Administrator." (AR 33; Pl. Mem.
at 27.)  Plaintiff asserts that this language "states that
additional Plan documents exist" that are not included in the
Administrative Record. (Pl. Mem. at 29.)  Plaintiff's
speculative assertion, however, mischaracterizes the evidence in
the Administrative Record and presumes, without any evidentiary
basis, that the Booklet-certificate constitutes a "Summary Plan
Description."  As explained above, Hartford has produced

---

[10] Notably, plaintiff's characterization of the documents in the
Administrative Record is inconsistent throughout his various submissions.  In
his Memorandum in Support of his cross-motion for summary judgment, plaintiff
maintains that the Administrative Record contains "a plan amendment" and "a
Summary Plan Description." (Pl. Mem. at 26.)  In his Opposition, however,
plaintiff maintains that the Administrative Record includes only "Policy
documents (SPD)." (Pl. Opp. 12-13.)  In his Reply Memorandum, plaintiff again
alters his characterization of the Plan-related documents and acknowledges
that, as conceded by Hartford, the Administrative Record does not contain the
Summary Plan Description. (Pl. Reply at 5.)  Plaintiff's shifting
characterization of the relevant Plan Documents merely obfuscates the fact
that the Administrative Record contains legally binding Plan Documents that
unambiguously establish Hartford's discretion under the Plan.

controlling Plan documents establishing that Hartford retains discretionary authority under the Plan.  Plaintiff's insistence that additional Plan Documents may exist and his concomitant speculation that such additional Plan Documents may controvert the discretion unequivocally set forth in the submitted Plan Documents — specifically, the Booklet-certificate — are insufficient to raise a genuine issue of material fact.

Moreover, plaintiff's reliance on *CIGNA Corp. v. Amara*, 131 S. Ct. 1866 (2011) is unavailing. (Pl. Mem. at 29.) In *Amara*, the Supreme Court held that terms set forth in summary plan descriptions could not be enforced as terms of the plan itself. 131 S. Ct. at 1877-78.  The Court reasoned that "[t]o make the language of a plan summary legally binding could well lead plan administrators to sacrifice simplicity and comprehensibility in order to describe plan terms in the language of lawyers" and thus concluded that "the summary documents . . . do not themselves constitute the *terms* of the plan." *Id.* at 1877-78.

*Amara* is inapposite for two reasons.  First, as previously noted, there is no evidentiary basis to conclude that the documents in the Administrative Record constitute summary plan descriptions rather than controlling Plan Documents.[11]  To

_____

[11] In fact, as noted *supra*, plaintiff appears to acknowledge in his Reply Memorandum that the documents in the Administrative Record do not constitute the Summary Plan Description. (*See* Pl. Reply at 5 & n.1.)

the contrary, as discussed above, the 2004 Policy Amendment clarifies that the Booklet-certificate, which establishes Hartford's discretion under the Plan, controls the terms of the benefits plan. (*See* AR 3.)  Moreover, the Administrative Record establishes that the Booklet-certificate is a part of the Group Insurance Policy and that the Group Insurance Policy is part of the Plan.[12] (*See* AR 15, 33.)

Second, unlike in *Amara*, there is no admissible proof demonstrating that "the Plan" conflicts with any of the documents in the Administrative Record received by plaintiff regarding Hartford's discretionary authority. *Schussheim v. First Unum Life Ins. Co.*, No. 09-CV-4858, 2012 WL 3113311, at *3 (E.D.N.Y. July 31, 2012) ("After *Amara*, to the extent that the

---

[12] Even accepting plaintiff's initial assertion, in his moving papers and his Opposition brief, that the Booklet-certificate constitutes a "Summary Plan Document," (Pl. Mem. at 26; Pl. Opp. at 12-13), the court finds that the Booklet-certificate nevertheless suffices to demonstrate Hartford's discretion under the Plan.  In *Durham v. Prudential Ins. Co.*, the district court rejected the plan administrator's contention that the Summary Plan Description "should be considered part of the Plan because it is contained in the same bound booklet as the Group Insurance Certificate." 890 F. Supp. 2d 390, 395 (S.D.N.Y. 2012).  The district court explained that "'an insurer is not entitled to deferential review merely because it claims the [Summary Plan Description] is integrated into the Plan.  Rather, the insurer must demonstrate that the [Summary Plan Description] is part of the Plan, for example, by the [Summary Plan Description] clearly stating on its face that it is part of the Plan.'" *Id.* (quoting *Eugene S. v. Horizon Blue Cross Blue Shield*, 663 F.3d 1124, 1131 (10th Cir. 2011)).  The district court in *Durham* ultimately declined to construe the Summary Plan Description as part of the plan because the Summary Plan Description "expressly provide[d] that it [was] *not* part of the Group Insurance Certificate." *Id.* (emphasis in original); *see also Hamill v. Prudential Ins. Co.*, No. 11-CV-1464, 2012 WL 6757211, at *4-6, 9 (E.D.N.Y. Sept. 28, 2012), *adopted by* 2013 WL 27548 (E.D.N.Y. Jan. 2, 2013).  By contrast, the Booklet-certificate in this case controls the terms of the Plan and expressly provides that it is part of the Policy, which is in turn part of the Plan. (AR 15, 33.)  Consequently, under *Durham*, the Booklet-certificate, even if construed as a Summary Plan Description, establishes Hartford's discretionary authority. (*Id.*)

language of a 'plan summary' conflicts with the actual terms of the plan, the terms of the plan control."). Plaintiff concedes that "the specific language relied upon by . . . Hartford is adequate to describe discretionary authority," and merely asserts that additional Plan documents may exist. (Pl. Mem. at 25.) Nowhere in plaintiff's submissions does he assert that those additional Plan documents divest Hartford of discretionary authority.[13] As such, the Supreme Court's holding in *Amara* is not controlling and does not compel application of *de novo* review in this case.

Equally unavailing is plaintiff's reliance on *Sheehan v. Metro. Life Ins. Co.*, 368 F. Supp. 2d 228 (S.D.N.Y. 2005). (Pl. Mem. at 29.) In *Sheehan*, the district court found that MetLife, the plan administrator, failed to establish that the arbitrary and capricious standard of review applied. *Id.* at 231. The district court reasoned that MetLife conceded during the initial round of discovery that it could not uncover complete copies of the relevant plan documents. *Id.* After permitting plaintiff to conduct additional "documentary and deposition discovery on the issues of plan interpretation," the district court in *Sheehan* rejected MetLife's request for deferential review on the ground that MetLife again failed to produce the

---

[13] Notably, despite plaintiff's repeated assertion that Hartford failed to produce "the Plan" or additional Plan Documents during discovery, (Pl. Mem. at 28-29), plaintiff failed to file a discovery motion to compel production of such documents despite ample time and opportunity to do so.

relevant plan documents demonstrating MetLife's discretionary authority. *See id.*

Unlike in *Sheehan*, where the district court rejected MetLife's request for arbitrary and capricious review based on its complete failure to locate and present plan documents establishing conferral of discretionary authority, Hartford has produced the relevant Plan Documents — the Booklet-certificate and the 2004 Policy Amendment — which when read together, establish Hartford's explicit discretionary authority to enforce and interpret the terms of the Plan.[14]

---

[14] Plaintiff faults Hartford for failing to produce Plan Documents bearing the counter-signature of Allstate. (Pl. Reply at 4.)  Plaintiff has failed to cite — and the court has not located — any legal authority supporting the proposition that a Plan Document like the Booklet-certificate is insufficient to demonstrate a plan administrator's discretionary authority where the Plan Document bears no counter-signature from the employer.  ERISA merely requires "that a plan be maintained in writing; it does not specify the adoption formalities that must be followed by a plan sponsor in approving the terms of a plan." *Cohen v. Metro. Life Ins. Co.*, 485 F. Supp. 2d 339, 348 (S.D.N.Y. 2007) ("Plaintiff argues that the deferential review standard should not apply because there is no documentation signed by the plan sponsor indicating specific adoption or approval of the Discretionary Clause. Plaintiff cites no legal authority for this proposition."), *aff'd in relevant part*, 334 F. App'x 375 (2d Cir. 2009).  Admittedly, the district court in *Cohen* addressed a discretionary clause in a Summary Plan Description before the Supreme Court's decision in *Amara*, which, as noted earlier, held that terms in a Summary Plan Description do not necessarily constitute the terms of the plan.  *Amara*, however, does not abrogate *Cohen*'s legally sound holding that ERISA "does not specify the adoption formalities that must be followed by a plan sponsor in approving the terms of a plan." *Id.*

In any event, courts apply the arbitrary and capricious standard where, as here, the controlling plan documents reserve discretion to the plan administrator in clear and unequivocal language. *E.g.*, *Thurber*, 2013 WL 950704, at *3 ("[T]he language contained in Aetna's plan . . . clearly reserves discretion to Aetna for determining participants' eligibility for disability benefits. That Thurber did not have actual notice of Aetna's reservation of discretion is of no consequence."); *Palmiotti*, 423 F. Supp. 2d at 297 ("In cases where the plan does confer such discretionary authority, courts review the denial of benefits under the more deferential arbitrary and capricious standard . . . .").  Plaintiff's speculative assertion that Hartford may have drafted these documents without the authorization or approval of Allstate is unsubstantiated, ignores the fact that the Booklet-

Accordingly, Hartford has adduced sufficient evidence to establish that the Plan confers explicit discretionary authority on Hartford.

### 2.     Hartford's Purported Failure to Comply with Regulatory Time Requirements

Plaintiff next maintains that the court should apply a *de novo* standard of review because Hartford failed to comply with the DOL's time requirements for deciding plaintiff's administrative appeal. (Pl. Mem. at 22-24.)  Specifically, plaintiff contends that his administrative appeal, which was submitted on March 2, 2009, was not decided by Hartford until September 1, 2009, long after the regulatory time period set forth under 29 C.F.R. §§ 2560.503-1(i)(1)(i), 2560.503-1(i)(3)(i). (Pl. Mem. at 22-23.)  Plaintiff argues that Hartford's failure to issue a timely decision by June 25, 2009 deprives Hartford of its discretion, thereby requiring *de novo* review of its termination of plaintiff's LTD benefits. Plaintiff's argument fails.

Even assuming that Hartford's decision on plaintiff's appeal was untimely, a close review of the Administrative Record

---

certificate constitutes a Plan Document that sufficiently vested discretionary authority to Hartford, and is inconsistent with plaintiff's arguments elsewhere in his submissions.  The Booklet-certificate and the 2004 Policy Amendment serve as sufficient proof that Hartford reserves discretion under the Plan. *See Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 622-23 (2d Cir. 2008) (holding that a supplemental certificate of coverage was sufficient proof that plan vested discretionary authority in plan administrator).  Indeed, plaintiff does not, and cannot based on mere conjecture, dispute that the Booklet-certificate controls the terms of the Plan. (AR 3.)

establishes that Hartford is entitled to deferential review.[15]
Far from forfeiting its discretionary authority, Hartford
requested updated medical records from plaintiff's treating
physicians to ensure a complete and accurate claim file and
thereafter rendered its written decision less than one month
after obtaining all of the relevant medical evidence.  In doing
so, Hartford properly exercised its discretion and substantially
complied with the DOL's regulatory deadlines, and its decision
remains entitled to a deferential standard of review.

        Indeed, the weight of authority in the Second Circuit
supports the application of arbitrary and capricious review
where, as here, the plan administrator remains in regular
contact with the benefits claimant and issues a decision prior
to the commencement of federal litigation. *E.g.*, *Duncan v. CIGNA
Life Ins. Co.*, No. 10-CV-1164, 2011 WL 6960621, at *5 (E.D.N.Y.
Dec. 30, 2011) ("CLICNY has provided a decision to which the
Court can defer, and did so before it was served with the
complaint in this action. . . .  Moreover, CLICNY regularly

---

[15] In light of the court's determination that Hartford is entitled
to deferential review regardless of any purported delay, the court need not
determine whether the time period to determine plaintiff's appeal was tolled
while Hartford awaited updated medical records from plaintiff's treating
physicians.  The court, however, rejects plaintiff's mischaracterization of
Hartford's conduct as a "cavalier approach towards [plaintiff's] claim" or an
"arrogant disregard of its legal responsibilities under ERISA." (Pl. Opp. at
10.)  Despite plaintiff's disingenuous protestations to the contrary, the
Administrative Record is devoid of evidence that Hartford's purported delay
was motivated by a cavalier approach to plaintiff's claim.  To the contrary,
Hartford proactively communicated with plaintiff's counsel during the
pendency of plaintiff's administrative appeal to ensure that Hartford's
claims file was complete and accurate.

communicated with plaintiff regarding the status of his appeal and informed the plaintiff of the reasons for delays." (citations omitted)), *aff'd*, *Duncan v. CIGNA Life Ins. Co.*, No. 12-CV-328, 2013 WL 57871 (2d Cir. Jan. 7, 2013); *Robinson v. Metro. Life Ins. Co.*, No. 06-CV-7604, 2007 WL 3254397, at *2 (S.D.N.Y. Nov. 2, 2007) ("[A]lthough MetLife did not issue a decision within the time prescribed by ERISA, its tardiness was not in bad faith.  MetLife remained in contact with [plaintiff's] attorney, informed him of the reasons for its delays, and took steps to ensure a full and fair review of Robinson's claim.  Therefore, the Court will apply the arbitrary and capricious standard."); *Daniel v. UnumProvident Corp.*, No. 04-CV-1073, 2006 WL 5692739, at *14 (E.D.N.Y. Mar. 13, 2006) ("UNUM Life's delay in providing plaintiff with timely notice of the denial of her appeal was occasioned, at least in part, by additional medical and vocational reviews of her claim, following additional submissions by plaintiff.  Thus, the delay cannot be characterized as dilatory or as evidencing bad faith."); *Pava v. Hartford Life & Accident Ins. Co.*, No. 03-CV-2609, 2005 WL 2039192, at *9-10 (E.D.N.Y. Aug. 24, 2005) (holding that where the administrator communicates with the claimant regarding the status of the appeal, acts in good faith, and does not delay its decision unreasonably, its failure to comply with the regulation deadlines may be excused); *Hammer v.*

*First Unum Life Ins. Co.,* No. 01-CV-9307, 2005 WL 525445, at *3 (S.D.N.Y. Mar. 7, 2005) (holding that the Second Circuit has not carved out an exception to the arbitrary and capricious standard to revert to a *de novo* standard of review for untimely rendered decisions of administrative appeals), *aff'd on other grounds,* 160 F. App'x 103 (2d Cir. 2005); *cf. Demirovic v. Bldg. Serv. 32 B-J Pension Fund*, 467 F.3d 208, 212 (2d Cir. 2006) ("[R]ather than go directly to court when the Fund failed to issue a timely initial determination, [plaintiff] chose to appeal. She then waited for and received a timely decision on her appeal. This eventual decision constitutes a final decision and exercise of the Fund's discretion, to which we must defer." (footnote omitted)).

The district court's reasoning in *Duncan* provides strong support for the application of arbitrary and capricious review in this case. In *Duncan*, the district court held that the plan administrator's untimely determination of plaintiff's appeal did not require *de novo* review. 2011 WL 6960621, at *4-5. Specifically, the district court reasoned that "[e]ven assuming that defendant's determination was late, this is not a case in which the administrator fails to respond at all, nor is it a case in which the administrator has failed to comply in any reasonable respect with the regulatory deadlines." *Id.* at 5 (internal citations and quotation marks omitted). The district

94

court further explained that the plan administrator rendered a decision before the commencement of the plaintiff's federal ERISA action and regularly communicated with the plaintiff regarding the status of his appeal. *Id.* In light of the plan administrator's good faith conduct, the *Duncan* court held that arbitrary and capricious, rather than *de novo*, review was warranted. *Id.*

As in *Duncan*, Hartford's delay in this case did not arise out of dilatory gamesmanship or bad faith. Hartford regularly communicated with plaintiff regarding the status of his appeal, informed plaintiff of the additional time needed to acquire relevant medical records from his treating physicians, and thereafter rendered a decision on plaintiff's appeal months before the commencement of the instant action. Having done so, Hartford substantially complied with the DOL's regulatory deadlines and rendered a decision that is entitled to deferential review, notwithstanding any purported delay in its final benefits determination. *See Pava*, 2005 WL 2039192, at *9 ("[T]he case law in this Circuit indicates that where the administrator communicates with the claimant regarding the status of her appeal, acts in good faith, and does not delay its decision unreasonably, its failure to comply with the regulation deadlines may be excused.").

Indeed, the timeline of events surrounding plaintiff's administrative appeal confirms Hartford's proactive and comprehensive approach to plaintiff's LTD benefits claim and demonstrates that Hartford substantially complied with the DOL's regulatory deadlines.[16]  Specifically, on March 2, 2009, plaintiff submitted his administrative appeal, and supplemented that appeal on March 27, 2009 with an additional letter from Dr. Boglia. (AR 1028, 1690.)  By letter dated March 27, 2009, Hartford informed plaintiff that it would issue a decision on his administrative appeal by May 11, 2009. (AR 1028, 1091.)  On April 22, 2009, after reviewing the treatment calendar submitted by plaintiff in support of his appeal, Hartford discerned that it lacked updated medical records from plaintiff's treating physicians and sought to obtain those updated records. (AR 995-96.)  Accordingly, by letter dated April 27, 2009, Hartford informed plaintiff of its request for additional medical records from plaintiff's treating physicians and encouraged plaintiff's counsel to assist Hartford in obtaining those updated records. (*See* AR 1027.)

On May 4, 2009, Hartford informed plaintiff that it was taking a forty-five day extension to decide plaintiff's

---

[16] In fact, on December 8, 2008, Hartford afforded plaintiff an extension of time to complete his appeal, further demonstrating Hartford's willingness to provide plaintiff a full and fair review. (AR 994.) Plaintiff's unwillingness to reciprocate this courtesy, and his concomitant attempt to punish Hartford for its alleged failure to comply with the DOL's regulatory deadlines, is troubling.

administrative appeal because it was awaiting updated medical records from plaintiff's treating physicians. (*See* AR 1026.) Between May 2009 and June 2009, Hartford received numerous updated medical records from Dr. Franko, Dr. Schirripa, Dr. Capustin, Dr. Brathwaite, Dr. Schiller, and Dr. Muhlrad. (*See* AR 996, 1422-37, 1228-51.)  Although Hartford received Dr. Muhlrad's 2008-2009 medical records on June 24, 2009, Hartford did not receive Dr. Muhlrad's 2007 medical records. (AR 1228-51, 1257.)  Accordingly, by letter dated June 26, 2009, Hartford notified plaintiff that it would not commence its review of plaintiff's appeal until it received Dr. Muhlrad's 2007 medical records. (AR 1021.)  Significantly, in its June 26th letter, Hartford also advised plaintiff to inform Hartford if he wanted it to evaluate the administrative appeal without Dr. Muhlrad's 2007 records. (AR 1021.)  Plaintiff, however, did not request Hartford to commence its appeal before Dr. Muhlrad's 2007 records were received.

On August 3, 2009, Hartford received Dr. Muhlrad's 2007 medical records. (AR 1002.)  On August 5th, Hartford explained that the receipt of Dr. Muhlrad's 2007 records completed plaintiff's appeal and required a determination within forty-five days with the option for another forty-five day extension. (AR 1020.)  Less than one month later, on September 1, 2009, Hartford rendered its decision on plaintiff's appeal

and upheld Hartford's initial termination of plaintiff's LTD benefits. (AR 1009-16.)

Throughout this extended process, Hartford consistently communicated with plaintiff regarding its need for updated records from plaintiff's numerous treating physicians to ensure a full and fair review of plaintiff's LTD benefits claim. Hartford informed plaintiff of the additional time needed to obtain those updated records and requested the assistance of plaintiff's counsel to ensure timely receipt of those records. Furthermore, Hartford afforded plaintiff the option of proceeding with consideration of his appeal without the medical records of his orthopedist.  Having failed to avail himself of that option, plaintiff now seeks to shift the blame onto Hartford and to punish Hartford for attempting to base its decision on updated and complete medical records.  The court rejects plaintiff's meritless attempts to subject Hartford's claims determination to *de novo* review and finds that Hartford was in substantial compliance with the DOL's regulatory deadlines.

The case law cited by plaintiff does not command a different result.  In *Nichols v. Prudential Ins. Co.*, the plan administrator failed to decide plaintiff's appeal before the expiration of the regulatory deadlines. 406 F.3d 98, 104-08 (2d Cir. 2005).  Thereafter, plaintiff filed a lawsuit in federal

98

court, and the plan administrator moved to dismiss plaintiff's
complaint for failure to exhaust her administrative remedies.
*Id.* at 102.  The Second Circuit held that because the plan
administrator failed to render a timely decision before the
plaintiff commenced her federal action, the plaintiff's
administrative appeal was "deemed denied," thereby permitting
her to go directly to federal court rather than await the plan
administrator's belated decision. *Id.* at 105-109.  The Second
Circuit further clarified that the plaintiff's "'deemed denied'
claim [was] not denied by any exercise discretion, but by
operation of law" and therefore held "that a 'deemed denied'
claim is entitled to de novo review." *Id.* at 109.  In so
holding, the Second Circuit declined to apply the "substantial
compliance" approach to the plan administrator's failure to
comply with the regulatory deadlines because doing so could
effectively block the plaintiff's access to the federal courts.
*See id.* at 107.

The district court in *Fershtadt v. Verizon Commc'ns,
Inc.* reached a similar result. No. 07-CV-6963, 2010 WL 571818,
at *10-11 (S.D.N.Y. Feb. 9, 2010).  In *Fershtadt*, the plan
administrator failed to communicate at all with the plaintiff
and issued a decision on the plaintiff's appeal five days after
he filed his federal complaint. *Id.* at *11.  Relying on *Nichols*,
the *Fershtadt* court refused to apply deferential review to the

plan administrator's untimely decision because "the defendant
had failed to acknowledge the appeal by the administrative
deadline and failed to render a decision by the time the suit
was brought." *Id.* (citing *Nichols*, 406 F.3d at 109).  As in
*Nichols*, the district court in *Fershtadt* declined to apply the
substantial compliance doctrine and did not excuse the plan
administrator's failure to comply with the regulatory deadlines.
*Id.*

     This case is not analogous to *Nichols* or *Fershtadt*.
In *Nichols* and *Fershtadt*, *de novo* review was appropriate because
the plan administrators failed to issue their final
determination prior to the commencement of the claimants'
federal lawsuits.  Additionally, in each case, the plaintiff did
not await the plan administrator's decision before proceeding to
federal court, and application of the substantial compliance
doctrine thus risked prejudicing the plaintiff's access to
federal court.  By contrast, Hartford rendered its decision on
plaintiff's administrative appeal on September 1, 2009, several
months before plaintiff commenced this action on April 30, 2010.
(*Compare* AR 1009-16, *with* Compl.)  Rather than proceeding
directly to federal court after Hartford's purported failure to
comply with the DOL's deadlines, plaintiff awaited Hartford's
decision on his administrative appeal and relied upon that
decision in his Complaint.  In denying plaintiff's claim,

Hartford did not forfeit, but rather exercised, its discretion. As such, neither *Nichols* nor *Fershtadt* supports plaintiff's argument that *de novo* review is warranted. *See Daniel*, 2006 WL 5692739, at *13 (holding that because the plan administrator "provided plaintiff with a written denial of her claim which detailed its reasons for the denial, albeit in an untimely manner," the "case [did] not involve a decision that was 'deemed denied' under the regulations and, thus, [was] distinguishable from those cases which held that a 'deemed denial' does not warrant any deference"); *Pava*, 2005 WL 2039192, at *9-10 (distinguishing *Nichols* and holding that "[t]he pattern of interaction between the parties demonstrates that Plaintiff sought and waited for Hartford to exercise its discretion, and that she relied on this exercise before coming to this Court").

Consequently, the court finds that Hartford's decision on plaintiff's appeal, even if untimely, is subject to arbitrary and capricious review. This approach is consistent with the policy underlying the DOL's regulations, particularly in light of Hartford's proactive attempts to render a decision based on complete and updated medical records. *See Pava*, 2005 WL 2039192, at *9-10; *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 635 (10th Cir. 2003) ("ERISA's procedural regulations are meant to promote accurate, cooperative, and reasonably speedy decision-making.").

II.   **Application of Arbitrary and Capricious Review**

As explained above, Hartford's decision to terminate plaintiff's LTD benefits must be reviewed under the arbitrary and capricious standard of review.   "[T]he scope of judicial review when applying the arbitrary and capricious standard is narrow." *Zarringhalam*, 2012 WL 5989896, at *12 (citing *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003)).   Under this standard, the court "may overturn a denial of benefits 'only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Demirovic*, 467 F.3d at 212 (quoting *Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89, 92 (2d Cir. 2000)).   "Substantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance.'" *Celardo*, 318 F.3d at 146 (alterations in original) (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995)).

"In the context of a summary judgment motion, the arbitrary and capricious standard requires that [the court] ask whether the aggregate evidence, viewed in the light most favorable to the nonmoving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits." *Zarringhalam*, 2012 WL 5989896,

at *12 (alteration in original) (internal quotation marks omitted).  Critically, courts "reviewing plan administrators' benefit denials for arbitrariness and capriciousness are not free to substitute [their] own judgment for that of the insurer as if [they] were considering the issue of eligibility anew." *Duncan*, 2011 WL 6960621, at *6 (alterations in original) (internal quotation marks omitted).  "The mere existence of conflicting evidence does not render the [plan administrator's] decision arbitrary or capricious." *Daniel*, 2006 WL 5692739, at *15 (alteration in original) (internal quotation marks omitted).

Despite the "deferential nature of the 'arbitrary and capricious' standard," the court is mindful that the "plan's administrator . . . must provide a full and fair review of the decision to deny the claim." *Neely v. Pension Trust Fund of the Pension Hospitalization & Benefit Plan of the Elec. Indus*., No. 00-CV-2013, 2004 WL 2851792, at *8 (E.D.N.Y. Dec. 8, 2004).  "[S]uch a review must include a searching and careful determination as to whether the conclusion reached by the administrator in view of the facts before it was indeed rational and not arbitrary." *Rappa v. Conn. Gen. Life Ins. Co*., No. 06-CV-2285, 2007 WL 4373949, at *9 (E.D.N.Y. Dec. 11, 2007) (internal quotation marks omitted).

For the reasons discussed below, the court finds that Hartford afforded plaintiff a full and fair review and

terminated plaintiff's LTD benefits based on substantial evidence in the Administrative Record. Consequently, Hartford's decision was neither arbitrary nor capricious.[17]

**A. Hartford Denied Plaintiff's LTD Benefits Claim Based on Substantial Evidence After a Full and Fair Review**

Hartford initially terminated plaintiff's LTD benefits in July 2008, upon a determination that plaintiff was no longer disabled from performing any occupation, as defined by the Plan. (*See* AR 987-92.) In September 2009, Hartford upheld this initial determination on administrative appeal. (AR 1003-15.) Both Hartford's initial decision and its decision on appeal were supported by substantial evidence in the Administrative Record.

**1. Hartford's Initial Determination to Terminate Plaintiff's LTD Benefits**

Hartford's initial determination to terminate plaintiff's LTD benefits in July 2008 was based on a comprehensive and detailed review of plaintiff's claim file, the relevant clinical data, and all of the medical evidence in the Administrative Record. (*See* AR 44.) In particular, Hartford relied upon: (1) the medical records of plaintiff's treating physicians; (2) the functional capacity opinions of Drs. Boglia, Brathwaite, and Schiller; (3) plaintiff's own statements

---

[17] Upon an independent review of the Administrative Record, the court would also uphold Hartford's termination of plaintiff's LTD benefits under *de novo* review for substantially the same reasons explained below. To wit, Hartford based its decision on the preponderance of the objective medical evidence in the Administrative Record and took steps to ensure a full and fair review at every stage of the decision making process.

regarding his improved functional capacity; and (4) Hartford's Employability Analysis Report.  Accordingly, Hartford's initial termination of plaintiff's LTD benefits was supported by substantial evidence and was neither arbitrary nor capricious.

First, Hartford based its denial of plaintiff's LTD benefits on the updated records of his treating physicians, all of whom documented improvement in plaintiff's medical conditions and functional capacity in the months leading up to July 2008.

For example, in his January 2008 APS, Dr. Schiller acknowledged plaintiff's improved functional capacity. (*See* AR 389-92.)  Specifically, Dr. Schiller reported that plaintiff was capable of sitting for two hours at a time for a total of ten hours per day, standing for half an hour at a time for a total of one hour per day, and walking for one hour at a time for a total of one hour per day.[18] (AR 390.)  Dr. Schiller further indicated that plaintiff could occasionally kneel, drive, reach overhead, and lift/carry up to 20 pounds with both hands. (*Id.*)  Notably, Dr. Schiller expected plaintiff's functional restrictions to last approximately six months and explained that plaintiff could "participate in vocational rehabilitation services," including worksite accommodations — a medical finding consistent with Hartford's determination to terminate

---

[18] Notably, before plaintiff's gastric banding surgery in November 2007, Dr. Schiller noted in his 2006 PCE that plaintiff could sit for only one hour at a time for a total of two hours per day and walk for only fifteen minutes for a total of one hour per day. (AR 704.)

plaintiff's benefits in July 2008. (*Id.*)  Although Dr. Schiller observed that plaintiff suffered from moderate knee pain radiating into the right leg, Dr. Schiller also recorded plaintiff's comment that his knee pain was improving.[19] (AR 391.) Dr. Schiller further noted that plaintiff was responding well to his physical therapy and pain medications. (*Id.*)  In addition, Dr. Schiller indicated that plaintiff "has been tolerating his medications well." (*Id.*)

Dr. Brathwaite, plaintiff's bariatric surgeon, similarly reported improvement in plaintiff's medical condition and functional capacity after his November 2007 gastric banding surgery. (*See* AR 239-56, 1453-55.)  According to Dr. Brathwaite's December 2007 post-surgical examination notes, plaintiff expressed no complaints regarding the gastric banding procedure and, in fact, reported walking thirty minutes a day. (AR 244.)  Moreover, Dr. Brathwaite recorded plaintiff's pre-surgery weight as 404 pounds and noted that by February 2008, plaintiff weighed 378 pounds. (AR 971.)  Notably, by June 27, 2008, shortly before Hartford's initial termination of

---

[19] Dr. Schiller's 2007 medical records include various office visit notes regarding plaintiff's knee injury, which resulted from plaintiff's fall through his basement stairs in January 2007. (*See* AR 264-66, 287-89, 290-91, 307, 313, 320-22.)  The medical reports revealed no "obvious fracture-dislocation." (AR 320-21.)  Moreover, like his 2008 APS, Dr. Schiller's November 28, 2007 office visit note documented plaintiff's statement that his "[r]ight knee was improving." (AR 264).

plaintiff's LTD benefits, plaintiff had lost even more weight, reporting a weight of 367 pounds. (AR 1445.)

Dr. Boglia, plaintiff's nephrologist, similarly provided updated treatment records documenting plaintiff's improved medical condition.  In a June 2008 office visit note, Dr. Boglia acknowledged that plaintiff possibly required a knee replacement and appeared stressed because of his divorce but ultimately observed that plaintiff was "feeling better" and trying to lose weight and "take control of [his] health." (AR 59.)  Likewise, in a March 2008 office visit note, Dr. Boglia noted plaintiff's weight loss due to his gastric banding surgery despite the lack of any exercise. (AR 63.)

In addition, Dr. Capustin, plaintiff's pulmonologist, provided updated medical records indicating that plaintiff utilized a CPAP machine to treat his sleep apnea and that "as weight loss progresses, CPAP pressures will be titrated down." (AR 109.)  Moreover, Hartford also considered medical records from plaintiff's psychotherapist, who reported that plaintiff was receiving psychotherapeutic treatment on a weekly to bi-weekly basis. (AR 105.)

Furthermore, even before plaintiff's gastric banding surgery, Dr. Grella, plaintiff's cardiologist, noted improvement in plaintiff's cardiac health. (*See* 180-195, 1890.) Specifically, in a May 23, 2007 letter, Dr. Grella cleared

plaintiff for surgery and opined that "from a cardiac perspective [plaintiff] is clinically stable, and overall, would pose an acceptable and low cardiac risk for surgery." (AR 184-85.)  Likewise, in a pre-surgery evaluation dated November 5, 2007, Dr. Grella explained that despite plaintiff's nonobstructive coronary artery disease, diastolic dysfunction, leg edema, and dyspnea, plaintiff was "asymptomatic in terms of any cardiac issues in terms of chest discomfort" and reported no "lightheadedness, dizziness, palpitations, or syncopal events." (AR 181.)

Taken together, the contemporaneous treatment records of plaintiff's physicians support Hartford's initial determination to terminate plaintiff's LTD benefits based on his improved functional capacity. (*See* AR 44-46.)

Second, Hartford also relied upon medical opinions solicited from Drs. Boglia, Brathwaite, and Schiller regarding plaintiff's improved functional capacity.  Specifically, in response to Hartford's inquiries regarding plaintiff's functional capacity, Dr. Schiller indicated that, as of April 2008, plaintiff was capable of performing full-time sedentary work despite his knee pain and low back pain but opined that

plaintiff was unable of performing full-time light work.[20] (AR

148.)  Dr. Schiller provided no explanation or supporting

medical evidence for his determination that plaintiff was unable

to perform full-time light work, despite the opportunity to

provide such an explanation. (*See id.*)  In addition, Dr.

Brathwaite stated that, as of April 2008, plaintiff was capable

of both light and sedentary work due to his November 2007

gastric banding surgery. (AR 149-50.)  Finally, Dr. Boglia

responded that, as of July 2008, plaintiff was able to perform

light work despite his hypertension and trace edema.[21] (AR 48-

49.)

---

[20] In his cross-motion for summary judgment, plaintiff incorrectly claims that Hartford "altered the [DOL's] legal definitions of sedentary and light work." (Pl. Mem. at 11.)  In support of this misguided contention, plaintiff cites to SSA regulations and argues that the phrase "sitting most of the time" does not appear in the federal government's definition of "sedentary work." (*Id.* (citing 20 C.F.R. § 404.1567).)  Plaintiff's argument rests on a clear misrepresentation of the Administrative Record.  Hartford clarified in its letters to Drs. Brathwaite, Boglia, and Schiller that it was using the DOL's definitions of light and sedentary work. (*See* AR 55-56, 147-50.)  In each of the letters, Hartford accurately defined light and sedentary work as set forth by the DOL in its Dictionary of Occupational Titles. (*Compare* AR 55-56, 147-50, *with* United States Department of Labor, Dictionary of Occupational Titles (4th ed. 1991), http://www.occupationalinfo.org/ appendxc_1.html# strength (last visited Mar. 29, 2013)), *and Alfano*, 2009 WL 222351, at *14 ("According to the [DOL's Dictionary of Occupational Titles], . . . Sedentary work involves sitting most of the time." (internal quotation marks omitted)).

[21] Plaintiff asserts that Dr. Boglia responded to Hartford's inquiry about plaintiff's functional capacity because he was "hounded" by Hartford employees. (*See* Pl. Mem. at 13; Pl. Rule 56.1 Stmt. ¶ 96.)  In support of this allegation, plaintiff cites to a letter drafted by Mr. Quiat to Dr. Boglia, in which Mr. Quiat recounts that "[t]he only reason [Dr. Boglia responded to Hartford] was because Hartford continued to hound [him] about signing the form until [he] finally signed it just to get [Hartford] to stop contacting [him]." (AR 1680.)  The court rejects this self-serving allegation.  Dr. Boglia never expressly confirmed that Hartford "hounded" him, and the Administrative Record provides no support for plaintiff's contention that Hartford obtained Dr. Boglia's opinion through unwelcome harassment or other improper means.  As established by the Administrative

In an attempt to discredit these three opinions, plaintiff maintains that Hartford inappropriately asked Drs. Schiller, Brathwaite, and Boglia only about the isolated conditions that each respective physician was treating. (Pl. Mem. at 35.)  Plaintiff's contention does not alter the court's conclusion that Hartford appropriately relied upon the solicited opinions of plaintiff's treating physicians.  As correctly noted by Hartford, the solicited opinions of the three treating physicians were consistent with their contemporaneous treatment records, which documented improvement in plaintiff's medical conditions and functional capacity subsequent to his November 2007 gastric banding procedure.  Moreover, Drs. Schiller, Brathwaite, and Boglia were asked about plaintiff's functional capacity with respect to their respective knowledge and specialties.  In limiting the scope of its inquiry as to each physician, Hartford ensured that the doctors based their opinions on objective medical evidence and personal knowledge. Hartford therefore appropriately credited the opinions of Drs. Boglia, Brathwaite, and Schiller in its initial determination to terminate plaintiff's LTD benefits. (*See* AR 991-92.)

---

Record, Hartford received Dr. Boglia's updated medical records on July 18, 2008. (AR 59-66, 69-74, 1879.)  By letter dated July 23, 2008, Hartford requested Dr. Boglia's opinion regarding plaintiff's functional capacity, (AR 53-56, 2018-19), and Dr. Boglia promptly responded on July 28, 2008, (AR 48-49).  Even interpreting the evidence in the light most favorable to plaintiff, the court finds that Hartford's communications with Dr. Boglia fall far short of "hounding."

Third, Hartford also reasonably relied upon
plaintiff's own statements regarding his improved functional
capacity.  For example, in his 2008 Claimant Questionnaire,
plaintiff explained that despite his various medical conditions,
he was able to perform "[s]ome household chores at a slow pace,"
to walk, to use the bathroom, to sort through mail, to pay
bills, and to carry out "very light yard maintenance." (AR 378.)
Plaintiff also reported his ability to independently perform
various daily tasks such as bathing, feeding himself, dressing,
and using the toilet, albeit at a slow pace. (*See id.*)
Additionally, during a telephone discussion on March 24, 2008,
plaintiff advised Hartford of his back and knee pain but noted
that he was prescribed pain medication. (*Id.*)  Plaintiff
confirmed that he continued to lose weight and that "his
diabetes is under control." (*Id.*)  Finally, on May 13, 2008,
plaintiff notified Hartford that he lost 39 pounds since his
gastric banding surgery, that his "only complications" related
to his knee injury, that he intended to seek treatment from an
orthopedist for that knee injury, and that he continued to have
back pain. (*See* AR 1887-88.)  Notably, plaintiff's statements
regarding his improved functional capacity and medical
conditions were consistent with the contemporaneous clinical
data provided by his treating physicians.  Accordingly,
plaintiff's description of his improved medical conditions and

111

functional capacity further buttressed Hartford's reasoned
determination that he was able to perform sedentary work.

Fourth, and finally, Hartford predicated its July 2008
initial benefits determination in part on a May 2008
Employability Analysis Report. (*See* AR 122-23, 144-45.)
Hartford's Employability Analysis Report considered plaintiff's
education, work history, and functional capacities and
determined that plaintiff had the requisite skill and knowledge
to perform at least three sedentary occupations prevalent in the
national economy. (AR 122-23.)

In light of the evidence described above, and upon an
independent review of the Administrative Record, the court finds
that Hartford's initial determination to terminate plaintiff's
LTD benefits was reasonable and based on substantial evidence.
Notwithstanding plaintiff's exaggerated assertions to the
contrary, Hartford carefully reviewed all of the relevant
medical evidence and clinical data and rationally determined
that plaintiff was no longer disabled under the Plan.  Moreover,
the Administrative Record lacks, and plaintiff has failed to
identify, sufficient evidence to establish that Hartford acted
arbitrarily or capriciously.  Indeed, even crediting plaintiff's
contention that the Administrative Record contains some evidence
in conflict with Hartford's findings, it is well established
that the "mere existence of conflicting evidence does not render

112

the [plan administrator's] decision arbitrary or capricious."
*See Daniel*, 2006 WL 5692739, at *15 (alteration in original)
(internal quotation marks omitted).

### 2. Plaintiff's Administrative Appeal

Hartford's September 2009 decision on plaintiff's
administrative appeal was equally supported by substantial
evidence in the Administrative Record. After receiving
plaintiff's administrative appeal, Hartford promptly requested
updated medical records from plaintiff's treating physicians and
initiated ongoing efforts to supplement plaintiff's claims file
with clinical data from his recent medical appointments. (*See* AR
995-96, 1025, 1027.) Based upon a comprehensive review of the
updated medical records from plaintiff's physicians, the
preexisting medical evidence in plaintiff's claims file, and the
medical peer review reports of two independent physician
consultants, Hartford reaffirmed its initial determination that
plaintiff was no longer disabled under the Plan and upheld the
July 2008 termination decision. (*See* AR 1003-06, 1009-13.) In
reaching this determination, Hartford did not act arbitrarily or
capriciously and afforded plaintiff a full and fair review.

First, the updated medical records obtained from
plaintiff's treating physicians during the administrative appeal
did not alter Hartford's conclusion that plaintiff could perform
sedentary work in light of his weight loss and improved

113

functional capacity.[22]  According to Dr. Brathwaite's updated
medical records, plaintiff reported walking two to three times a
week for as much as fifteen minutes at a time. (AR 1429.)  In
addition, Dr. Franko's updated medical records documented
plaintiff's significant weight loss, noting that plaintiff lost
approximately eighty pounds as of February 2009 due to his
gastric banding surgery. (AR 1609.)  Dr. Capustin's updated
office visit notes reported plaintiff's weight at 347 pounds as
of January 2009. (AR 1631-33.)  Dr. Boglia's April 10, 2009
office visit note recorded plaintiff's weight at 341 pounds. (AR
1562.)

        Second, Hartford secured two independent co-morbid
medical peer review reports completed by board-certified
physicians, both of whom further reinforced Hartford's
determination to deny plaintiff's LTD benefits. (AR 1165-66.)
In the first peer review report, Dr. Nudell, a board-certified
internist, provided a detailed discussion of plaintiff's
numerous medical conditions and concluded that, despite his

_____

        [22] Although many of the updated medical records obtained by
Hartford documented plaintiff's subjective complaints and symptoms of knee
pain, back pain, and mild edema, (*see, e.g.*, AR 1200, 1362, 1431), none of
the updated medical records provide a sufficient explanation of how such
complaints and symptoms resulted in limitations, if any, to plaintiff's
functional capacity such that he could not perform sedentary work or was
rendered disabled as defined by the Plan.  For example, plaintiff notes that
"on April 28, 2008, Dr. Schiller noted that amount the factors which
aggravate plaintiff's pain are: 'bending, prolonged standing, and sitting.'"
(Pl. Opp. at 6 (quoting AR 1362).)  Notably, however, on that same date, Dr.
Schiller also noted improvement in plaintiff's knee pain and reported that
plaintiff's "pain does not wake him from sleep and the pain is better in the
morning." (AR 1362.)

various medical conditions, plaintiff was capable of functioning in a full time sedentary position. (*See* AR 1113-23.) In arriving at this conclusion, Dr. Nudell specifically considered plaintiff's diabetes, hypertension, sleep apnea, coronary artery disease, venous stasis, history of leg edema, lumbar degenerative disc disease, spinal stenosis, and knee injury and ultimately determined that plaintiff's medical conditions did not restrict his ability to perform sedentary work. (*See* AR 1121-22.) Dr. Nudell recognized that plaintiff "should be afforded the opportunity to shift positions as needed for pain control" and to "raise his lower extremities to avoid . . . swelling," but found "no specific indication to restrict [plaintiff's] fine motor activity with the upper extremities." (AR 1122.)

In the second peer review report, Dr. Green, a specialist in occupational medicine, likewise concluded that plaintiff was capable of performing sedentary work. (AR 1123-28.) Dr. Green considered plaintiff's hypertension, sleep apnea, multiple medications, knee pain, back pain, and morbid obesity and noted that individually, plaintiff's conditions did not "have a significant functional impact on day to day activities . . . apart from the morbid obesity." (AR 1127.) Dr. Green acknowledged that "[t]aken as a collection of conditions, . . . [plaintiff's] functional capacity is impaired." (*Id.*) Dr.

115

Green's acknowledgment of plaintiff's functional impairment, however, did not amount to a finding that plaintiff was unable to perform sedentary work.  Rather, Dr. Green expressly opined that in light of plaintiff's own statements in his Claimant Questionnaires and the information in Dr. Schiller's medical records, plaintiff was "probably more functional than he claims" and determined that "the claimant is capable of performing a sedentary position." (*Id.*)  Notably, Dr. Green commented that plaintiff "must be very strong in order to raise himself up and move himself about" and recommended that plaintiff "would be able to work eight hours per day, 40 hours per week." (*Id.*)  Dr. Green further explained that plaintiff could perform sedentary work because he was already performing similar tasks at home. (AR 1128.)

In addition to their individual peer review reports, Drs. Nudell and Green also provided a consensus opinion in which they expressed their agreement that notwithstanding plaintiff's medical conditions, he was capable of performing sedentary work. (*Id.*)  Taken together with all of the medical evidence in the Administrative Record, the individual and consensus opinions of Dr. Nudell and Dr. Green provided Hartford with a strong evidentiary basis to reject plaintiff's administrative appeal.

Furthermore, Hartford considered and reasonably rejected or afforded minimal weight to additional evidence

116

offered in support of plaintiff's administrative appeal.  For
example, Hartford did not credit Dr. Schiller's July 20, 2009
letter, in which Dr. Schiller expressed his opinion that
plaintiff is unable to work due to his chronic medical
conditions, including plaintiff's obesity, cardiac problems,
sleep apnea, knee pain, and low back pain. (AR 1176.)  In
rejecting Dr. Schiller's opinion letter, Hartford rationally
explained that Dr. Schiller provided no "clinical documentation
in support of his opinion, and did not specify any functional
impairments except difficulty with ambulation." (AR 1014.)  In
addition, Hartford found unpersuasive the solicited retractions
of Dr. Boglia, Dr. Brathwaite, and Dr. Schiller. (AR 1013.)
Hartford reasoned that none of the doctors "provided any new
statement regarding his functionality or specifying any
medically indicated limitations or restrictions." (*Id.*)  In
affording little weight to Dr. Schiller's July 2009 opinion
letter as well as the new opinions of Dr. Boglia, Dr.
Brathwaite, and Dr. Schiller, Hartford did not "arbitrarily
refuse to credit the reliable evidence put forth by
[plaintiff]." *Demirovic*, 467 F.3d at 212 (internal quotation
marks omitted).  Rather, Hartford determined that such evidence
was neither reliable nor relevant in light of the lack of
supporting clinical documentation and the absence of new
statements specifying plaintiff's medically indicated functional

117

limitations. (AR 1013.)   Moreover, after considering the

totality of the medical evidence, Hartford concluded that Dr.

Schiller's July 20, 2009 letter and the three retractions did

not offset the substantial objective medical evidence

demonstrating plaintiff's improved functional capacity and the

findings of Dr. Nudell and Dr. Green.   The court finds no basis

to disturb Hartford's reasonable determination. *Hobson*, 574 F.3d

at 89 ("[T]he question for this court is not whether [the plan

administrator] made the correct decision [but] whether [the plan

administrator] had a reasonable basis for the decision that it

made." (internal quotation marks omitted)).

        After a full and fair review of all of the relevant

and reliable medical evidence and clinical data in the

Administrative Record, Hartford determined that plaintiff was

not disabled under the Plan in light of his improved functional

capacity and ability to perform sedentary work.   In making this

determination, Hartford rendered a decision based on substantial

evidence and properly denied plaintiff's administrative appeal.

According due deference to Hartford, the court finds that

Hartford's decision on plaintiff's administrative appeal was

neither arbitrary nor capricious.

**B.   Plaintiff's Arguments**

        Plaintiff advances several meritless arguments in an

attempt to discredit Hartford's decision to terminate his LTD

118

benefits.  Specifically, plaintiff maintains that Hartford
denied plaintiff a full and fair review and acted arbitrarily or
capriciously by: (1) failing to consider all of the relevant
medical evidence; (2) failing to afford adequate weight to
plaintiff's favorable 2006 SSA Disability Finding; (3)
improperly relying on the peer review reports of Dr. Green and
Dr. Nudell; (4) failing to conduct an independent medical
examination ("IME"), functional capacity examination ("FCE"), or
surveillance; and (5) terminating plaintiff's LTD benefits based
on a conflict of interest.  As explained below, plaintiff's
arguments lack any persuasive force and rest on a misguided view
of the law and facts.

### 1.   Hartford's Failure to Consider All Relevant Medical Evidence

Plaintiff argues that Hartford's decision to terminate
plaintiff's LTD benefits was not based on substantial evidence.
Specifically, plaintiff contends that Hartford (a) ignored
evidence of plaintiff's orthopedic impairments, including
sustained knee, joint, and back pain, (Pl. Opp. at 1-7; Pl.
Reply at 9-11); (b) failed to consider his subjective statements
regarding his disabling medical conditions, (Pl. Mem. at 39-41);

and (c) disregarded the side effects of plaintiff's medications, (Pl. Opp. at 22-23).[23] Plaintiff's contentions are unavailing.

### a. Plaintiff's Orthopedic Impairments and Complaints of Pain

First, based on the record before the court, plaintiff's unfounded assertion that Hartford ignored plaintiff's orthopedic impairments during its initial determination to deny plaintiff's benefits in July 2008 must be rejected. (*See* Pl. Opp. at 2.) As explained above, Hartford considered all of the medical evidence in plaintiff's claim file and based its initial decision to terminate plaintiff's LTD benefits on substantial evidence in the Administrative Record. Indeed, Hartford terminated plaintiff's LTD benefits based on Dr. Schiller's opinion that plaintiff was capable of full-time sedentary work, despite his knee pain. (AR 147-48.) Hartford further relied upon objective medical evidence demonstrating plaintiff's improved functional capacity and plaintiff's own statements regarding his physical abilities. (*See, e.g.*, AR 59, 63, 239-56, 378, 389-93, 971, 973.)

---

[23] Plaintiff also briefly argues that "Hartford failed to do a proper co-morbidity analysis which would have truthfully established the lack of plaintiff's functionality." (Pl. Mem. at 35.) This contention is erroneous. The Administrative Record establishes that Hartford considered the totality of plaintiff's medical records during both its initial determination in July 2008 and its decision on plaintiff's administrative appeal in September 2009. Moreover, during plaintiff's administrative appeal, Hartford referred plaintiff's LTD benefits claim to two peer review physicians for a co-morbidity analysis and notified RRS that "because of the multiple conditions and specialties involved, [Hartford] would really like to have separate reviews to ensure that all conditions in combination are fully considered." (AR 1003.)

To discredit Hartford's initial determination, plaintiff cites to medical records in the Administrative Record documenting plaintiff's purportedly disabling orthopedic impairments and asserts that Hartford failed to consider such medical evidence before terminating plaintiff's benefits in July 2008. (Pl. Opp. at 1-3; Pl. Reply at 10.)  Plaintiff, however, disregards the fact that a majority, if not all, of the cited medical records regarding his orthopedic impairments were not produced to Hartford until plaintiff's administrative appeal in 2009. (*See, e.g.*, AR 1228-35, 1265-66, 1285, 1300, 1307, 1350, 1355, 1362, 1367, 1383.)  Hartford could not have ignored, in 2008, medical records that it did not receive from plaintiff's physicians until his administrative appeal in 2009.[24]  In any event, the Administrative Record lacks sufficient medical evidence establishing that plaintiff's purported orthopedic impairments were disabling as defined by the Plan, or precluded him from engaging in sedentary work.  As such, the court finds no reason to substitute its judgment for the reasoned and comprehensive judgment of Hartford in deciding to terminate plaintiff's LTD benefits in July 2008. *See Duncan*, 2011 WL 6960621, at *6.

---

[24] Nor was it Hartford's duty to uncover these medical records under the terms of the Plan; rather, the Plan placed the burden on plaintiff to submit proof that he was disabled as defined by the Plan. (*See* AR 20, 25-26, 28, 36.)

Nor did Hartford ignore plaintiff's orthopedic impairments or complaints of knee, back, or joint pain in deciding his appeal in September 2009. (*See* Pl. Opp. at 4-5.) To the contrary, Hartford engaged in a comprehensive review of all of the relevant medical evidence, fully considered plaintiff's medical conditions, and determined that plaintiff could engage in sedentary work based on the totality of the evidence in plaintiff's claims file.  Additionally, Hartford retained two independent medical peer review physicians, both of whom considered but discounted plaintiff's purportedly disabling orthopedic impairments.  For example, Dr. Nudell indicated that he observed no compelling medical evidence that plaintiff's degenerative disc disease would preclude plaintiff from functioning in a full time sedentary position, "as long as [plaintiff] was given the opportunity to shift positions as needed for pain control." (AR 1122.)  Dr. Nudell acknowledged that plaintiff suffered from a "meniscal tear" in his knee which would "limit [plaintiff'] ability to ambulate for prolonged periods, but should not affect his ability to perform in a sedentary position." (*Id.*)  Likewise, Dr. Green advised that plaintiff's knee injury "could result in difficulty performing activities of daily living" but concluded, that the MRI findings "are not so severe that one would expect the claimant to have to significantly change his activities of daily living or

contemplate a different type of work than he had been working in." (AR 1126.)  Dr. Green further considered plaintiff's back pain but determined that such pain was "not peculiar to an individual of [plaintiff's] age irrespective of occupational demands or the impact of morbid obesity on the axial spine." (*Id.*)

Furthermore, upon review of the record, the court finds that the peer review opinions of Dr. Nudell and Dr. Green are consistent with the objective medical records documenting plaintiff's orthopedic impairments.  Dr. Nudell and Dr. Green provided medical opinions regarding the effect of those purported orthopedic impairments on plaintiff's functional capacity and based those opinions on the medical records in plaintiff's claims file.  Thus, Hartford's reliance on the expert medical peer review opinions of Dr. Nudell and Dr. Green does not amount to a "wholesale embrace of one medical report supporting a claim denial to the detriment of a contrary report that favors granting benefits." *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 136 (2d Cir. 2008); *see also Schnur v. CTC Commc'ns Corp. Grp. Disability Plan*, 413 F. App'x 377, 379 (2d Cir. 2011) ("[T]hat [the plan administrator] chose to credit its own, outside doctors over [the plaintiff's] personal physician is not, itself, grounds for reversing the determination."). Rather, the peer review opinions of Dr. Green and Dr. Nudell

123

were supported by the clinical data and reports of plaintiff's treating physicians establishing plaintiff's improved functional capacity.

Notably, as noted earlier, Dr. Schiller's findings in March and April 2008 that plaintiff's pain could be aggravated by "bending, prolonged standing, and sitting" do not establish plaintiff's disability or inability to perform sedentary work. (AR 1362, 1367.)  Indeed, as noted by Dr. Green, "[a] sedentary position does not require significant ambulation or mobility . . . or exertion." (AR 1128.)  In fact, Dr. Green concluded that "[t]here would be significant benefit to the claimant medically to return to the workplace." (*Id.*)  Accordingly, substantial evidence in the Administrative Record also supports Hartford's reasonable decision on appeal to deny plaintiff's LTD benefits, notwithstanding plaintiff's purported orthopedic impairments.

**b.   Plaintiff's Subjective Statements**

The Administrative Record also belies plaintiff's assertion that Hartford failed to consider his subjective complaints. (*See* Pl. Mem. at 39-41.)  During plaintiff's administrative appeal, Hartford considered the subjective complaints included in plaintiff's Certification, but nevertheless concluded, based on treatment records in the Administrative Record and plaintiff's own statements in his 2008 Claimant Questionnaire, that plaintiff could perform sedentary

124

work. (*See* AR 1009-11.)  Moreover, as accurately noted by

Hartford, plaintiff failed to adduce sufficient objective

medical evidence establishing his disability or inability to

perform sedentary work.  Plaintiff's failure to present specific

objective evidence cannot be cured by subjective allegations in

a Certification.  Indeed, it is well-settled that Hartford was

"not required to accept [plaintiff's] subjective complaints in

the absence of objective evidence supporting disability. It was

plaintiff's burden to demonstrate [his] disability under the

terms of the plan, and it was reasonable for Hartford to require

objective evidence to support [his] alleged physical

limitations." *Ianniello v. Hartford Life & Accident Ins. Co.*,

No. 10-CV-370, 2012 WL 314872, at *3 (E.D.N.Y. Feb. 1, 2012)

(internal citation and quotation marks omitted), *aff'd*, 2013 WL

262235 (2d Cir. Jan. 24, 2013); *Rund v. JPMorgan Chase Grp. Long

Term Disability Plan*, 855 F. Supp. 2d 185, 204 (S.D.N.Y. 2012)

("[Plaintiff] submitted documentation that he suffered from pain

in his hand and knuckles but he failed to provide specific

objective evidence as to how that impairment affects his

functional capacity."); *Schnur v. CTC Commc'ns Corp. Grp.

Disability Plan*, No. 05-CV-3297, 2010 WL 1253481, at *11

(S.D.N.Y. Mar. 29, 2010) ("[A] distinction exists between the

amount of fatigue or pain an individual experiences, which is

completely subjective, and how much an individual's degree of

pain or fatigue limits his functional capabilities, which can be objectively measured." (internal quotation marks omitted)), *aff'd*, 413 F. App'x 377 (2d Cir. 2011).

Notably, even if the court fully credited plaintiff's subjective complaints, this would not render Hartford's determination arbitrary, capricious, or contrary to law. Plaintiff's subjective complaints in his Certification are consistent with Hartford's ultimate determination that plaintiff could perform sedentary work.  For example, in his Certification, plaintiff averred that he is able to go food shopping twice a week and drives to his medical appointments. (AR 1806.)  Although plaintiff claimed that he does not do chores that make him dizzy, (*id.*), Dr. Green noted that "the duties involved with sedentary work and those that the claimant is currently performing at home are very similar," (AR 1128). Moreover, in his 2008 Claimant Questionnaire, plaintiff testified that he could perform "[s]ome household chores at a slow pace," could walk as tolerated, sort through mail, pay bills, carry out "very light yard maintenance," and go to doctor's appointments. (AR 378.)  Thus, in light of his own statements about his functional capacity, plaintiff's subjective complaints do not controvert Hartford's decision that plaintiff was no longer disabled under the Plan based on substantial

evidence.  Accordingly, the court rejects plaintiff's argument
that Hartford turned a blind eye to his subjective complaints.

### c.   Side Effects of Plaintiff's Medications

Plaintiff's contention that Hartford failed to address
the side effects of his numerous medications lacks any factual
basis. (Pl. Opp. at 22-23.)  Dr. Green considered the effects of
plaintiff's multiple medications and determined, based on Dr.
Schiller's medical finding, that plaintiff was tolerating his
medications well. (*See* AR 1126, 1285.)  In addition, in his
January 10, 2008 treatment notes, Dr. Schiller observed that
"[t]he patient has been tolerating his medications well." (AR
391.)  Based upon this medical evidence, Hartford determined
that "the documentation in the available medical records from
all physicians does not reflect any impairment as a result of
medication side effects." (AR 1006.)  Furthermore, plaintiff
failed to submit any medical evidence establishing that the
purported side effects of his medications rendered him disabled
or unable to perform sedentary work.  In the absence of such
evidence, Hartford relied on the medical evidence in the
Administrative Record and the expert opinion of Dr. Green and
reasonably concluded that plaintiff remained able to perform
sedentary work. *See Hobson*, 574 F.3d at 89 ("[Plaintiff] failed
to explain how exactly she had established to Metlife that her
medications rendered her unable to work.  For example, [the

127

plaintiff] could have provided, but did not in fact provide,
letters from her treating physicians opining that her
medications hindered her functional abilities.").

In sum, Hartford's determination to terminate
plaintiff's LTD benefits was based on substantial evidence and
was not arbitrary, capricious, or contrary to law.  Plaintiff's
arguments to the contrary are untethered to the facts or the law
and provide no basis to overturn Hartford's decision. *Suren v.
Metro. Life Ins. Co.*, No. 07-CV-4439, 2008 WL 4104461, at *10
(E.D.N.Y. Aug. 29, 2008) ("In light of all the medical evidence
in the record, . . . [the court] cannot responsibly find [the
plan administrator's] decision to be without reason, unsupported
by substantial evidence or contrary to law.").

### 2.    2006 SSA Disability Finding

Plaintiff next contends that Hartford failed to give
proper consideration to the SSA's 2006 determination finding
plaintiff disabled. (Pl. Mem. at 37-38; Pl. Opp. at 18-20.)  To
that end, plaintiff asserts that Hartford encouraged plaintiff
to apply for Social Security Disability benefits but ignored the
SSA's disability findings when terminating plaintiff's LTD
benefits under the Plan. (Pl. Mem. at 37.)  Plaintiff further
maintains that it was "Hartford's obligation to acquire the
Social Security record" but that Hartford failed to do so.  (Pl.
Opp. at 20.)  Plaintiff's argument fails for several reasons.

128

First, plaintiff's contention is factually inaccurate. Hartford did not ignore the SSA's 2006 disability finding. Rather, Hartford expressly considered the ALJ's disability findings but declined to afford significant weight to those findings, which were made prior to plaintiff's November 2007 gastric banding surgery. (*See* AR 1011.) Specifically, Hartford explained that the "SSD decision [was] based on specific established rulings" and noted that Hartford "must administer claims based on the medical documentation available to [it], and is required to make its determination based on applicable Policy language and provisions, independent of all other Agencies." (*Id.*) Hartford thereafter determined that, based on the preponderance of the medical evidence in the Administrative Record, plaintiff was not disabled as defined by the Plan. (*See* AR 1011-16.) In making this determination under the Plan, Hartford was not bound by the SSA's disability finding nor required to accord special deference to the SSA's determinations in 2006. *Ianniello*, 2012 WL 314872, at *3 ("Hartford was not bound by the decision of the Social Security Administration."); *see also Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 141 (2d Cir. 2010) ("Nor were the Funds required to accord special deference to the determination of the Social Security Administration." ); *Fortune*, 391 F. App'x at 78 ("While Hartford did not explain why its assessment of Fortune's disability claim

differed from that of the SSA, it was not bound by the agency's decision."); *Kagan v. Unum Provident*, 775 F. Supp. 2d 659, 677 (S.D.N.Y. 2011); *Billinger v. Bell Atl.*, 240 F. Supp. 2d 274, 285-86 (S.D.N.Y. 2003) ("The definition of disability to be employed by a benefit plan when evaluating a claim for long-term disability benefits is the one set forth in the Plan documents, not the one used by the Social Security Administration."), *aff'd*, 124 F. App'x 669 (2d Cir. 2005). In fact, the Second Circuit has held that a plan administrator need not even explain why its disability determination under the Plan differs from the disability finding of the SSA. *Richard v. Fleet Fin. Grp. Inc. Ltd. Emp. Benefits Plan*, 367 F. App'x 230, 233 (2d Cir. 2010) ("Finally, there is no merit to [the plaintiff's] contention that the Hartford was required to explain why its decision differed from that of the Social Security Administration ('SSA'). Contrary to [plaintiff's] argument, *Hobson* does not require any such explanation."). As such, Hartford's decision to terminate plaintiff's LTD benefits in 2008, and its subsequent affirmation of this decision on appeal in 2009, was not arbitrary or capricious, irrespective of the SSA's disability finding in 2006, which was not probative, much less determinative, of plaintiff's medical conditions after his gastric banding surgery in 2007.

Furthermore, the court rejects plaintiff's attempts to fault Hartford for failing to obtain additional medical records related to the SSA's 2006 disability finding. (Pl. Opp. at 20.) Under the Plan, Hartford had no obligation to acquire additional records in support of plaintiff's disability benefits claim.  To the contrary, under the terms of the Plan, plaintiff alone shouldered the burden of submitting proof of disability that was "satisfactory to [Hartford]," (AR 26-27), a burden which plaintiff failed to discharge, see *Wojciechowski v. Metro. Life Ins. Co.*, 1 F. App'x 77, 81 (2d Cir. 2001) ("[Although] test results [from the claimant's physicians] could have been requested . . . , it was [the claimant's] burden under the Plan, not [the plan administrator's], to submit, at his own expense, 'proof of disability satisfactory to [the plan administrator].'").

Plaintiff's reliance on the Eleventh Circuit's reasoning in *Gaither v. Aetna Life Ins. Co.* is misplaced. 394 F.3d 792, 807 (11th Cir. 2004).  In *Gaither*, the Eleventh Circuit asserted the "narrow principle that fiduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refute that theory." *Id.*  Here, even assuming *arguendo* that *Gaither*'s narrowly

131

applied principle were controlling, the evidence in the record does not support plaintiff's continued entitlement to LTD benefits and in fact substantially refutes plaintiff's continued entitlement.  In any event, *Gaither* is inapposite and does not establish that plan administrators like Hartford have an affirmative duty to gather information on behalf of claimants. Indeed, at least one district court in this Circuit has noted that, notwithstanding the Eleventh Circuit's holding in *Gaither*, "[t]he Second Circuit has never found that ERISA fiduciaries have a duty to gather information." *Young v. Hartford Life & Accident Ins. Co.*, No. 09-CV-9811, 2011 WL 4430859, at *11 (S.D.N.Y. Sept. 23, 2011), *aff'd*, No. 11-CV-4501, 2012 WL 6621372 (2d Cir. Dec. 20, 2012).  Notably, in *Young*, the district court alternatively held that "even if such a duty [to gather information] were to exist, such a holding would not affect the outcome here because [the plaintiff] has not demonstrated that Hartford failed to collect readily available, *material* information." *Id.* (emphasis in original).

     The alternative holding in *Young* applies with equal force here.  As in *Young*, even if Hartford had a duty to collect additional medical records related to the SSA's disability finding in 2006, plaintiff has failed to establish that such medical records contained material information that would have affected Hartford's ultimate disability determination in 2008 in

132

light of plaintiff's gastric banding surgery in 2007 and
attendant significant weight loss thereafter.  Indeed, the
medical records and reports underlying the SSA's 2006 disability
determination predated plaintiff's November 2007 gastric banding
surgery, after which plaintiff's treating physicians noted
improvement in plaintiff's functional capacity and medical
conditions.[25]  Hartford appropriately based its 2008 termination
of plaintiff's LTD benefits on the updated medical records
documenting his improved medical conditions and functional
capacity.  As such, any failure to obtain additional SSA records
was not arbitrary, capricious, or contrary to law because
plaintiff's 2006 medical conditions and functional capacity were
not at issue during Hartford's 2008 determination to terminate
plaintiff's LTD benefits. *Kagan*, 775 F. Supp. 2d at 677 ("[T]he
SSA's determination that [the plaintiff] was entitled to SSDI
benefits rested entirely on [the plaintiff's] condition in 1999,
which is not at issue in this action."); *see also Hobson,* 574
F.3d at 92 (holding that SSA's evaluation of plaintiffs pre-
surgery condition was "no longer relevant" because ERISA plan's
determination to deny benefits was based on post-surgical
recovery).

---

[25] Significantly, when the SSA found plaintiff disabled in March
2006, Hartford similarly found plaintiff disabled under the Plan and was
therefore paying him LTD benefits. (AR 1909-10.)

### 3.   Medical Peer Review Reports of Dr. Nudell and Dr. Green

Plaintiff challenges Hartford's reliance on the co-morbid peer review reports of Dr. Nudell and Dr. Green on two grounds, both of which are unconvincing.

#### a.   Lack of Expertise in Bariatrics or Orthopedics

First, plaintiff argues that Dr. Nudell, a board-certified internist, and Dr. Green, a board-certified specialist in occupational medicine, lack any expertise in bariatrics or orthopedics and thus were not competent to provide reliable medical opinions on plaintiff's medical conditions. (Pl. Opp. at 20-21.)  Yet, elsewhere in his submissions, plaintiff asserts that it was improper for Hartford to seek individualized functional capacity assessments from a number of his treating specialists without consideration of all his conditions and medications. (Pl. Mem. at 35.)   Plaintiff further contends that Hartford's reliance upon the two peer review opinions violated DOL regulations.[26] (Pl. Opp. at 21.)   In support of this

---

[26] Plaintiff also appears to argue that Hartford's failure to retain experts in bariatrics and orthopedics ran afoul of Hartford's claims manual. (Pl. Mem. at 23; Pl. Opp. at 21.)  This is not so.  Hartford's claims manual notes that, during an independent records review, a claims analyst should "[d]etermine whether a specialty is needed for Medical Consultant referral." (ECF No. 66, Exh. B, BMS Claims Manual, Bates 3156.)  Here, Hartford determined – and plaintiff concedes (Pl. Mem. at 35) — that a co-morbid analysis was necessary in light of plaintiff's various medical conditions.  Hartford therefore retained two independent physician reviewers who were capable of assessing plaintiff's medical conditions in the aggregate.  This was not a violation of the claims manual and was neither arbitrary nor capricious.

argument, plaintiff cites to 29 C.F.R. § 2560.503-1(h)(3)(iii),[27] which states, in relevant part, that

> [t]he claims procedures . . . will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless . . . the claims procedures . . . [p]rovide that, in deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment . . . , the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment.

(Pl. Opp. at 21.) Plaintiff's argument rests on a misunderstanding of applicable law. ERISA and the applicable DOL regulations neither require a plan administrator to rely only upon the opinions of specialists nor preclude a plan administrator from relying on the opinions of physicians trained in internal or occupational medicine. Rather, "courts have deemed it sufficient that doctors trained in internal medicine

---

In a separate section, the claims manual states that during an IME — which was not necessary here and thus not conducted by Hartford — the claims analyst should determine "which medical specialty can best evaluate the insured's disabling condition." (BMS Claims Manual, Bates 2474.) The claims manual goes on to specify that the "physician chosen to perform the evaluation should be board certified and have the same or better qualifications as the claimant's primary care physician." (*Id.*) Even assuming that these requirements apply to an independent records review, Hartford's reliance upon the independent peer review opinions of a board-certified internist and a board-certified specialist in occupational medicine did not violate the claims manual. Where, as here, the claimant claimed various disabling conditions, it was reasonable and appropriate for Hartford to rely upon a co-morbid analysis of all of plaintiff's various medical conditions. (*See* AR 1003.)

[27] 29 C.F.R. § 2560.503-1(h)(3)(iii) is made applicable to plaintiff's disability benefits claim pursuant to 29 C.F.R. § 2560.503-1(h)(4).

or occupational medicine were retained to review the [p]laintiff's records." *E.g.*, *Schnur*, 2010 WL 1253481, at *16 ("[A]lthough Plaintiff makes much of the fact that Cameron is a Lyme disease expert, whereas Truchelut and Gerstenblitt are generalists, there is no requirement that [the plan administrator] engage physicians specially trained in the diagnosis of Lyme disease to examine Plaintiff or her records."); *see also Fitzpatrick v. Bayer Corp.*, No. 04-CV-5134, 2008 WL 169318, at *14 (S.D.N.Y. Jan. 17, 2008) ("[T]here is no requirement that the Committee engage physicians specially trained in the diagnosis of CFS and fibromyalgia to examine the Plaintiff or the Plaintiff's records in a recovery of benefits case.  To the contrary, in similar cases involving plaintiffs afflicted with CFS and/or fibromyalgia, courts deemed it sufficient that doctors trained in internal medicine or occupational medicine were retained to review the Plaintiff's records." (citation omitted)); *Lee v. Aetna Life & Cas. Ins. Co.*, No. 05-CV-2960, 2007 WL 1541009, at *2-3, 6 (S.D.N.Y. May 24, 2007) (holding that plan administrator was entitled to rely on internist's opinions so long as plan administrator considered all information submitted by the claimant).

As in *Schnur* and *Fitzpatrick*, the board-certified physicians retained by Hartford in the instant case were sufficiently qualified to evaluate all of plaintiff's medical

conditions and to provide an opinion regarding plaintiff's functional capacity based on all of the objective medical evidence and clinical data.  Upon independent review of the Administrative Record, the court finds that Hartford's reliance upon those independent peer review opinions was not arbitrary or capricious.[28]

### b.   Plaintiff's Lack of Opportunity to Rebut

Second, plaintiff contends that Hartford denied him a full and fair review by failing to provide him with an opportunity to rebut the medical peer review reports of Dr. Green and Dr. Nudell. (Pl. Mem. at 16, 46; Pl. Opp. at 21-22.) According to plaintiff, Hartford's failure to afford him an opportunity to respond to the two peer review reports violated both Hartford's claims manual and DOL regulations. (Pl. Mem. at 16, 46; Pl. Opp. at 21-22.)  The court disagrees.[29]

---

[28] In addition, as Hartford properly observes and as noted previously, plaintiff's challenge to Hartford's reliance on the medical opinions of Dr. Green and Dr. Nudell is inconsistent with his arguments elsewhere in his submissions.  For example, although plaintiff argues that Dr. Green and Dr. Nudell should have had a specific expertise in bariatrics or orthopedics, (Pl. Opp. at 20-21), plaintiff also maintains that Hartford should have conducted a co-morbidity analysis and considered every medical condition that plaintiff claimed to have, (Pl. Mem. at 14, 15, 35).  Hartford considered all of plaintiff's conditions by requesting the co-morbid peer review by Drs. Green and Nudell.  Moreover, plaintiff's criticism of Hartford's use of Dr. Nudell, an internist, is at odds with his assertion that Hartford should have considered the findings of SSA physician Dr. Osvaldo Falco, who is also an internist. (AR 631-32; Pl. Mem. at 37.)

[29] The court notes that plaintiff's contention that he was entitled to respond to the medical peer review reports is at odds with his argument that Hartford failed to meet the DOL's regulatory decision deadlines.  Had Hartford afforded plaintiff an opportunity to respond to the opinions of Dr. Nudell and Dr. Green, Hartford's decision on his administrative appeal undoubtedly would have been delayed further.

Hartford's claims manual contains no requirement that a claimant must be afforded an opportunity to respond to an independent peer review report based on medical evidence already available to the claimant. (*See generally* ECF No. 66, Exh. B, BMS Claims Manual.)  Although Hartford's claims manual requires medical peer reviewers to contact a claimant's attending physician under certain circumstances, (BMS Claims Manual, Bates 2926), the claims manual does not require Hartford to provide claimants with independent peer review reports and to allow claimants to respond to such reports during an administrative appeal.  Plaintiff's assertion that Hartford violated its own policies is therefore baseless.

Nor did Hartford's failure to provide plaintiff an opportunity to rebut the two peer review reports of Drs. Green and Nudell violate ERISA or the applicable DOL regulations. Pursuant to 29 C.F.R. §§ 2560.503-1(h)(2)(ii) and (iii),

> the claims procedure of a plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless the claims procedures . . . [p]rovide claimants the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits; [and] [p]rovide that a claimant shall be provided . . . reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits.

138

Relying on *Solomon v. Metro. Life Ins. Co.*, 628 F. Supp. 2d 519 (S.D.N.Y. 2009), plaintiff maintains that Hartford deprived him of a full and fair review by precluding him from submitting comments, documents, or records regarding the conclusions of Dr. Nudell and Dr. Green. (Pl. Opp. at 22.)  In *Solomon*, the district court declared that a "fair review necessarily requires an opportunity to review and rebut the basis of the denial determination." 628 F. Supp. 2d at 532.  Applying this principle, the *Solomon* court held that the claims administrator denied the plaintiff a full and fair review by relying on the medical reports "not made available to [the plaintiff] until after the final decision was made." *Id.* at 533.

Solomon, however, is not binding on this court, and its reasoning has been questioned and rejected elsewhere.  For example, in *Black v. Pitney Bowes Inc.*, the plaintiff argued that the plan administrator denied him a full and fair review because he was not given the opportunity to respond to the medical peer review report of an independent physician consultant before the plan administrator's decision on the plaintiff's administrative appeal. No. 05-CV-108, 2008 WL 3992306, at *11 n.7 (S.D.N.Y. Aug. 28, 2008).  Rejecting this argument, the district court in *Black* found unconvincing the "proposition that failure to provide such an opportunity [to respond to the physician's report] denies a participant 'full

and fair review.'" *Id.*  In so holding, the *Black* court
acknowledged that numerous courts rejected the logic
underpinning the plaintiff's argument. *Id.* (citing cases).

For example, in *Metzger v. Unum Life Ins. Co.*, the
Tenth Circuit observed that the plan administrator was not
required to afford a claimant the opportunity to rebut peer
review reports generated on appeal "[s]o long as appeal-level
reports analyze evidence already known to the claimant and
contain no new factual information or novel diagnoses." 476 F.3d
1161, 1167 (10th Cir. 2007).  In reaching this conclusion, the
Tenth Circuit explained that "[p]ermitting a claimant to receive
and rebut medical opinion reports generated in the course of an
administrative appeal . . . would set up an unnecessary cycle of
submission, review, re-submission, and re-review." *Id.* at 1166.
Likewise, in *Midgett v. Washington Grp. Int'l Long Term
Disability Plan*, the Eight Circuit held that "the full and fair
review to which a claimant is entitled under 29 U.S.C. § 1133(2)
does not include reviewing and rebutting, prior to a
determination on appeal, the opinions of peer reviewers
solicited on that same level of appeal." 561 F.3d 887, 896 (8th
Cir. 2009); *see also Winz-Byone v. Metro. Life Ins. Co.*, No. 07-
CV-238, 2008 WL 962867, at *8 (C.D. Cal. Mar. 26, 2008)
("Metlife did not abuse its discretion in terminating
Plaintiff's benefits without providing her the opportunity to

140

respond to the reports of Drs. Lumpkins and Getz."); *Skipp v. Hartford Life Ins. Co.*, No. 06-CV-2199, 2008 WL 346107, at *10-11 (D. Md. Feb. 6, 2008).

The court adopts the reasoning articulated in *Black*, *Metzger*, and *Midgett* and finds that Hartford did not deny plaintiff a full and fair review. As in *Metzger*, the medical peer review reports of Drs. Green and Nudell confirmed medical information already in the Administrative Record, presented no new factual information, and did not risk ambushing plaintiff with surprise evidence. (*See* AR 1113-28.) As such, Hartford was not required to offer plaintiff yet another opportunity to respond to the analysis of the medical evidence contained in the record and discussed in the peer review reports of Drs. Green and Nudell. The Second Circuit has long confirmed that the "purpose of [the 'full and fair review'] requirement is to provide claimants with enough information to prepare adequately for further administrative review or an appeal to the federal courts." *Juliano v. Health Maint. Org. of N.J., Inc.*, 221 F.3d 279, 287 (2d Cir. 2000) (alteration in original) (internal quotation marks omitted). Hartford provided plaintiff with ample information to prepare his administrative appeal and his federal lawsuit even without affording him the opportunity to rebut the two medical peer review reports. Indeed, during both stages of its review, Hartford ensured a complete and accurate

141

claims file by obtaining updated medical reports from
plaintiff's treating physicians and thereafter provided
plaintiff with detailed statements of its reasons for
terminating his LTD benefits.  Furthermore, permitting plaintiff
to rebut and respond to the peer review reports of Dr. Nudell
and Dr. Green would likely have created an "endless loop of
opinions" characterized by an "unnecessary cycle of submission,
review, resubmission, and re-review." *Metzger*, 476 F.3d at 1167.

Significantly, even if the medical peer review reports
of Dr. Nudell and Dr. Green were disregarded, this would not
alter the court's conclusion that Hartford's decision to
terminate plaintiff's LTD benefits was supported by substantial
evidence in the Administrative Record.  As discussed in detail
above, Hartford had ample basis to conclude that plaintiff could
perform sedentary work even without the independent expert
opinions of Dr. Nudell and Dr. Green. *See Black*, 2008 WL
3992306, at *11 n.7 ("But even if Dr. Broder's report is
disregarded, the Committee's decision to deny LTD benefits to
[the plaintiff] was not arbitrary or capricious.").

### 4.   Failure to Conduct IME, FCE, and Surveillance

Plaintiff further argues that Hartford was obligated,
but failed, to request an IME, FCE, or surveillance in order to
obtain additional information regarding plaintiff's functional
capacity. (Pl. Mem. at 32-34, 37, 44; Pl. Opp. at 23-25.)

Contrary to plaintiff's unsubstantiated assertions, Hartford's failure to conduct an IME, FCE, or surveillance did not deny plaintiff a full and fair review.

### a. IME and FCE

It is well established in the Second Circuit that plan administrators are not legally obligated to request or perform an IME or FCE, particularly where, as here, a plaintiff's medical evidence fails to establish that he is disabled under the Plan. *E.g.*, *Hobson*, 574 F.3d at 91 ("[W]here the ERISA plan administrator retains the discretion to interpret the terms of its plan, the administrator may elect not to conduct an IME, particularly where the claimant's medical evidence on its face fails to establish that she is disabled."); *Zoller v. INA Life Ins. Co.*, No. 06-CV-112, 2008 WL 3927462, at *13 (S.D.N.Y. Aug. 25, 2008) ("[I]t is well settled that, in denying a claim for benefits under ERISA, the plan administrator may rely on the opinion of independent medical reviewers who have not conducted an examination of the applicant, even where the reviewer's opinion conflicts with that of the treating physicians."); *Fitzpatrick*, 2008 WL 169318, at *14 ("[A]ny suggestion that an administrator's physicians are required to conduct an in-person, physical examination of a plaintiff rather than a review of the record in a case such as this is unsupported by law."); *Gannon v. Aetna Life Ins. Co.*, No. 05-CV-2160, 2007 WL 2844869, at *13

(S.D.N.Y. Sept. 28, 2007) ("Aetna was not required to employ a physician to conduct an independent . . . examination of the plaintiff, although it had the right to do so.").

In fact, plaintiff concedes "that plan administrators [need not] conduct an IME or FCE in every ERISA case." (Pl. Mem. at 34 n.11 (citing *Hobson*, 574 F.3d at 91).) Nevertheless, plaintiff insists that Hartford was obligated to avail itself of these additional procedures to resolve a "direct conflict between the opinions of" Drs. Nudell and Green and plaintiff's treating physicians. (*Id.*) To that end, plaintiff cites to *Chan v. Hartford*, in which the district court found that the plan administrator's failure to order an FCE or IME "call[ed] into question its decision to terminate [the claimant's] benefits." No. 02-CV-2943, 2004 WL 2002988, at *9 (S.D.N.Y. Sept. 8, 2004).

*Chan*, however, is distinguishable from this case. Unlike in *Chan*, where an independent physician consultant suggested "that an FCE . . . may have been necessary if 'further clarification' of [the claimant's] abilities were required," *id.*, no physician suggested the need for an FCE in this case because no further clarification regarding plaintiff's functional capacity was necessary in light of the substantial medical evidence documenting plaintiff's improved functional capacity and ability to perform sedentary work. As in *Hobson*, where the plaintiff's failure to produce sufficient objective

144

evidence supporting her disability rendered an IME and FCE unnecessary, *Hobson*, 574 F.3d at 91, plaintiff here has similarly failed to adduce sufficient objective medical evidence proving that he continued to be disabled under the Plan.  A personal examination of plaintiff was therefore unnecessary to establish what the preponderance of the medical evidence decisively proved: namely, plaintiff's ability to perform sedentary work notwithstanding his various medical conditions. *See Rotondi v. Hartford Life & Accident Grp.*, No. 09-CV-6287, 2010 WL 3720830, at *11 (S.D.N.Y. Sept. 22, 2010) ("Nothing in the Plan's terms obligated Hartford to perform an IME of Plaintiff.  Hartford, in its discretion, decided that the medical evidence, including the reports and notes of Dr. Zenetos and the opinions of the two reviewing physicians along with the videotaped surveillance footage of Plaintiff provided it with sufficient information to evaluate Plaintiff's LTD claim. Plaintiff has not demonstrated that an IME was required to fairly evaluate his claim." (footnote omitted)).

Indeed, the objective medical evidence in the Administrative Record establishes that plaintiff's functional capacity and medical conditions, the majority of which were related to his weight, improved after his gastric banding

surgery in November 2007.[30]

---

[30] The remaining out-of-circuit case law cited by plaintiff is similarly unpersuasive and inapposite. First, the court affords little weight to *Lalli v. Hartford Ins. Co.*, 854 F. Supp. 2d 1156, 1162-63 (D. Utah 2012). In *Lalli*, the plan administrator admitted that the medical records were inconclusive and decided not to conduct a physical examination because of purported logistical difficulties – conduct the district court found unreasonable. *Id.* Here, Hartford has not conceded, nor does the court find, that the medical records are inconclusive. Rather, Hartford based its termination of plaintiff's LTD benefits on the medical records of plaintiff's treating physicians, plaintiff's own statements about his functional capacity, the solicited opinions of his treating physicians, and the peer review reports of Drs. Green and Nudell. In any event, during the pendency of this action, the district court in *Lalli* withdrew and vacated the memorandum and order relied upon by plaintiff. *See Lalli v. Hartford Ins. Co*, No. 10-CV-152, 2012 WL 5328622, at *1 (D. Utah Oct. 29, 2012).

Second, the court is similarly unconvinced by plaintiff's reliance on *Kurth v. Hartford Life Ins. & Accident Ins. Co.*, 845 F. Supp. 2d 1087 (C.D. Cal. 2012). In *Kurth*, the district court determined that objective medical evidence and concrete clinical data supported the treating cardiologist's diagnosis that the plaintiff was disabled. *Id.* at 1099. In light of the treating cardiologist's finding of disability and "lingering questions regarding Plaintiff's functionality," the *Kurth* court found unreasonable the plan administrator's reliance on a records review in lieu of an in-person medical evaluation. *Id.* at 1099-1100. Unlike in *Kurth*, Hartford declined to conduct an FCE or IME in light of the substantial evidence establishing plaintiff's functional capacity to perform sedentary work. Although Drs. Boglia, Brathwaite, and Schiller subsequently recanted their opinions with the prompting of plaintiff's counsel, the three physicians provided no medical evidence or clinical data supporting their retractions or explaining their new opinions. Moreover, Dr. Schiller's July 2009 letter expressing his belief that plaintiff was disabled was unsupported by sufficient clinical documentation and did not establish that plaintiff could not perform sedentary work. Consequently, in a proper exercise of its discretion, Hartford relied upon the objective medical evidence in the Administrative Record and the co-morbid evaluations conducted by Dr. Green and Dr. Nudell and, based on that evidence, rationally determined that plaintiff could perform sedentary work. *Kurth* is therefore not persuasive.

Finally, plaintiff's reliance on *Faulkner v. Hartford Life & Accident Ins. Co.* fails for substantially similar reasons. No. 11-CV-408, 2012 WL 913632 (E.D. Cal. Mar. 16, 2012). Unlike in *Faulkner*, where the record contained "overwhelming medical evidence in support of plaintiff's underlying disability claim," *id.* at 1144, the medical evidence supports Hartford's determination. Moreover, the medical peer review reports of Dr. Green and Dr. Nudell were consistent with the updated medical records of plaintiff's treating physicians. Thus, *Faulkner* is inapposite. That Hartford credited the independent peer review reports rather than the unsubstantiated revised opinions of Drs. Boglia, Brathwaite, and Schiller does not amount to arbitrary or capricious conduct. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.").

Furthermore, Hartford's claims manual did not require Hartford to conduct an IME or FCE where, as here, clarification regarding plaintiff's functional capacity was unnecessary in light of the objective medical evidence in plaintiff's claims file.  As a preliminary matter, Hartford was entitled to conduct a record review in lieu of a medical examination. (*See* BMS Claims Manual, Bates 2473-74.)  Indeed, Hartford's claims manual acknowledges that "[t]here may be circumstances for which an IME is not practical" and expressly states that "an independent records review can be used for the same purposes as an IME." (BMS Claims Manual, Bates 2478.)  Thus, Hartford reasonably exercised its discretion in referring plaintiff's benefits claim to two independent physician consultants. *See Carroll v. Hartford Life & Accident Ins. Co*., No. 11-CV-1009, 2013 WL 1296487, at *23 (D. Conn. Mar. 28, 2013) ("Based on [its Claims] Manual, a Hartford analyst would have possessed the discretion to refer [the plaintiff] for an independent medical examination. However, by the express terms of the Manual, Hartford was not required to do so.").  Moreover, plaintiff provides no reason why Hartford's claim procedures required the use of an IME or FCE during Hartford's initial determination in July 2008 or during plaintiff's administrative appeal in 2009. (*See* BMS Claims Manual, Bates 2924.)  Indeed, at the initial stage of review in 2008, no clarification regarding plaintiff's

147

functionality was necessary in light of the uniform opinions of Drs. Boglia, Brathwaite, and Schiller that plaintiff could perform sedentary work. Notably, these three opinions were further corroborated by plaintiff's own statements in his 2008 Claimant Questionnaire and by the objective clinical data in the Administrative Record. Thus, an IME and FCE was not needed to "resolve legitimate conflicting opinions between the claimant's . . . treating physicians . . . or . . . between the claimant's treating/examining physicians and [Hartford] staff." (*Id.*)

In addition, during plaintiff's administrative appeal, Hartford based its decision on the updated medical evidence obtained from plaintiff's treating physicians and again determined that plaintiff retained the capacity to perform sedentary work. Although Drs. Boglia, Brathwaite, and Schiller recanted their previous opinions regarding plaintiff's ability to perform sedentary work during the pendency of plaintiff's administrative appeal,[31] Hartford reasonably determined that the three doctors provided no clinical data in support of their revised opinions and therefore relied instead upon the objective medical evidence in the Administrative Record and the co-morbid

---

[31] As Hartford correctly observes, Hartford's claims manual neither requires nor suggests the use of peer-to-peer review during an administrative appeal. Thus, Hartford was not required to contact Drs. Boglia, Brathwaite, or Schiller to secure further explanation for their retracted opinions.

evaluations of Drs. Nudell and Green.  Accordingly, Hartford did
not violate the procedures set forth in its own claims manual.

### b.   Surveillance

Equally as meritless is plaintiff's contention that
Hartford denied him a full and fair review by failing to conduct
surveillance on him. (Pl. Mem. at 18; Pl. Opp. at 24-25.)
Neither controlling case law nor Hartford's claims manual
requires the use of surveillance on claimants, particularly in
cases where, as here, the objective medical evidence
demonstrates plaintiff's functional capacity to perform
sedentary work.  Moreover, plaintiff fails to cite to any
authority supporting the proposition that Hartford was required
to conduct surveillance in this case.  Indeed, in his Reply,
plaintiff concedes that plan administrators are "not required in
every case to . . . [conduct] surveillance."  (Pl. Reply at 12.)
As such, the court finds that Hartford was not required to
conduct surveillance for the same reasons that it was not
required to conduct an IME or FCE: plaintiff's capacity to
perform sedentary work was confirmed by substantial evidence in
the Administrative Record, including plaintiff's statements, the
opinions of his treating physicians, the contemporaneous
treatment records, Hartford's Employability Analysis Report, and
the independent peer review reports of Drs. Nudell and Green.

### 5.   Conflict of Interest

Finally, plaintiff argues that Hartford's termination of his LTD benefits was influenced by an "inherent conflict of interest." (Pl. Opp. at 30; *see also* Pl. Mem. at 42-47.)  In pursuing this argument, plaintiff yet again misconstrues the facts and the applicable case law and improperly relies upon the inadmissible affidavit of Sandra Carter.

### a.   Motion to Strike Affidavit of Sandra Carter

As a threshold matter, the court must first resolve Hartford's motion to strike the Affidavit of Sandra Carter (the "Carter Affidavit") pursuant to Federal Rules of Civil Procedure 37 and 56. (ECF No. 66, Exh. 2A, Affidavit of Sandra Carter ("Carter Aff."); ECF No. 48, Hartford's Letter Motion to Strike Carter Affidavit dated 4/6/12 ("Hart. Mot. To Strike").) Plaintiff maintains that the court may take judicial notice of the Carter Affidavit pursuant to Federal Rule of Evidence 201 because the affidavit is a public document filed in *Howard v. Hartford Life & Accident Ins. Co.*, No. 10-CV-192 (M.D. Fla. Dec. 6, 2011). (ECF No. 49, Plaintiff's Response to Mot. To Strike dated 4/9/12 ("Pl. Resp. to Mot to Strike."), at 2 n.2.) Hartford, however, argues that the Carter Affidavit is inadmissible extra-record evidence that is not relevant, not properly authenticated, not compliant with Federal Rule of Civil Procedure 26 disclosure requirements, and not amenable to

judicial notice. (Hart. Mot. To Strike at 1-3.)  The court finds
that plaintiff failed to comply with Rule 26 and that the Carter
Affidavit is neither amenable to judicial notice nor relevant.
The Carter Affidavit is therefore stricken for purposes of this
motion.

First, the court notes that plaintiff failed to
identify Ms. Carter as a person with relevant knowledge and did
not disclose the Carter Affidavit in his initial disclosures or
supplemental disclosures, as required by Federal Rules of Civil
Procedure 26(a)(1)(A) and 26(e)(1).  Pursuant to Federal Rule of
Civil Procedure 37(c)(1), a party fails to disclose information
required by Rule 26 may not use such information as evidence on
a motion "unless the failure was substantially justified or is
harmless."  In determining whether to preclude evidence, courts
consider the following relevant factors: (1) the party's
explanation for failure to comply with the disclosure
requirement; (2) the importance of the precluded evidence; (3)
the prejudice suffered by the opposing party as a result of
having to respond to the new evidence; and (4) the possibility
of a continuance. *See Patterson v. Balsamico*, 440 F.3d 104, 117
(2d Cir. 2006); *see also Schiller v. City of New York*, No. 04-
CV-7922, 2007 WL 735010, at *3 (E.D.N.Y. Mar. 12, 2007).

Upon due consideration of the four relevant factors
enumerated in *Patterson*, the court finds that plaintiff's

151

failures to identify Ms. Carter as a person with relevant
knowledge and to disclose the Carter Affidavit until after the
close of discovery are neither harmless nor excused by
substantial justification.  Having failed to disclose
information required by Rule 26 until the submission of his
Opposition to Hartford's summary judgment motion, plaintiff
prejudiced Hartford's ability to depose Ms. Carter or to
investigate the substance of her affidavit as it relates to
plaintiff's case.  Additionally, the purported importance of the
testimony set forth in the Carter Affidavit is insufficient to
counterbalance the prejudice suffered by Hartford as a result of
plaintiff's delinquent disclosure of the information, as
required by Rule 26.  Accordingly, exclusion of the Carter
Affidavit is appropriate here.

Second, the Carter Affidavit is not amenable to
judicial notice pursuant to Federal Rule of Evidence 201 because
the allegations asserted therein are subject to a reasonable
dispute and are not generally known within this court's
territorial jurisdiction.  Federal Rule of Evidence 201 provides
that courts may only take judicial notice of facts outside the
trial record that are "generally known within the trial court's
territorial jurisdiction" or "not subject to a reasonable
dispute." Fed R. Evid. 201(b).  It is well settled that a "court
may take judicial notice of a document filed in another court

'not for the truth of the matters asserted in the other
litigation, but rather to establish the fact of such litigation
and related filings.'" *Int'l Star Class Yacht Racing Ass'n v.
Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998)
(quoting *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*,
969 F.2d 1384, 1388 (2d Cir. 1992)).

Here, plaintiff does not merely submit the Carter
Affidavit to establish the uncontroversial fact that Ms. Carter
filed an affidavit in the *Howard* case in the Middle District of
Florida. Rather, plaintiff offers the Carter Affidavit for the
truth of the matters asserted therein: namely, the financial
profit motives that allegedly taint Hartford's claims
administration procedures. Plaintiff cannot circumvent the
evidentiary rules by mischaracterizing the Carter Affidavit as a
public document within the purview of judicial notice. In
addition, the facts asserted in the Carter Affidavit are
undoubtedly subject to reasonable dispute and are therefore not
amenable to judicial notice under Fed. R. Evid. 201. Indeed,
plaintiff readily acknowledges that the Carter Affidavit is
offered in response to Hartford's affidavits regarding the
propriety of its claims administration procedures. (Pl. Resp. to
Mot. To Strike at 1-2.) Consequently, plaintiff's request that
the court take judicial notice of the Carter Affidavit is
denied.

153

Third, even if the Carter Affidavit were within the purview of judicial notice, the court finds that the Carter Affidavit has little to no probative value in determining the nature or weight of Hartford's alleged conflict of interest.  In her Affidavit, dated October 31, 2011, Ms. Carter avers that she worked in Hartford's claims department from 2004 through 2006 and thereafter transferred to the customer contact center, where she worked until 2011. (Carter Aff. ¶¶ 2-3.)  Nowhere in her Affidavit does Ms. Carter testify that she was involved with plaintiff's LTD benefits claim or that she handled any Hartford benefits claims when Hartford terminated plaintiff's LTD benefits in 2008. (*See generally* Carter Aff.)  As such, the Carter Affidavit pertains to a time period that is not probative of Hartford's claims administration practices during the denial of plaintiff's benefits claim.  Nor does the Carter Affidavit contain any statements, based on Ms. Carter's personal knowledge, that present triable issues of fact regarding the Declarations of Mr. Luddy or Ms. Guthrie, who both testified about Hartford's claims administration procedures during Hartford's consideration of plaintiff's LTD benefits claim in 2008 and 2009.

Accordingly, the court finds that the Carter Affidavit is not relevant to the conflict of interest inquiry presently before the court.[32]

### b.   Weight of the Conflict of Interest

The court engages in a two-step inquiry when analyzing a plan administrator's alleged conflict of interest. *E.g.*, *Durakovic*, 609 F.3d at 138-39; *Mugan v. Hartford Life Grp. Ins. Co.*, 765 F. Supp. 2d 359, 369 (S.D.N.Y. 2011). First, the court must ask "whether the plan administrator both evaluates claims for benefits and pays benefits claims." *Durakovic*, 609 F.3d at 138 (internal quotation marks omitted). Second, "[i]f so, the court [must] determine how heavily to weight the conflict of interest thus identified, considering such circumstances as whether procedural safeguards are in place that abate the risk, perhaps to the vanishing point." *Id.* (internal quotation marks omitted). Here, neither party seriously disputes that a structural conflict of interest exists. Hartford, as plan administrator, both evaluates claims for benefits under the Plan and insures those benefits claims, a dual role that gives rise to a conflict of interest. *See Glenn*, 554 U.S. at 113-15. As

---

[32] Furthermore, even if the Carter Affidavit were admissible and considered by the court on this motion, the assertions contained therein do not give rise to a genuine issue of material fact with respect to the nature and effect of Hartford's purported conflict of interest. Even crediting all of the allegations in the Carter Affidavit, the court would nevertheless find that Hartford's conflict of interest had no effect on its determination to terminate plaintiff's LTD benefits, and thus Hartford's termination of LTD benefits does not amount to arbitrary or capricious conduct.

such, the court must determine what weight, if any, to accord to
that conflict.

In *Glenn*, the Supreme Court recently held that a
conflict of interest is "but one factor among many that a
reviewing judge must take into account." 554 U.S. at 116; *see
also Boison v. Ins. Servs. Off., Inc.*, 829 F. Supp. 2d 151, 158-
59 (E.D.N.Y. 2011); *Schnur*, 2010 WL 1253481, at *11 ("[A]
conflict of interest is only one of several factors a court
should consider when reviewing a benefits denial."). "The
weight properly accorded a *Glenn* conflict varies in direct
proportion to the 'likelihood that [the conflict] affected the
benefits decision.'" *Durakovic*, 609 F.3d at 139 (quoting *Glenn*,
554 U.S. at 117) (alteration in original). Thus, as expounded
in *Glenn*,

> [i]t should prove less important (perhaps to
> the vanishing point) where the administrator
> has taken active steps to reduce potential
> bias and to promote accuracy, for example,
> by walling off claims administrators from
> those interested in firm finances, or by
> imposing management checks that penalize
> inaccurate decisionmaking irrespective of
> whom the inaccuracy benefits.

*Glenn*, 554 U.S. 117. Moreover, "[n]o weight is given to a
conflict in the absence of any evidence that the conflict
actually affected the administrator's decision." *Durakovic*, 609
F.3d at 140; *see also Kelly v. Handy & Harman,* 406 F. App'x 538,

539 (2d Cir. 2011); *Burgio v. Prudential Ins. Co.*, No. 06-CV-6793, 2011 WL 4532482, at *5, 8 (E.D.N.Y. Sept. 26, 2011).

Guided by these principles, the court accords no weight to Hartford's conflict of interest and is confident that Hartford did not abuse its discretion in terminating plaintiff's LTD benefits. Indeed, the evidentiary record lacks compelling evidence that the conflict of interest affected Hartford's decision to terminate plaintiff's LTD benefits. Rather, even viewed in the light most favorable to plaintiff, the evidence in the record establishes that Hartford rationally determined that plaintiff was no longer disabled under the Plan in light of all of the relevant medical evidence and clinical data. As explained above, Hartford afforded plaintiff a full and fair review and based its determination on substantial objective medical evidence. Thus, Hartford's conflict of interest deserves no weight and does not suffice to defeat Hartford's motion for summary judgment. *Durakovic*, 609 F.3d at 140.

Moreover, the evidence in the record establishes that Hartford enacted sufficient procedural safeguards to promote accuracy and reduce potential bias. Thus, Hartford's conflict of interest has been reduced to the vanishing point, deserves, at the very most, insignificant weight, and does not render Hartford's termination of plaintiff's LTD benefits arbitrary, capricious, or contrary to law.

157

As set forth in the Affidavit of Genie Guthrie and the
Declaration of Bruce Luddy, Hartford has implemented the type of
"walling-off" necessary to separate claims administrators from
Hartford's financial departments.[33]  First, Hartford does not
provide Claims Specialists, Team Leaders, or Appeals Specialists
with any incentives, bonuses, awards, or other recognition based
on the denial or termination of LTD benefits claims. (*See* Luddy
Decl. ¶ 8; Guthrie Aff. ¶ 9.)  Second, Hartford's claims
analysts and appeals specialists are evaluated based on the
quality and accuracy of their claims decisions as set forth in
the applicable Plan Documents. (Luddy Decl. ¶ 9; Guthrie Aff.
¶ 9.)  Third, Hartford does not discourage claims analysts from
paying legitimate claims. (Luddy Decl. ¶ 10.)  Fourth, Hartford
maintains a separate Appeals Unit for consideration of claims
that have been denied by the Hartford claims department on its
initial review. (*Id.* ¶ 3.)  Fifth, during a claimant's
administrative appeal, the Appeals Specialist does not discuss
the merits of the claim with the Claims Specialist who made the
initial benefits determination. (*Id.* ¶ 5; Guthrie Aff. ¶ 7.)
Sixth, Hartford's claims department and Appeals Unit are

---

[33] As previously noted, the Carter Affidavit, even if considered,
fails to give rise to a genuine dispute of material fact regarding Hartford's
claim procedures because the Carter Affidavit does not rebut the allegations
in the Guthrie Affidavit or Luddy Declaration regarding Hartford's procedural
safeguards in 2008 and 2009 during its consideration of plaintiff's LTD
benefits claim.  Indeed, Ms. Guthrie specifically testifies about her conduct
during the pendency of plaintiff's administrative appeal — testimony that the
Carter Affidavit does not and cannot dispute.

completely separate business units from the financial and underwriting departments. (Luddy Decl. ¶¶ 12, 14.) Neither the claims department nor the Appeals Unit seeks approval from Hartford's financial underwriters when deciding benefits claims.[34] (*Id.* ¶ 13.)

Hartford implemented these safeguards in the instant case. Ms. Guthrie, the Appeals Specialist assigned to plaintiff's claim, did not speak with Claims Specialist Debbie Staz. (Guthrie Aff. ¶ 7.) Ms. Guthrie did not consider or discuss the financial impact of the termination of plaintiff's LTD benefits with anyone from Hartford's financial or underwriting departments. (*Id.* ¶ 8.) Nor did Ms. Guthrie receive any remuneration, bonus, or other incentive as a result of her decision to terminate plaintiff's LTD benefits. (*See id.* ¶ 9.) Instead, Ms. Guthrie's performance evaluations are based on the accuracy of her decision making, rather than her recommended disposition for each claim.[35] (*Id.*) In light of the

---

[34] In an attempt to rebut Mr. Luddy's Affidavit, plaintiff cites to *Kurth* in which the district court discredited Mr. Luddy's testimony regarding Hartford's procedural safeguards because of a document in the administrative record reflecting an unexplained six-figure monetary amount in the margins. *See* 845 F. Supp. 2d at 1097. *Kurth*, however, did not criticize Mr. Luddy's testimony or call into question his statements regarding Hartford's procedural safeguards. Rather, the *Kurth* court found that a degree of skepticism was appropriate in light of other admissible evidence in the record giving rise to an inference of bias. Similar evidence is noticeably absent from the record in this case.

[35] The court is not persuaded by plaintiff's speculative assertion that Ms. Guthrie falsely testified about her claims handling practices in "order to cover her failure to comply with ERISA regulations, and to better position herself for company bonuses." (Pl. Reply at 14.) That Ms. Guthrie's performance was based on the successful completion of her job requirements

foregoing evidence, the court finds that Hartford successfully promoted accuracy and minimized bias during its termination of plaintiff's LTD benefits.

Furthermore, even assuming without deciding that Hartford's conflict of interest influenced Hartford's decision, the court would assign the conflict very little weight, if any, and would find that Hartford did not act in an arbitrary or capricious manner. The court's result is consistent with the result reached by many courts in this Circuit which have found that procedural safeguards similar or identical to those implemented by Hartford here mitigate or eliminate the effects of a plan administrator's structural conflict of interest. *E.g.*, *Ianniello*, 2012 WL 314872, at *5; *Burgio*, 2011 WL 4532482, at *8; *Jennison v. Hartford Life & Accident Ins. Co.*, No. 10-CV-164, 2011 WL 3352449, at *8 (N.D.N.Y. Aug. 3, 2011); *Mugan*, 765 F. Supp. 2d at 372; *Rotondi*, 2010 WL 3720830, at *11-12; *Bendik v. Hartford Life Ins. Co.,* No. 03-CV-8138, 2010 WL 2730465, at *4-6 (S.D.N.Y. Jul. 12, 2010), *aff'd*, 432 F. App'x 24 (2d Cir. 2011); *Schnur,* 2010 WL 1253481, at *11; *Fortune*, 637 F. Supp. 2d at 144.

Upon review of the record and the applicable case law, the court accords no weight to Hartford's conflict of interest,

does not support an inference that Ms. Guthrie testified falsely that she met the deadline for determining appeals. Nor does plaintiff's allegation diminish the procedural safeguards implemented by Hartford in this case, as described above.

which had no influence on Hartford's decision, and further finds
that, even if influenced by the conflict, Hartford did not act
arbitrarily or capriciously.  Plaintiff's arguments to the
contrary – a majority of which are similar to, if not
duplicative of, arguments already considered and rejected above
— rest on baseless speculation and are wholly unavailing, as
explained below.

First, the court rejects plaintiff's argument that
Hartford's decision was infected by its financial bias arising
out of its longstanding business relationship with RRS, the
vendor management company that retains independent peer review
physician consultants. (Pl. Mem. at 44.)  In support of this
argument, plaintiff notes that Hartford paid RRS $1,688,990 in
2008 and $1,203,342 in 2009. (*Id.*)  Based on that financial
relationship, plaintiff asserts that Hartford enlisted the help
of RRS to "generate a medical façade upon which to justify
termination of [plaintiff's] benefits." (*Id.*)  Relying on *Kurth*,
plaintiff further insists that Hartford's business relationship
with RRS itself presents a financial conflict of interest that
the court should weigh heavily. (Pl. Opp. at 26.)  In *Kurth*, the
district court held that the "nature of [Hartford's]
relationship with the vendors and their reviewing physicians
creates an incentive for the vendors to reach results that are
favorable to [Hartford] in order to foster and sustain their

161

business relationship." 845 F. Supp. 2d at 1096.  Notably, the
district court in *Kurth* acknowledged that the plaintiff failed
to present "direct evidence showing that [Hartford's] financial
interests and bias caused the termination of his benefits." *Id.*
at 1097.  Nevertheless, the district court found that sufficient
evidence in the record supported the conclusion that Hartford's
bias infiltrated the entire administrative decision making
process. *Id.*  Furthermore, the *Kurth* court found that plaintiff
proffered evidence demonstrating that Hartford's claims
personnel were not completely walled off from those involved in
its financial operations. *Id.*

        *Kurth* is distinguishable from this case.  Unlike in
*Kurth*, the evidentiary record here lacks sufficient evidence to
establish that Hartford's financial bias tainted its decision
making process.  In fact, the evidentiary record demonstrates
that Hartford employed the services of RRS to ensure a
comprehensive review of plaintiff's varied medical conditions.
Plaintiff presents no evidence that either Hartford or RRS had
any ability to influence or control the opinions of Drs. Green
or Nudell, both of whom issued independent peer review reports
based on the medical records in plaintiff's claims file. *See*
*Mugan*, 765 F. Supp. 2d at 373 ("[W]e reject [plaintiff's]
remaining argument that the reviewing doctors were not
independent and therefore Hartford's conflict is entitled to

greater weight.  There is no evidence that either of the medical consultants or [the peer review vendor] itself lacked independence.").  Moreover, unlike the plaintiff in *Kurth*, plaintiff in this case has proffered no admissible evidence demonstrating that Hartford failed to implement procedural safeguards to minimize and eliminate any potential bias created by its purported financial conflict of interest with RRS, Dr. Green, or Dr. Nudell.  Thus, the district court's holding in *Kurth* provides little persuasive guidance where, as here, the plan administrator has conducted a full and fair review and has minimized the potential risk of bias or inaccuracy by walling off claims administrators from those interested in firm finances.

In addition, *Kurth* is inconsistent with case law in the Second Circuit.  For example, in *Hobson*, the Second Circuit held that a plan administrator does "not abuse its discretion by considering . . . trained physicians' opinions solely because they were selected, and presumably compensated," by the plan administrator. 574 F.3d at 90.  As such, unlike the district court in *Kurth*, this court "cannot conclude that the medical consultants harbored bias simply because they were compensated by Hartford for their work in connection with this review *and past reviews*." *Mugan*, 765 F. Supp. 2d at 373 (emphasis added).  Moreover, in *Young*, the district court rejected the plaintiff's

contention that an independent physician consultant, who worked for a medical review agency that Hartford hired on numerous occasions, was biased because he had an "incentive to save a repeat customer money." 2011 WL 4430859, at *10.  In rejecting this argument, the *Young* court held that "there mere fact that a professional was compensated for his or her services does not compromise their neutrality." *Id.*  *Young* therefore rejects the assumption in *Kurth* that a longstanding financial relationship "creates an incentive for the vendors to reach results that are favorable to [the plan administrator] in order to foster and sustain their business relationship." *Kurth*, 845 F. Supp. 2d at 1096.  The court therefore finds *Kurth* unpersuasive.

For substantially similar reasons, the court also rejects plaintiff's related assertion that Dr. Nudell and Dr. Green are "notorious insurance defense supporters whose history of supporting disability claim terminations is well known." (Pl. Mem. at 45.)  The evidentiary record lacks any support for plaintiff's bald assertion that Dr. Nudell and Dr. Green lacked independence from Hartford in this case or failed to exercise objective judgment in evaluating plaintiff's claim simply because they were compensated by Hartford or because they have conducted peer review reports favorable to other defendants in the past.  Notably, both doctors attested to the fact that

"completion of [plaintiff's] review [did] not constitute a conflict of interest." (*See* AR 1122, 1128.)

Furthermore, an independent review of the Administrative Record confirms that Dr. Green and Dr. Nudell exercised their independent and objective medical judgment in developing their opinions on plaintiff's functional capacity. That Dr. Green and Dr. Nudell were paid for their services does not render their opinions biased in favor of Hartford. *Mugan*, 765 F. Supp. 2d at 373; *see also Suren*, 2008 WL 4104461, at *11 ("That [the independent physician consultants] were paid . . . does not disable [the plan administrator] from considering their opinions in making benefits decisions.").

Nor is the court persuaded by plaintiff's attempts to impugn the validity of Ms. Staz's initial recommendation to terminate plaintiff's LTD benefits in 2008. (Pl. Mem. at 43.) Specifically, plaintiff maintains that Ms. Staz and Hartford terminated plaintiff's benefits in July 2008 against the opinions of Hartford Nurse Fanita Wilson, Hartford Nurse Amanda Ferrill, and Hartford Claims Examiner Jamie Lindvall. (*Id.*) Plaintiff is incorrect.  In 2004, Nurse Wilson observed that "[w]eight loss could be an essential part of [plaintiff's] treatment program to get better." (AR 915.)  In June 2006, Nurse Ferrill issued an opinion finding plaintiff disabled, documenting plaintiff's medical conditions, and ultimately

concluding that "without significant weight loss [plaintiff's]
health will not improve." (AR 952-54.)  Claims Examiner Lindvall
likewise issued a 2006 opinion finding plaintiff disabled and
concluding that plaintiff's "condition [was] unlikely to improve
. . . unless [he] experiences significant weight loss." (AR
955.)  Hartford's determination to terminate plaintiff's
benefits in 2008, after plaintiff experienced weight loss from
his gastric banding surgery in November 2007, is consistent with
the opinions of Wilson, Ferrill, and Lindvall.  Indeed, on May
13, 2008, plaintiff informed Hartford that he had lost 39 pounds
since his gastric banding surgery.[36] (AR 1887-88.)  Plaintiff is
thus incorrect that Hartford's termination of benefits
contradicted the opinions of Wilson, Ferrill, and Lindvall.

          Plaintiff is also incorrect that Ms. Staz's
correspondence soliciting the opinions of plaintiff's treating
physicians regarding his functional capacity was "designed to
secure artificial evidence to justify termination of benefits."
(Pl. Mem. at 43.)  The Administrative Record disproves
plaintiff's baseless assertion.  The letters to Drs. Boglia,
Brathwaite, and Schiller provided each physician with the
opportunity to explain why plaintiff could not perform sedentary
or light work due to his medical conditions. (AR 147-49.)  Thus,
the correspondence with plaintiff's treating physicians was not

---

[36] In addition, by April 2009, plaintiff had lost approximately
eighty pounds due to his gastric banding surgery. (AR 1609.)

calculated to obtain any specific response but was instead a legitimate effort to determine the status of plaintiff's medical condition.

Finally, plaintiff mistakenly argues that other courts have recognized that Hartford has a history of biased claims administration. (Pl. Mem. at 47; Pl. Reply at 14-15.)  To that end, plaintiff cites to two out-of-circuit district court cases, neither of which supports his specious assertion. (*See* Pl. Mem. at 45; Pl. Reply at 14-15.)  In *Hoch v. Hartford Life & Accident Ins. Co.*, the district court recognized that "Hartford does have a history *of at least one instance* of biased claims administration." No. 08-CV-4805, 2009 WL 1162823, at *12 (E.D. Pa. Apr. 29, 2009) (emphasis added) (citing *Post v. Hartford Ins. Co*, No. 04-CV-3230, 2008 U.S. Dist. LEXIS 76916 (E.D. Pa. Oct. 2, 2008)).  Notably, however, the district court in *Hoch* acknowledged that "[o]ther than our decision in *Post* . . . Hoch has not presented any other instances of biased claims administration on the part of Hartford." *Id.*  In *Holler v. Hartford Life & Accident Ins. Co.*, the district court initially stated that Hartford "has a clear history 'of biased claims administration.'" 737 F. Supp. 2d 883, 905 (S.D. Ohio 2010).  The district court, however, later clarified its statement and noted that "there is a clear history of biased claims administration *in the instant case*.  It is clear from the

167

language of the opinion that the Court was not referring to [Hartford's] claims administration processes in general — a conclusion that this Court would have no basis to make." *Id.* (emphasis added).  Thus, neither *Hoch* nor *Holler* stands for the proposition that Hartford has a generalized history of biased claims administration.  Plaintiff's insinuation that those cases support that broad proposition borders on the deceptive.

Accordingly, the evidentiary record does not support a finding that Hartford was influenced by a conflict of interest or that Hartford acted in an arbitrary or capricious manner in terminating plaintiff's LTD benefits.

## CONCLUSION

Upon independent review of the record and for the reasons set forth above, the court finds that Hartford's decision to terminate plaintiff's LTD benefits survives scrutiny under either arbitrary and capricious or *de novo* review. Accordingly, Hartford's motion for summary judgment is granted, plaintiff's cross-motion for summary judgment is denied, and plaintiff's Complaint is dismissed.

**SO ORDERED.**

**Dated**:    May 16, 2013
          Brooklyn, New York


                    _____/s/_____
                    KIYO A. MATSUMOTO
                    United States District Judge